Abby Jane Moscatel
CA Bar No. 276207
LAW OFFICE OF ABBY MOSCATEL
99 S Almaden Blvd Suite 600
San Jose CA 95113
Tel: (406) 318.7223
amoscatel@blacktailllaw.com

Michael Thad Allen
*pro hac vice* admission pending
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

United States District Court for the District of

Northern California -SAN JOSE DIVISION

|  |  |
|---|---|
| TABIA LEE,<br><br>Plaintiff,<br><br>vs.<br><br>THE FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, DE ANZA COMMUNITY COLLEGE, LLOYD A. HOLMES, in his official and individual capacity; PATRICK J. AHRENS, LAURA CASAS, PEARL CHENG, PETER LANDSBERGER, GILBERT WONG in their official capacity; AND ALICIA CORTEZ, THOMAS RAY, CHRISTINA ESPINOSA-PIEB, AND LYDIA HEARN in their individual and official capacity,<br><br>Defendants. | Case No.: 5:23-CV-03418-SVK<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dr. Tabia Lee, who is Black, stood up for free speech, academic freedom, humanism, and equal treatment for all students and faculty, regardless of race as faculty member of De Anza Community College ("De Anza") within Defendant Foothill-De Anza Community College District ("District"). She was accused of "Whitesplaining" and not being the "right kind of Black person."

Dr. Lee refused to knuckle under to campus orthodoxy concerning purely performative "land acknowledgments," to the intentional misspelling of foreign words such as "Latinos" as "Latinx" (which no one uses other than campus bureaucrats and self-proclaimed "social justice" advocates), to the segregation of students and faculty into so-called "affinity groups," and to other race-based pieties enforced by the Defendant Foothill – De Anza Community College District ("District") and De Anza Community College ("De Anza").

Dr. Lee also objected to racial stereotypes peddled by Defendants that targeted both White and Black Americans, bizarrely celebrating Blacks as incapable of objectivity, individualism, efficiency, progress, and other grossly demeaning stereotypes, while condemning Whites for promoting these same values, which Defendant's label "colonialism" and "White supremacy."

Defendants, as state actors, then retaliated against Dr. Lee and censored her free speech in violation of the First and Fourteenth Amendment to the United States Constitution and Article 1, § 2(a) of the California State Constitution Bill of Rights.  Dr. Tabia Lee therefore brings suit under 42 USC § 1983 to vindicate her rights and analogous state-law claims. She also brings claims under Title VI of the Civil Rights Act of 1964, 42 USC 2000d, et seq. and under California's common law for her wrongfully termination.

## I. JURISDICTION

1.      This action arises under the laws of the U him nited States, under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 USC §§ 1983 and 1988.

2.      This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 USC § 1343; the requested declaratory relief pursuant to 28 USC § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

3.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 USC § 1367(a).

## II. VENUE

4.      Venue is proper in this District pursuant to 28 USC § 1391(b) because Defendants reside in this District and the acts described in this Complaint occurred in this District.

## III. DIVISIONAL ASSIGNMENT

5.      San Jose is the proper division of Court pursuant to Civil L.E. 3-2(c) because De Anza Community College is located in Cupertino, California. Cupertino is part of Santa Clara County. Santa Clara County cases are assigned to San Jose District pursuant to N.D. Cal. Civ. L.R. 3-2.

## IV. PARTIES

6.      Plaintiff Dr. Tabia Lee was, until the date of her termination, a full-time tenure-track faculty, Faculty Director for the Office of Equity, Social Justice, and Multicultural Education at De Anza Community College in Cupertino, California. Dr. Lee resides in Sacramento, California.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 3 | CASE NO. 5:23-CV-03418-SVK

7.      The Foothill-De Anza Community College District ("District") is a public entity that operates a system of public community colleges, including De Anza Community College, and its principal place of business is 12345 El Monte Road, Los Altos Hills, California 94022. The Foothill-De Anza Community College District receives federal funding.

8.      De Anza Community College ("De Anza") is a public institution of post-secondary education with principal place of business at 21250 Stevens Creek Blvd, Cupertino, California 95014. De Anza receives federal funding.

**A.  Individual Defendants**

9.      The following Defendants are sued in their official and individual capacities:

10.      Lloyd A. Holmes is and was at all relevant times President of De Anza Community College and resides within the jurisdiction of the Northern District of California. Holmes was the ultimate supervisor of all faculty and staff of De Anza. Holmes is being sued in both his individual and official capacity.

11.      Alicia Cortez is and was at all relevant times Dean of Equity and Engagement at De Anza. In this role she was Plaintiff Dr. Lee's direct supervisor. Cortez is a member of the De Anza Latinx [sic.] Association and was the de facto chair of Plaintiff's Phase I and Phase II Tenure Review Committee. Cortez resides within the jurisdiction of the Northern District of California. Cortez is being sued in both her individual and official capacity.

12.      Christina G. Espinosa-Pieb was Vice President of Instruction for De Anza and a member and "elder" of the segregated De Anza Latinx [sic.] Association, retiring April 28, 2023. Espinosa-Pieb resides within the jurisdiction of the Northern District of California. Espinosa-Pieb is being sued in both her individual and official capacity.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 4 | CASE NO. 5:23-CV-03418-SVK

13.     Thomas Ray is Interim Associate Vice President of Instruction and participated in Plaintiff's Phase I and Phase II Tenure Review Committee. Ray resides within the jurisdiction of the Northern District of California. Ray is being sued in both his individual and official capacity.

14.     Lydia Hearn was formerly Interim Associate Vice President of Instruction and participated in Plaintiff's Phase I Tenure Review Committee. Hearn is a member of the segregated De Anza Asian Pacific American Staff Association. Hearn resides within the jurisdiction of the Northern District of California. Hearn is being sued in both her individual and official capacity.

**B.  Trustee Defendants**

15.     The following Defendants are members of the District Board of Trustees ("Board"). The Board has ultimate supervisory authority over the District and De Anza and has ultimate responsibility to ensure that De Anza and the District follow their own rules and policies and that all faculty, staff, and employees of De Anza and the District are properly supervised.

16.     Patrick J. Ahrens is the president of the District Board of Trustees and resides within the jurisdiction of the Northern District of California. Ahrens is sued in his official capacity as state actor.

17.     Laura Casas is Vice President at Large of the District Board of Trustees and resides within the jurisdiction of the Northern District of California. Casas is sued in her official capacity as state actor.

18.     Pearl Cheng is a trustee of the District Board of Trustees and resides within the jurisdiction of the Northern District of California. Cheng is sued in her official capacity as state actor.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 5 | CASE NO. 5:23-CV-03418-SVK

19. Peter Landsberger is a trustee at large of the District Board of Trustees and resides within the jurisdiction of the Northern District of California. Landsberger is sued in his official capacity as state actor.

20. Gilbert Wong is a trustee at large of the District Board of Trustees and resides within the jurisdiction of the Northern District of California. Wong is sued in his official capacity as state actor.

## V. FACTUAL BACKGROUND

### A. Tabia Lee

21. Plaintiff Tabia Lee is an educational sociologist and native to California. She happens to be Black, but first and foremost, Dr. Lee is a teacher dedicated to humanism and civil rights. She teaches that people should not be judged by the color of their skin but by the content of their character. De Anza is hostile to this concept.

22. Dr. Lee espouses the idea, abhorrent in the District, that people, especially teachers, must treat people like human beings, not political abstractions reduced to unchangeable attributes ascribed by characteristics of race and gender beloved by De Anza's race and gender ideologues.

23. In 1999, Dr. Lee received a Bachelor of Arts in sociology from the University of California, Davis. By 2004, she achieved a Masters in Education, and in 2009, she earned her Doctor of Education from the University of California, Irvine and California State University, Los Angeles.

24. Before that, from 1999-2009, Dr. Lee worked as a National Board Certified Teacher in the Los Angeles Unified School District. Dr. Lee taught middle school, in which she established a widely praised civic education program. The Los Angeles Unified School District

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 6 | CASE NO. 5:23-CV-03418-SVK

Board of Education praised Dr. Lee's civic education program for its positive impact on the lives of students and community members. Dr. Lee also facilitated mock elections and community awareness panels, served as faculty mentor for student-led voter registration drives, and participated in other programs. For her fellow teachers, Dr. Lee provided school-wide training to promote culturally inclusive programs for gifted and mainstream education and facilitated the adoption of new technologies for pedagogy. She became chair of her school's Social Studies Department.

25.    From 2009 to the present Dr. Lee has served as an education technology consultant providing training and advisement to K-12 expert teacher trainers, teachers, schools, and districts to build capacity around technological integration and transformation, pedagogy, curriculum, and evaluation. Dr. Lee also presented expert lectures, workshops, and invited presentations at state, local, national, and international educational conferences on these topics.

26.    From 2013-2015 Dr. Lee served as a Part-Time Online Instructor/Capstone Course developer in the online Masters program in Teaching English to Speakers of Other Languages ("TESOL") for the University of San Francisco, serving teaching professionals, including administrators, current instructors, and teacher candidates.

27.    From 2017-2020, Dr. Lee worked as an instructional designer for undergraduate programs and Part-Time Senior Lecturer for an online Masters degree program in Teaching English to Speakers of Other Languages ("TESOL") for Notre Dame de Namur University. Dr. Lee taught courses to graduate student teacher candidates, administrators, and current instructors. She provided individual and departmental coaching, resources, and supports for faculty including development of an integrated course design certification program to assist faculty with designing or updating their courses for more humanistic and holistic student learning outcomes.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 7 | CASE NO. 5:23-CV-03418-SVK

28.     In 2020, Dr. Lee joined the faculty of the College of San Mateo as a temporary tenure-track Faculty Instructional Designer providing campus-wide leadership and faculty support for holistic instructional design including serving as a faculty leader for multiple advisory committees, conducting individual and departmental consultations and collaborations, peer mentorship, and developing course enhancement and course evaluation and redesign tools and resources for faculty.

29.     Among her many other endeavors, Dr. Lee is a founding member, author, and member of the Board of Directors of Free Black Thought ("FBT"). FBT[1] is an online journal and community of heterodox scholars and public intellectuals dedicated to the rich diversity of thought among and about Black Americans. Authors of *Free Black Thought* strive for an accurate analysis of and observations about Black lives beyond the relatively narrow spectrum of views promoted by mainstream outlets purporting to define "the Black perspective." FBT promotes itself as frequently non-conforming, often provocative, and sometimes contrarian.

30.     FBT is reviled for that very reason. Those who publish in FBT are sometimes accused, as Defendants accuse Tabia Lee at De Anza, of not being the "right" sort of Black voices, of being "Oreos," "whitesplaining," perpetuating "white supremacy" (by somehow publishing Black authors), and other racist stereotypes and tropes.

**B.  Dr. Lee is Hired as a Full-Time Tenure-Track Faculty at De Anza**

31.     In August 2021, Dr. Lee joined the full-time tenure-track faculty of De Anza as Faculty Director for the Office of Equity, Social Justice, and Multicultural Education and

---

[1] See https://freeblackthought.com/about.
AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 8 | CASE NO. 5:23-CV-03418-SVK

Chairperson of the Department of Equity, Social Justice, and Multicultural Education. (See https://www.deanza.edu/gov/academicsenate/department-chairs.html).

32.     Dr. Lee's primary duties include facilitating an "institution-wide transformation" and promoting "inclusion." Ironically, Dr. Lee faced discrimination and censorship for attempting to do the job she was hired to do.

33.     According to her job description, Dr. Lee's primary responsibility as Faculty Director was "facilitating an institution-wide transformation that realizes and promotes our commitment to equity, social justice, and multicultural education for students, classified professionals, faculty and administrators ... The position is responsible for supporting the college's equity plan by working collaboratively with and mentoring teaching and non-teaching faculty and classified professionals in culturally responsive and transformative curriculum and pedagogy, promoting culturally responsive services, and for promoting an inclusive campus environment."

34.     At De Anza, however, Equity and Engagement does not mean fostering the inclusivity of differing viewpoints on matters of public concern.

35.     Among other things, Dr. Lee was responsible for making "report-outs" to the Academic Senate, meaning speaking publicly to the full faculty on matters of public concern that implicate her office and its work.

36.     Dr. Lee was responsible for designing instructional workshops and programs for teachers and all members of the learning community including administrators, classified professionals, students, and the community-at-large, developing workshops and seminars for faculty programs within and outside the District, in addition to other duties.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 9 | CASE NO. 5:23-CV-03418-SVK

37.     Dr. Lee also publishes scholarship, speaks at conferences, and appears in the media, where she speaks on matters of public concern.

38.     De Anza has unlawfully censored and discriminated against Dr. Lee for doing her job and has censored her public, protected speech. De Anza has already erased Tabia Lee from its website promoting the Office of Equity, Social Justice and Multicultural Education.

39.     Defendants informed Dr. Lee that she would be terminated in June 2023 because of her viewpoints and protected public speech and because of De Anza and the District's ideological opposition to Dr. Lee's humanism in the classroom.

## C. De Anza's Ideological Intolerance

40.     When Dr. Lee assumed her position as a full-time, tenure track faculty member in August of 2021, she was excited and optimistic about the prospect of bringing her experience and expertise to De Anza College's learning community.

41.     However, shortly after Dr. Lee's arrival, it became clear that the Department of Equity and Engagement was committed to suppressing academic freedom, to censoring free speech, and to discrimination on the basis of race. In particular, these illegal and illiberal policies were promoted by Dean Cortez through the Office of Equity, Social Justice, and Multicultural Education and other offices.

42.     Defendant Cortez was Dr. Lee's direct supervisor as Dean of Equity and Engagement.

43.     Before Dr. Lee could even complete employee onboarding, Dean Cortez emailed Dr. Lee to attend a "Decentering Whiteness" webinar. This was repugnant to Dr. Lee because it singled out a specific group on the basis of race. Obviously, De Anza would be up in arms if Dean Cortez or others promoted racist events targeted at "decentering" or "marginalizing" Black

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 10 | CASE NO. 5:23-CV-03418-SVK

students and faculty, but somehow illegally targeting White people on the basis of race counts as "progressive" at De Anza.

44.     Dr. Lee recognizes that even obnoxious ideas may form part of diverse discussions of ideas at any college. Thus, Dr. Lee (incorrectly) assumed that this racist message represented only one of the many diverse perspectives that could be explored at De Anza College. Dr. Lee registered to attend two of the workshops.

45.     Unfortunately, Dr. Lee soon learned that this event did not represent one of many perspectives at De Anza; it represented the orthodoxy enforced by Defendants. Deviation from this orthodoxy, which identifies "Whiteness," "White supremacy," and "White colonialism" as the root of all ills, is met at De Anza with severe retaliation.

46.     In addition to Defendant Alicia Cortez (as Dean) and Dr. Lee (as Director), the other staff involved in the De Anza's Office of Equity, Social Justice, and Multicultural Education are Adriana Garcia and Tony Santa Ana. Even these lower-level staff members exemplify De Anza's inflexible and illiberal approach to ideologically driven, race-based teaching.

47.     Santa Ana served as program coordinator of the Office of Equity, Social Justice, and Multicultural Education before resigning from his role with the Office of Equity in August 2022. Since January 2023 he has been listed as an adjunct instructor in the Ethnic Studies Department at De Anza College. Santa Ana was the first student to receive a scholarship at the inaugural De Anza's segregated Asian Pacific American Staff Association luncheon and remains an active member of the organization. He is a self-proclaimed "community organizer" and "artivist [sic.]."  His "artivism" is generally directed toward faculty and staff of De Anza when their viewpoints conflict with what he considers to be correct viewpoints. He holds himself out

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 11 | CASE NO. 5:23-CV-03418-SVK

as an "educator and globe trotter that seeks to contribute to humanity and also an instructor in Intercultural Studies."

48.     Garcia is an administrative assistant in the Office of Equity, Social Justice, and Multicultural Education and an avid member of the De Anza's segregated Latinx [sic.] Association. To Ms. Garcia, this is an overtly ideological job. She holds herself out as not just keeping the administrative affairs of the office in good order but advocating for "immigrant rights campaigns and womyn [sic.] wellness through a human rights and social justice lens" (whatever that means) and "international solidarity with local people's movements such as police brutality, gender equity, racial justice and environmental justice, especially when it involves art for the people."

49.     The same day Dean Cortez suggested Dr. Lee attend the "Decentering Whiteness" webinar, Mr. Santa Ana emailed Dr. Lee to inform her and others in the campus community that the Office of Equity, Social Justice, and Multicultural Education would provide free copies of a book by Black Lives Matter founder Alicia Garza, *The Purpose of Power: How We Come Together When We Fall Apart*.

50.     Again, Dr. Lee did not object to the clearly ideological content of Garza's book because Dr. Lee (again, incorrectly) assumed that this was only one of many different perspectives on the topic or race that could be discussed critically at De Anza.

51.     On October 8, 2021, Dr. Lee was further surprised to be assigned to serve as moderator of an event with Garza about *The Purpose of Power* and the Black Lives Matter movement. Because Dr. Lee is Black, it did not occur to any of Dr. Lee's colleagues or to any of Defendants Dr. Lee was capable of forming her own personal opinion or any criticism of Garza. At De Anza, Black women are expected to think the same (or to shut up).

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 12 | CASE NO. 5:23-CV-03418-SVK

52.     As moderator, however, Dr. Lee committed an ideological indiscretion. Dean Cortez informed Dr. Lee that Garza could not be asked unscripted questions. Students wished to pose questions to Garza, their hero as a prominent Black Lives Matter movement organizer. Instead of suppressing the students' free speech and free inquiry, Dr. Lee encouraged the students to put forward their questions as "follow-up questions."

53.     This prompted Garza, although the questions were positive soft-ball questions, to turn off her video conference camera. Later, Cynthia Kaufman claimed this was an example in which Dr. Lee did nothing more than put student questions to Garza, of Dr. Lee "criticizing" Garza and undermining Black Lives Matter.

54.     Posing questions to a Black woman in an open forum is not allowed at De Anza—at least if a Black woman openly espouses the Black Lives Matter movement. However, it became clear that it is permissible and encouraged to criticize a Black woman, such as Dr. Lee, for any inkling, however hallucinatory, that the authority of the Black Lives Matter leadership could be questioned by De Anza students.

55.     Dean Cortez and others criticized Dr. Lee for her lamentable failure to discourage free and open discussion with Alicia Garza.

56.     De Anza's intolerance was demonstrated again about a month later (on or around November 1, 2021). Bizarrely, in the "social justice" ideology the District has imposed, the efficient organization of meetings, punctuality, objectivity, and the like are condemned as "white supremacy." Thus, when Dr. Lee chaired a team meeting which included Santa Ana and attempted to set a meeting agenda and identify ways to collaborate, Santa Ana objected on the grounds of hostile race-based stereotypes.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 13 | CASE NO. 5:23-CV-03418-SVK

57.    Santa Ana accused Dr. Lee of "White speak," being "transactional," and "Whitesplaining."  Apparently, to Mr. Santa Ana and De Anza College, simply articulating a different perspective was enough to revoke Dr. Lee's "Black card" and somehow transform the words of an educated Black woman into "White speak."

58.    Whereas real White supremacists of the 19th century condemned people of color for being supposedly genetically incapable of punctuality, efficient work, facility with the written word, and "perfectionism"; in the District and at De Anza, these racist stereotypes have now been turned upside down. De Anza now celebrates these racist stereotypes as somehow indicating the *superiority* of people of color. The consequence is that any Black person, such as Dr. Lee, who believes in hard work, individualism, efficiency, doing well at mathematics, writing well, and many other attributes, is considered some sort of race traitor. This is what Santa Ana conveyed to Dr. Lee in the November meeting.

59.    This racial stereotyping was further exemplified by indoctrination sponsored by De Anza on June 7, 2022, promoted by Dean Cortez, and actively participated in by Dean Cortez and administrative assistant Adriana Garcia. De Anza sponsored a presentation by University of California Davis administrator Laura Bohorquez Garcia, a mid-level staff member at UC Davis' with no more than a BA in "American Cultural Studies." Bohorquez Garcia's presentation was titled "White Supremacy Culture, Professionalism and the 'Good' Immigrant Narrative" and again promoted by Dean Cortez.

60.    Over 50 members of the campus learning community attended, including administrators, faculty, classified professionals, and students.

61.    Bohorquez Garcia circulated the following slide identifying so-called "CHARACTERISTICS OF WHITE SUPREMACY CULTURE" (all caps in original), in which

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 14 | CASE NO. 5:23-CV-03418-SVK

values such as "worship of the written word," "objectivity," "individualism," "perfectionism," and "progress" are vilified as vials of poison.





62.     The District also promoted the ideology that "WHITE SUPREMACY IS A PROJECT OF COLONIZATION" (emphasis in original), in which Whiteness supposedly "colonizes our minds, our bodies, our psyches, our spirits, or emotions … as well as the land and the water in the sky and air we breathe."

63.     Just as real white supremacists of a bygone era identified immigrants (of whatever sort) as inarticulate, lazy, incapable of progress, trapped by tribal, communal values, and objectively incompetent, so too, Defendants peddle the same stereotypes. Defendants simply substitute praise of all these demeaning, racist stereotypes for the condemnation expressed by the

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 16 | CASE NO. 5:23-CV-03418-SVK

racists of yesteryear. At the same time, Defendants condemn all the stereotypical "White" qualities that racists used to praise as evidence of "White" genetic superiority.

**D. Tabia Lee Expresses Viewpoints that the District Finds Intolerable**

64.     As early as October 2021, Dr. Lee began to encounter difficulty expressing even mainstream viewpoints in her teaching at De Anza.

65.     Dr. Lee discovered that De Anza purposefully maintains campus facilities to exclude students, faculty, and staff on the basis of race.

66.     On October 4, 2021, Dr. Lee chaired a team meeting with Garcia, Santa Ana, and Instructor of English, Francesca Caparas, a member of the segregated "affinity group," the Asian Pacific American Staff Association ("APASA"). Caparas also serves as Faculty Coordinator for the "Women, Gender, and Sexuality Center, also known as the Jean Miller Resource Room" ("WGSC" / "JMRC"). While Caparas was not on the staff of the Office of Equity, Social Justice, and Multicultural Education, the WGSC/JMRC's physical space on campus is in that office. Therefore, Caparas often attended these team meetings in the fall 2021 quarter.

67.     Caparas explained that "more than one administrator has told me that White people, faculty members, are not feeling welcome at the Center . . . so where is this complaint coming from?"

68.     Caparas added, "I am not trying to make this a space for White gays and lesbians. They have the whole campus already."

69.     Santa Ana, the Program Coordinator who had accused Dr. Lee of "Whitesplaining," readily agreed, chiming in, "Our whole center is for people of color. That is our safe space we have made."

70.     In the meeting, Dr. Lee expressed the view, to which De Anza and the District were openly hostile, that resources of a state community college should be available to all students, regardless of race, and to all students seeking a non-threatening and welcoming environment to discuss their sexuality—of whatever persuasion.

71.     Dr. Lee urged the team to look at the growing complaints with an open mind. She emphasized that the Office should be a space for all members of the learning community who seek refuge or solace, regardless of race.

72.     Caparas, Santa Ana, and Garcia then informed Dr. Lee that the physical Office of Equity, Social Justice, and Multicultural Education is for students, faculty and staff of color only, and that White people or others who do not fit that definition are not welcome in the Office of Equity or in the Jean Miller Resource Room (i.e., the Women, Gender, and Sexuality center).

73.     Caparas stated that "we," meaning the whole De Anza administration, "are intentionally decentering Whiteness here."  The Individual Defendants knew of and endorsed Caparas' creation of a center that excluded people on the basis of race and gender orientation.

74.     Garcia announced that "We built this space for our voices and our stories, not for White people's voices. and that "they," apparently meaning anyone who is White, "have the whole campus already. They are trying to Whitewash our space."

75.     This conversation revealed how, despite the disgraceful tradition of segregation in America, De Anza and the District still promote illegal segregation, which is suddenly in vogue among "anti-racists."

76.     This new-found celebration of segregation is similar to Defendants' endorsement of other 19th-century racist stereotypes and practices, such as stereotyping non-Whites as

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 18 | CASE NO. 5:23-CV-03418-SVK

somehow incapable of objectivity, individualism, etc. They must now be segregated as well in the name of "safe spaces."

77.     In mid-November 2021, Dr. Lee committed an additional ideological indiscretion when she began expressing concerns about De Anza's use of recently invented labels such as "Latinx" and "Filipinx" in student-facing communications. Dr. Lee expressed her belief that placing these terms in De Anza's Educational Master Plan would impose a toxic ideology that everyone at the college would have to work under and follow.

78.     Advocates of using "x" instead of the usual gendered declension of nouns in Spanish words adopted in English (i.e. "-os" for masculine plural, "-as" for feminine plural) believe that this somehow promotes a more "inclusive" environment, despite statistical evidence showing that Latinos overwhelmingly reject such terms.[2]  At De Anza, the intentional misspelling and bastardization of foreign words, once considered a hallmark of xenophobes and ignorant bigots, is now celebrated as somehow "anti-racist" and "gender-affirming."

79.     Upon information and belief, De Anza included all this newspeak as part of its Educational Master Plan and Strategic Planning documents for the first time in the college's history. All Defendants had direct knowledge of and endorsed these efforts.

80.     Dr. Lee outlined her objections to these terms in an email to De Anza's Office of Research, writing "Some folks have shared with me that literally, one day they were directed, 'We will now refer to Latino or Latina as Latinx' without explanation or rationale . . . As for me,

---

[2] According to statistical surveys by the Pew Research Center, just 3% of Latin Americans use the term "Latinx," and more than three quarters have not even heard of the word, which is alien to them.  20 percent of Latinos have heard of it, but affirmatively choose to reject the term.  See https://www.pewresearch.org/hispanic/2020/08/11/about-one-in-four-u-s-hispanics-have-heard-of-latinx-but-just-3-use-it/

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 19 | CASE NO. 5:23-CV-03418-SVK

I do not use those newly invented terms out of respect for the cultures and languages of the working-class communities where I have worked for decades and also because a reasonable rationale and origin has not been provided to justify their use."

81.     As Dr. Lee explained, these terms are, for all intents and purposes, unrecognized by actual Latin Americans or Filipinos, and imposing such terms on large swaths of historically underprivileged populations, in opposition to their own preferences, may be "cultural imperialism." Dr. Lee also encouraged the Office of Research to consider using the racial and ethnic category names provided by California agencies, which do not include the alien misspellings "Latinx" and "Filipinx."

82.     Yet De Anza imposes this and other arcane vocabulary, utterly incomprehensible to the vast majority of Californians. To most people, the substitution of "y" for "e" in the common spelling of "women" or forcing Spanish speakers to cancel the gender declination of Spanish nouns is simply misspelling. But at De Anza, Defendants invest misspelling with world-historical importance in the cause of "social justice."

83.     Dr. Lee's dissent from this kind of magical thinking quickly made her a target for De Anza's suppression of her protected speech.

84.     Another example of Dr. Lee's ideological indiscretion was her asking questions about the performative nature and accuracy of De Anza's "land acknowledgement," a sacred cow in the District.

85.     De Anza maintains the following "land acknowledgment," which all state employees of its Office of Equity are forced to adopt, and which students are encouraged to perform at the beginning of school-wide events and proceedings:

> Office of Equity staff members humbly work in unceded Ohlone territory, here in De Anza College also known as the South Bay and or Silicon Valley.  We live

among the original caretakers and stewards, The Muwekma Ohlone Tribe of the San Francisco Bay Area. We recognize De Anza College sits on the crux of Raymatush and Tamien tribal lands,. For more information about the Muwekma, please visit their website.

Our vision is to continue a beautiful legacy of ancestral wisdom and cultural keeping in relationship to the land with much love and respect. We understand we do this work with the contradiction that we are in occupied territory after the massacre and genocide of Ohlone peoples, with western definitions of political borders. Thus with more conviction, we are determined to educate ourselves, as staff, faculty, students and as community members to decolonize and deconstruct, to make room for ongoing unschooling, to learn cultural humility, giving life to social justice inside and outside the classroom centering first nation peoples and through relationship building. In this way, we stay true to an indigenous way of life, to the core value that involves "To All My Relations."

See https://www.De Anza.edu/equityoffice/land.html.[3]

86.     Dr. Lee objected, among other things, that De Anza's "land acknowledgment" is not even accurate; it gets the names of indigenous tribal nations wrong and does not do anything to incorporate practices recommended by the Tribal Nations Resource Center. Like fetishizing "x" in misspelling foreign words, it demonstrates contempt for the actual minority populations it claims to recognize.

87.     That does not matter at De Anza, however. No dissent is allowed; the point is to enforce a self-satisfied ideological orthodoxy. The "land acknowledgment" is yet another empty "anti-racism" gesture, another indulgence of 19th-century race-based stereotypes, so beloved by Defendants, in this case the stereotype of the "noble savage."

88.     On information and belief, no one in the District, certainly no Defendant, has ever "decolonized" the Bay Area by sacrificing their personal property or time to do actual work for

_____

[3] According to Cal State East Bay's, C.E. Smith Museum of Anthropology, Virtual Museum, De Anza's "land acknowledgement" does not even appear to be historically/anthropologically accurate.  See https://www.csueastbay.edu/museum/virtual-museum/native-california/5-gen/tribal.html.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 21 | CASE NO. 5:23-CV-03418-SVK

Native Americans. On information and belief, neither the District nor De Anza has ever given "back" property to supposed tribes who were "original caretakers and stewards" of the land which De Anza claims to have appropriated.

89.     De Anza prefers empty gestures and word gimmicks to ending discrimination on the basis of race. And the only significant action taken by Defendants has been to discriminate against and retaliate against Dr. Lee for her failure to conform to race-based stereotypes, for her insistence on speaking her mind on matters of public concern as a faculty member, for her opposition to unlawful and immoral discrimination, and, to paraphrase the 19th-century racist tropes which Defendants repeatedly resurrect, for her persistence in being an "uppity" Black woman.

**E. Dr. Tabia Lee Addresses De Anza's Discriminatory "Anti-Racism" before the Faculty Senate and Is Retaliated Against**

90.     As part of Dr. Lee's job responsibilities, she provides regular "report outs" to the De Anza Academic Senate.

91.     The Academic Senate includes all faculty members. The Academic Senate is an organization whose primary function is to make recommendations on academic and professional matters in the District.

92.     On November 29, 2021, Dr. Lee presented in front of the Academic Senate.

93.     The text of her presentation was included in her quarterly newsletter circulated by email on December 1, 2021 to faculty and members of the De Anza community.

94.     Dr. Lee's message was that "my approach is one of unity and inclusion of diverse faculty ideological perspectives and learning together that intentionally centers respect for academic freedom and diversity of thought."

95.     Without identifying a colleague by name, she also related the following:

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 22 | CASE NO. 5:23-CV-03418-SVK

Recently, one of my colleagues that I highly respect met with me. They explained that they work from an anti-racist perspective and that because I have recently been advocating for our state and local senates to remain ideologically neutral and/or at least more ideologically inclusive in their resolutions and actions, they felt that they could no longer advance the anti-racist work that they had worked hard to advance over many years. I was floored to hear this. I explained to my colleague that I was baffled by how they somehow connected two completely unrelated items to a reflection on their personal pedagogical practice and I also shared with them that this extrapolation concerns me deeply. How could my personal advocacy for faculty academic freedom lead them to such a conclusion? Thankfully, we worked together to unpacked it.

96.     Dr. Lee also expressed to the academic Senate:

**We have to all work together in this world and in our learning community for greater equity. In the scope of this Academic Senate body, for me working together means protecting Academic Freedom for all even those we may be in disagreement with.** When we inevitably disagree with one another, please understand for real that I am not the great Black hope for Equity, so please don't try to cast me as such. **I am just a person, a colleague, a human being. If you have not yet had a conversation with me, have a conversation with me. If you have not yet come to my workshops, come to them. At my workshops by design you may hear or be exposed to diverse ideas, controversies, different thoughts, and utterances. It's fun!**

(Emphasis in original.)

97.     Although the statements and viewpoints expressed by Dr. Lee can hardly be characterized as inflammatory, at De Anza any reference to academic freedom and free speech is abhorrent. Dr. Lee's plea for academic freedom and diversity of opinion on campus quickly caused an uproar, especially among faculty and administrators who consider themselves "social justice" activists.

98.     Defendant Lydia Hearn, from August 2021 the Interim Associate Vice President of Instruction at De Anza, is a teacher of English who has taught at De Anza for over 20 years, she is an active member of De Anza's segregated Asian Pacific American Staff Association "affinity group."  She has struggled to finish a Ph.D. dissertation for approximately an equal amount of time, which she is apparently incapable of completing.

99.     Defendant Hearn confronted Dr. Lee and informed her that by opposing the prevailing campus ideology on things like land acknowledgements, misspelling Spanish words, questioning the actions of any Black Lives Matter leader, and failing to kowtow to District orthodoxy, Dr. Lee was "burning bridges" and did not have "allies" on campus. Apparently, at De Anza, simply disagreeing is sufficient to become a target.

100.    Defendant Hearn also took umbrage at Dr. Lee's statements referencing the "a seemingly difficult conversation between her and a colleague, who was mentioned anonymously, regarding the varying approaches to their work," suggesting that doing so without that person's permission was disrespectful or unprofessional.

101.    It is important to note that, as even Defendant Hearn acknowledged, Dr. Lee kept this person's identity anonymous. Dr. Lee even referred to this person as "one of my colleagues that I highly respect…" However, Dr. Lee had dared to question this person's intolerance to alternative viewpoints and her illiberal "anti-racist" views. At De Anza this is not acceptable. To Defendant Hearn, the existence of any such critique was highly inflammatory and "disrespectful."

102.    In De Anza's view, it is somehow a fireable offense to expose the intolerance of De Anza faculty, even anonymously.

103.    Defendant Hearn expressed this criticism of Dr. Lee, indicating a clear hostility to her protected speech and dissent from the orthodox ideology of the District. The clear message was that Dr. Lee should shut up.

**F.  De Anza Discriminates Against Dr. Lee**

104.    Because of Dr. Lee's open expression of her ideas and exercise of her academic freedom, Defendants actively retaliated against, discriminated against, and censored Dr. Lee.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 24 | CASE NO. 5:23-CV-03418-SVK

105.     Because of Dr. Lee's opposition to De Anza's race-based discrimination, Dr. Lee was singled out and targeted by the De Anza community, with full knowledge and approval of all Defendants.

106.     For example, Political Science Instructor Nicky Yuen accused Dr. Lee of "getting in the way of anti-racist progress." Black women who think freely are not acceptable at De Anza, and Yuen told Dr. Lee point blank that he would not allow anyone to get "in the way" of "the progress we have made in anti-racism" at De Anza.

107.     By contrast, criticizing a Black woman of "White speak" and "Whitesplaining," as Santa Ana did has no consequences and does not "get in the way" of "anti-racist progress" at De Anza. When Dr. Lee complained to Dean Cortez of this hostile environment, Dean Cortez did nothing. Santa Ana essentially suggested that Dr. Lee was carrying water for white supremacy and cast Dr. Lee in racist stereotypes of the "Uncle Tom," which have historically been used to discredit free-thinking Black intellectuals who express the "wrong" opinions.

108.     Dean Cortez, at all relevant times, by this notification others, had direct knowledge that Dr. Lee was discriminated against on the basis of race, in particular for not being the proper kind of Black person, and not expressing proper "Black" thoughts.

109.     Despite repeated notification of this racially discriminatory behavior, Dean Cortez refused to take any action.

110.     Dean Cortez refused to protect Dr. Lee from attacks on her academic freedom.

111.     Worse, when Defendant Cortez received Dr. Lee's complaint about Santa Ana's racist comments toward her, Cortez agreed to Dr. Lee's request that she would attend team meetings in the future to ensure that a tone of civility was maintained and have Santa Ana apologize for these racist comments. This never happened. Dr. Lee also requested that team

communication and team building training support be provided to herself and the office staff. This never happened.

112.    Santa Ana never apologized.

113.    Dean Cortez instead took over Dr. Lee's meetings herself, in which she added to the cacophony of criticism of Dr. Lee when Dr. Lee expressed unorthodox ideas.

**G.  De Anza's Censorship of Dr. Lee**

114.    Dean Cortez and others engaged in an active campaign to censor Dr. Lee and prevent her from doing the job she was hired to do. Dr. Lee was targeted because this particular Black woman expressed the wrong opinions.

115.    On information and belief, Vice President of Instruction, Defendant Christina Espinosa-Pieb and Dean Cortez ordered the removal of Dr. Lee's events from De Anza's College Events Calendar.

116.    In October 2022, De Anza suddenly imposed on Dr. Lee the requirement that her presentations and pedagogical materials were not "official activities of the Office of Equity and Engagement" and "will not be promoted through official college channels."  This was despite De Anza appointed Dr. Lee to the position of Faculty Director for the Office of Equity, Social Justice, and Multicultural Education Director and Department Chair of the Office of Equity, Social Justice, and Multicultural Education Director.

117.    In November 2022, Defendant Thomas Ray, then Interim Associate Vice President of Instruction, directed the De Anza communications team to remove all promotion of Dr. Lee's fall workshops from the College Events Calendar."

118.    Dean Cortez, Thomas Ray, and Espinosa-Pieb delisted Dr. Lee's workshops and events as available for professional growth activity hours ("PGA" hours), which are continuing

professional education credits for faculty. Prior to Dean Cortez recommendation of termination to Dr. Lee's Phase I Tenure Review Committee, Dr. Lee's presentations were listed as approved for PGA hours.

119.    Although De Anza continued to hold out Dr. Lee as the Department Chair of the Office of Equity, Social Justice, and Multicultural Education,[4] Dean Cortez instructed Dr. Lee that she was not, in fact, department chair in an email of February 9, 2023. Dean Cortez thus prevented Dr. Lee from holding meetings with faculty "on Academic Senate topics related to curriculum updates and revisions, new curriculum, student learning outcomes assessments, instructional program review and other instructional and/or faculty matters."

120.    While Dr. Lee was held out as Faculty Director for the Office of Equity, Social Justice, and Multicultural Education, Dean Cortez and Thomas Ray reprimanded Lee for calling team meetings for Dr. Lee's office so that she was effectively silenced.   Dean Cortez and Ray directed Administrative Assistant and acting Program Coordinator Garcia not to attend meetings or work with Lee on office matters and to ignore Dr. Lee's email communications.

121.    Dean Cortez instituted never-before-heard-of procedures for approving Dr. Lee's workshops. On information and belief, the procedures imposed on Dr. Lee were not applied to other faculty or program directors at De Anza.

122.    Dr. Lee was not required to gain such "approval" and her events were held on campus without this obstruction before Dean Cortez began to advocate for Dr. Lee's termination.

---

[4] See https://www.De Anza.edu/gov/academicsenate/department-chairs.html.

123.     Administrative assistant and self-proclaimed "social justice" advocate Adriana Garcia repeatedly locked the Office of Equity, Social Justice, and Multicultural Education Webpage to prevent Dr. Lee from publishing content on topics of public concern, especially messages openly dissenting form campus orthodoxy. Nominally, Garcia worked under and for Dr. Lee, but Defendants permitted and approved Garcia's censorship of Dr. Lee in Dr. Lee's own office.

124.     Another of Dr. Lee's heresies was her posing questions about De Anza's decision to offer special electoral privileges to "affinity groups."  At De Anza and within the District, "affinity" is a euphemism for District sponsored, District supervised race segregation in organizations that are officially recognized by the school and given special race-based rights.

125.     In the spring of 2022, De Anza proposed and eventually implemented a policy of giving some minority faculty, whom De Anza segregated into "affinity groups," special voting rights in the Academic Senate.

126.     But Dr. Lee had the habit, tragically misguided in the eyes of her state employer, of taking her job description literally. Her faculty position called for her to "facilitate inclusive processes that empower **all constituent groups** to be part of institutional transformation" and to work with shared governance groups, including the Academic Senate, to perform these duties.

127.     Whenever Dr. Lee attempted to perform these duties to include all groups, however, defined by ascribed traits of gender, race, sex, or other categories, Dean Cortez attacked her and attacked any who refused to abandon Dr. Lee and her principles of universal civil and human rights.

128.     Dr. Lee suggested to the Academic Senate that if the District, as an arm of the state, was going to sponsor segregated organizations by race and was going to incorporate

members of segregated groups into privileged governance structures, then it should offer such "resources" to white faculty, staff, and students as well as numerous other racial and ethnic groups that are not presently reflected in the segregated "affinity groups" of De Anza.

129.    De Anza rejected the suggestion that races be treated equally. De Anza and the District prefer to grant privileges, including privileged voting rights, to faculty members and students on the basis of race and national origin and deny voting rights to others based on skin color.

130.    At around this time (December 6, 2022), the Chancellor of the District Judy Miner welcomed the incoming President of Foothill, Dr. Christina Whalen, with a letter. Chancellor Miner announced that Dr. Whalen "provided oversight to redesign the curriculum development process to . . . work toward decentering whiteness as the standard guiding policy and practice."  This announced the District's official policy to target one group, in this case White people, on the basis of race.

131.    Another aspect of Dr. Lee's protected speech that De Anza and the District has censored was her advocacy of the rights of Jewish students on campus, their equal participation in the public life of De Anza, and their equal access to the resources of De Anza.

132.    In 2022, Dr. Lee learned that professor of philosophy and Director of the Vasconcellos Institute for Democracy in Action, Cynthia Kaufman (former mentor to "artivist" Santa Ana and a member of Dr. Lee's Phase I Tenure Review Committee), participated in and organized the suppression of Jewish events on campus. Dr. Lee again reported this racist discrimination and intolerance for alternative viewpoints and racial diversity to Dean Cortez.

133.    No action was taken. Nothing was done and neither Dean Cortez nor De Anza investigated these issues.

134.    Defendants openly opposed the celebration of Jewish culture, remembrance, or heritage on campus. Defendants encouraged the shout down and cancelation of Jewish culture, remembrance, or heritage on campus.

135.    Dean Cortez , Garcia, and Santa Ana obstructed Dr. Lee from presenting workshops on the topic of Jewish culture, remembrance, and heritage. Dean Cortez refused to promote or list on the De Anza college calendar events Dr. Lee organized on Jewish Inclusion and Anti-Semitism Community Education.

136.    Garcia attended a workshop where Dr. Lee urged students to report instances of anti-Semitism on campus to the Office of Equity and Engagement, whereupon Garcia demanded, with Dean Cortez's support, that Dr. Lee remove Garcia's name, picture, title, and any reference from all slides at all workshops Dr. Lee facilitated going forward. "Equity" and "Engagement" at De Anza does not include Jews.

137.    Dr. Lee also raised with Dean Cortez her concern that De Anza should recognize International Holocaust Remembrance Day and Jewish-American Heritage Month in the same way that it recognized heritage months or similar celebrations for other historically oppressed ethnic communities. Dean Cortez advised her that this was not a priority or important work.

138.    On January 26, 2022, Hillel of Silicon Valley and the National Jewish Advocacy Center reported concerns to the De Anza's Equity Action Council "for the Jewish student community at De Anza College."  They suggested actions that the College take to address longstanding concerns of anti-Semitism.

139.    But at De Anza, "anti-racism" does not include opposition to anti-Semitism.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 30 | CASE NO. 5:23-CV-03418-SVK

140.     During the meeting, in the chat, Garcia posted resources about anti-Zionist and anti-Israel organizations to antagonize the representatives of Hillel and the National Jewish Advocacy Center.

141.     Dr. Lee objected later that this was disrespectful to the speakers. Dean Cortez, Garcia, and Santa Ana then ganged up on Dr. Lee. Garcia told Dr. Lee, in Dean Cortez's presence, that there was no reason to lift up "White oppressors" when De Anza's focus was on "decentering Whiteness" (whatever that means).

142.     De Anza rejected all recommendations from the Jewish advocacy groups. Dean Cortez also informed Dr. Lee that the Office of Equity and Engagement would not update the District's webpages to condemn anti-Semitism because it was "not important."

143.     Garcia, who edits the office's website, opined that statements on the website condemning anti-Asian hate and supporting Black Lives Matter were good enough.

144.     Dean Cortez, Garcia, and others excluded Dr. Lee from the Equity Action Council going forward, even as her job description stated that she was to serve as "Faculty Lead" for the Equity Action Council.

145.     Although Dr. Lee continued to be held out as Faculty Director/Chairperson of the Office of Equity, Social Justice, and Multicultural Education, Dean Cortez and Thomas Ray attempted to reprimand Dr. Lee for calling team meetings, which was part of her job. They directed the administrative assistant, Garcia, not to attend the meetings, collaborate on scheduling them, or collaborate with Dr. Lee. Garcia stopped responding to Dr. Lee's emails.

146.     This and Defendants many other actions against Dr. Lee would chill any faculty member of ordinary firmness from continuing to engage in protected speech.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 31 | CASE NO. 5:23-CV-03418-SVK

**H.  Dr. Lee Faces a June 13, 2022 "Struggle Session" before the Trustee Defendants**

147.    On June 13, 2022, the District dedicated a Board of Trustees meeting to condemning Dr. Lee by name because she voiced what De Anza and the Defendants considered the wrong kinds of opinions and thoughts.

148.    As Dean Cortez and Hearn made clear in November 2022, it is somehow a fireable offense for Dr. Lee to refer, even anonymously, to a "respected colleague" for their intolerance of free expression. Yet at the Foothill-De Anza Board of Trustees Board meeting of June 13, 2022, it was permissible to hold a struggle session to attack Dr. Lee, ***expressly by name***.

149.    De Anza College Academic Senate President Cheryl Balm led the condemnation of Dr. Lee.

150.    Faculty members Erick Aragon, Maristella Tapia, Jorge Morales, Noemi Teppang, Andrea Santa Cruz, and Linda Conroy claimed to speak on behalf of the following race-based (that is, segregated) "affinity groups": De Anza Latinx [sic.] Association ("DALA") and De Anza Asian Pacific American Staff Association ("APASA").  They submitted written statements and came forward to speak about their "harm," "harassment," or other subjective feelings that they claimed had been hurt because they disagreed with Dr. Lee's protected speech.

151.    In particular, they condemned Dr. Lee for criticizing De Anza policies that she found racist, they condemned Dr. Lee for advocating the removal of "third wave anti-racism" signifiers from De Anza's official statements, they condemned Dr. Lee for criticizing De Anza's race-based, segregated "affinity groups," they condemned Dr. Lee for criticizing the Black Lives Matter organization, they condemned Dr. Lee for not using what they characterized as "gender neutral" (but actually misspelled) foreign language words like "Latinx" and "Filipinx," and they

condemned Dr. Lee for hosting an event on March 2, 2022, titled "Protecting Freedom of Expression on Campus."

152.    The Board and these official organizations of De Anza created and condoned a hostile environment attacking Dr. Lee's free expression of ideas. Yet these would-be "social justice" activists condemned Dr. Lee because, they claimed, by encouraging critical thinking and expression of improper opinions, she supposedly created a "hostile environment" *for them*.

153.    In sum, before De Anza and the District decided to recommend her termination, Dr. Tabia Lee had publicly expressed the following dissenting viewpoints which are not permitted at De Anza College:

- Support for Israel and Jewish Heritage Month

- Opposition to the public shout-down (the "heckler's veto") of Jewish events

- Opposition to stripping the gender declension from Spanish words like "Latino"

- Promotion of multiple Heritage Months (e.g., Native American Heritage Month, Arab American Heritage Month, Jewish American Heritage Month, and Sikh Awareness and Appreciation Month) of incorrect and disapproved ethnic groups

- Promotion of free speech on campus

- Promotion of academic freedom on campus

- Questioning granting voting rights based on racial preference to some students and student groups while suppressing the vote of other racial groups

- Objection to De Anza's purely performative and historically dubious "land acknowledgment"

- Permitting students to question a leader from the Black Lives Matter organization

- Criticizing racial segregation, euphemistically called "affinity groups"

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 33 | CASE NO. 5:23-CV-03418-SVK

- Criticizing racial stereotypes of Black Americans and others as somehow incapable of objectivity, mastery of the written word, individualism, progress, and other attributes De Anza disparages as "white supremacy" and "colonialization"

- Criticizing De Anza's orthodoxy of "anti-racism" as the only way to approach diversity, equity, and inclusion

## I. De Anza's Terminates Dr. Lee

154.     The District's employment probation, tenure review, and promotion policy is set forth in the District Tenure Review Handbook 2019-2022: A Guide for Faculty and Administrators ("Handbook").

155.     Under Article 6A, the District sets forth its process for evaluating faculty who are hired to a probationary period pending promotion to tenured faculty. This policy applied to Dr. Lee.

156.     During the probationary period, there is a "rigorous process of evaluation during which a review of the candidate's performance is conducted and a recommendation is made to the Board of Trustees, which makes the final decision on whether to grant tenure to the candidate."

157.     Tenure review, in its entirety, is a four-year process divided into three phases.

158.     Phase I takes place in the fall and winter quarter of the first year of employment.

159.     Phase II follows in the spring quarter of the first year. It then continues in the fall and winter quarters of the second year of employment.

160.     Phase III begins in the spring quarter of the second year and ends in the winter quarter of the fourth year.

161.     Each of these years from Phase I through Phase III is considered a "Probationary Year."

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 34 | CASE NO. 5:23-CV-03418-SVK

162.    The President of De Anza appoints a Tenure Review Coordinator, with concurrence of the Faculty Association (union) and the De Anza Academic Senate. The Chair coordinates all tenure review activities.

163.    De Anza convenes a "Core Committee" to evaluate the probationary faculty member. The Core Committee is composed of the Division Dean (in this case Defendant Dean Cortez) and to tenured faculty member from within the division, at least one of whom, if possible, "shall be from the same department as the probationary faculty employee."

164.    In Phases I and II, the appropriate Vice President or his or her delegate and a third tenured faculty member from the at-large faculty outside the division join the Core Committee. These five members comprise the Tenure Review Committee.

165.    The two tenured faculty members in the Core Committee must be nominated by the appropriate division faculty and confirmed by the De Anza Academic Senate.

166.    The at-large faculty member who joins the Tenure Review Committee in Phase I and II is appointed by the Academic Senate.

167.    The Chair of the tenure review committee is elected by the Core Committee.

1)  Phase I of Dr. Lee's Tenure Review

168.    Dr. Lee's Phase I Tenure Review Committee was composed of the following De Anza employees:

Julie Wilson served as Chairperson and Core Committee member. Wilson teaches English and Language Arts at De Anza and, ironically, holds herself out as addressing "anti-Blackness embedded in our society." She received tenure at De Anza in 2020 but has never earned a Ph.D.

Cynthia Kaufman served as part of the Core Committee. Kaufman was also the former mentor and teacher of "artivist" Tony Santa Ana. Kaufman holds herself out as a "lifelong social change activist" (whatever that means) and serves as Director of the De Anza Vasconcellos Institute for Democracy in Action—where she projects messages vilifying people on the basis of race, namely that "White supremacy remains a core part of every aspect of our society."

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 35 | CASE NO. 5:23-CV-03418-SVK

<u>Doli Bambhania</u> served as at-large member of the Tenure Review Committee in at-large capacity. Bambhania is a mathematics instructor and member of the segregated APASA "affinity group."

<u>Dean Alicia Cortez</u> served as Division Dean and Dean of Equity and Engagement, and she is also member of the segregated "affinity group" DALA.

<u>Lydia Hearn</u> is a member of the segregated "affinity group" APASA, served as Interim Associate Vice President of Instruction, and she returned to the faculty after predicting that Dr. Lee would be unanimously recommended for termination in Phase I. Lydia Hearn has been referenced above and proved especially hostile to Dr. Lee's ideas and public expression.

<u>Thomas Ray</u> followed Hearn as Interim Associate Vice President of Instruction and Dean of Language Arts, and he took over when Lydia Hearn stepped down on or around January 31, 2022 – just days after the Phase I delivered (as predicted) a unanimous vote against Dr. Lee.

<u>Veronica Acevedo Avila</u> served briefly as a member of the Tenure Review Committee at the end of Phase I, replacing at-large member Doli Bambhania. She is Instructor of English and reading and member of the DALA "affinity group."

169.    Student and faculty evaluations of Dr. Lee's workshops and classes were positive and were submitted to the Tenure Review Committee. But these were not considered.

170.    During Phase I, *at least three* probationary evaluations must be performed, one by each of the Core Committee members. Additional probationary evaluations may be called for by the Tenure Review Committee, at the discretion of the committee.

171.    Dr. Lee received three positive evaluations and two negative evaluations.

172.    The Chair of the Tenure Review Committee, Wilson, informed Dr. Lee on October 24, 2021 and on other occasions, that Dean Cortez acted as de facto Chair of the committee and that Wilson, as a professor only recently granted tenure, had little authority. She told Dr. Lee that she acted more like Dean Cortez's secretary, and had to make sure paperwork was filed on time.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 36 | CASE NO. 5:23-CV-03418-SVK

173.    Each of the two negative evaluations in Phase I criticized Dr. Lee's impermissible viewpoints, in direct violation of De Anza's academic freedom policy and its rules of faculty ethics.

174.    The Handbook provides that academic freedom and free speech are protected at De Anza by policy and not just by the inherent protections granted by the United States and California Constitution:

### ACADEMIC FREEDOM

Academic freedom encompasses the freedom to study, teach and express ideas and viewpoints, including unpopular and controversial ones, without censorship, political restraint or retribution. Academic freedom allows for the free exchange of ideas in the conscientious pursuit of truth. This freedom exists in all service areas, including but not limited to teaching, librarianship, counseling, coordinating and all faculty-student interactions. Academic Freedom is the bedrock principle of all institutions of learning and must be extended to all faculty regardless of their status as full-time, part-time, or probationary.

Faculty members have the principal right and responsibility to determine the content, pedagogy, methods of instruction, the selection, planning and presentation of course materials, and the fair and equitable methods of assessment in their assignment in accordance with the approved curriculum and course outline and the educational mission of the District, and in accordance with state laws and regulations. These rights and responsibilities include, but are not limited to, the faculty member's choice of textbooks and other course materials, assignments and assessment methods, teaching practices, grading and evaluation of student work, and teaching methods and practices.

Special vigilance must be paid to the protection of the Academic Freedom Rights of probationary faculty undergoing the tenure process. While the tenure process is, at its core, an evaluative process, the evaluation of probationary faculty must never be used as a pretense for abridging or restricting the Academic Freedom rights of a tenure candidate. All members of a probationary faculty member's tenure review committee should bear in mind that differences between their own teaching methods and practices and beliefs and those of the tenure candidate should never be the basis for their evaluation of a probationary faculty member. These differences are protected by the tenure candidate's Academic Freedom. The evaluation of a probationary faculty member should be based solely on those criteria described in the negotiated faculty evaluation instruments and those listed in the advertised job description under which the tenure candidate was hired.

175.    The Handbook also sets forth standards for faculty ethics, including, Section 3, which imposes the obligation on De Anza and District personnel, including all Defendants, to respect the freedom of inquiry and to refrain from harassing their colleagues:

> As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

176.    Kaufman submitted the first negative evaluation of Phase I on November 4, 2021.

177.    There were only two areas for evaluation that Kaufman did not give Dr. Lee top marks: "Communicates information clearly, concisely, and effectively" and "Accepts criticism."

178.    Kaufman's criticism turned on Dr. Lee's insistence on expressing dissenting thoughts and ideas. Kaufman criticized Dr. Lee for "criticiz[ing] [Black Lives Matter founder Alicia] Garza publicly." She also criticized Dr. Lee for having "too many concepts and ideas," two of which were "quite controversial." In particular, Kaufman expressed that she felt that Dr. Lee criticized the prevailing orthodoxy of De Anza and the District as a "third wave anti-racist lens," borrowing from the Columbia linguist Professor John McWhorter, which "raised some concerns for" Kaufman. Kaufman worried that "anyone who considered themselves anti-racist would have felt unfairly criticized by this analysis."

179.    In the virtual workshop that Kaufman evaluated, Dr. Lee had also proposed to take a poll to see how much of De Anza's "equity" work fell into each of three "anti-racist" categories that Dr. Lee analyzed in the presentation. Kaufman found this effort to collect even a modicum of objective data especially troubling. "That poll was hard for me to take when I felt that my position had been mischaracterized." Kaufman imagined that being surveyed about

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 38 | CASE NO. 5:23-CV-03418-SVK

controversial views at De Anza was "uncomfortable to many in ways that were not conducive to intellectual growth and dialogue."

180.    Kaufman was also quite upset that Dr. Lee disagreed with the intentional misspelling of foreign words such as "Latinx" and "Filipinx," as well as Dr. Lee's characterization of these misspellings as "linguistic imperialism."  At De Anza, it is laudable to force faculty and students to take seminars on "White supremacy" as "colonialization."  Yet it is forbidden to criticize the bastardization of foreign languages spoken by historically marginalized groups as "linguistic imperialism."  Kaufman insisted Dr. Lee's critique "seemed counterproductive" because it confronted De Anza students "with something quite challenging . . ."  To Kaufman, challenging the students of De Anza was worthy not just of criticism, but of termination.

181.    At De Anza, it is not allowed to make a self-proclaimed "anti-racist" "feel" criticized. In fact, it is a fireable offense.

182.    Ironically, Kaufman's evaluation is otherwise overwhelmingly positive. In eleven out of thirteen performance categories, Kaufman assigned Dr. Lee the highest possible score of "satisfactory or better"; she praised Dr. Lee for "know[ing] how to lead projects [and] mentor students"; and she describes Dr. Lee as "a skilled and experienced leader."

183.    Even in the categories in which Kaufman criticized Dr. Lee for expressing critical viewpoints, Kaufman gave Dr. Lee the second highest possible score of "satisfactory but needs improvement in specific areas."

184.    Defendant Lydia Hearn submitted the second negative evaluation in the Phase I process on January 14, 2022.

AMENDED COMPLAINT DEMAND FOR JURY TRIAL - 39 | CASE NO. 5:23-CV-03418-SVK

185.     In eleven out of the fifteen performance categories she evaluated, Hearn assigned Dr. Lee the highest possible score "satisfactory or better."

186.     In the remaining four categories, Hearn assigned Dr. Lee the second highest rating of "satisfactory but needs improvement."

187.     At no point did Hearn assign a score of "Unsatisfactory" to Dr. Lee in any of the performance categories.

188.     Hearn graded Dr. Lee down to "satisfactory but needs improvement in specific areas" in the following four categories:

- Demonstrate cooperation and sensitivity and working with colleagues and staff;

- Develops instructional and institutional resources;

- Provides leadership and coordinates programs effectively; and

- Communicate information clearly, concisely, and effectively.

189.     However, these were pretextual categories to criticize Dr. Lee's protected speech and attack her academic freedom because Dr. Lee had dissented from the prevailing De Anza orthodoxy.

190.     Tenure review at De Anza, by express policy of the District, may not be an ideological litmus test. Yet Hearn's review of Dr. Lee's performance explicitly criticized Dr. Lee for voicing controversial viewpoints.

191.     Hearn criticized Dr. Lee for her speech on November 29, 2021 before the Academic Senate Executive Committee (quoted in part above). In that speech, Dr. Lee had defended academic freedom, diverse viewpoints, and free speech. This was somehow controversial at De Anza and in the District.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 40 | CASE NO. 5:23-CV-03418-SVK

192.     Hearn went on to work tirelessly for Dr. Lee's termination, invoking ever-more pretextual reasons for discriminating against Dr. Lee on the basis of her protected speech and also on the basis of race—because Dr. Lee is not the "right kind" of Black person.

193.     The District's Handbook requires the findings and recommendations of the Phase I tenure review process to be reviewed and committed to writing for presentation to the probationary faculty member, in this case to Dr. Lee.

194.     That meeting took place on November 19, 2021. Yet nothing was presented to Dr. Lee in writing. The Tenure Review Committee, led de facto by Dean Cortez, informed Dr. Lee that they wanted to "see more of her" in the winter quarter. The Tenure Review Committee did not specify any specific areas in which Dr. Lee needed to improve, nor did they describe specific recommendations for improvement.

195.     To summarize – of the twenty-eight scores assigned to Dr. Lee by her evaluators, Dr. Lee received a score of "Unsatisfactory" in only one. Furthermore, Dr. Lee received the highest possible rating for twenty-two of the twenty-eight scores.

196.     On January 18, 2022, Interim Associate Vice President of Instruction, Lydia Hearn, and one of the two "evaluators" who had criticized Dr. Lee for her protected speech and open advocacy of academic freedom, among other things, told Dr. Lee that the Tenure Review Committee would be unanimously recommending her from termination.

197.     And true enough, on January 25, 2022, Phase I concluded with a unanimous recommendation that Dr. Lee should be terminated, in particular due to her dissent from De Anza's race-based orthodoxy.

198.     Ordinarily this would have led to Dr. Lee being separated from the college. However, Defendant President Lloyd Holmes overrode the Tenure Review Committee's

censorship of Dr. Lee, and she continued into Phase II. Although President Holmes was supposed to notify Dr. Lee directly, he never did so. Dr. Lee found out she would be allowed to advance to Phase II only by consulting an on-line list of faculty candidates who were being advanced to Phase II.

### 2) Phase II of Dr. Lee's Tenure Review Continues to Single Her Out for Protected Speech

199.    On May 3, 2022, Dr. Lee was given her Phase II tenure review schedule. The members of the Phase II Tenure Review Committee were:

Richard Lopez, mathematics Instructor and Chairperson;

Luis Limcolioc, English full-time faculty; and self-proclaimed social justice advocate;

Salamander Breiter, the co-Chair of the Humanities at De Anza. Breiter earned a bachelor's degree from Fairhaven College in 1995 followed by a Masters degree from Western Washington University in 2000. Like so many of the faculty called upon to pass judgment on Dr. Lee, however, he never earned a PhD. And like so many faculty at De Anza, he conceives of his job less as an instructor of an academic discipline, but more as a social activist. He designs his classes "to build commitment to civic and moral responsibility for diverse, equitable, healthy and sustainable communities," expecting students "to recognize themselves as members of larger social fabrics and to develop the abilities and motivation to take informed action for change."

200.    In addition, Dean Alicia Cortez continued to exert influence over the process as did Thomas Ray, both of whom remained on the Tenure Review Committee for Phase II.

201.    In Phase II of the tenure and promotion process, each member of the Tenure Review Committee must perform at least one additional probationary evaluation.

202.    Breiter submitted an evaluation of Dr. Lee on November 7, 2022, as had Hearn and Kaufman (fellow self-proclaimed "social justice" advocates) in Phase I. Breiter found fault with Dr. Lee's November 29, 2021 speech to the Academic Senate which defended academic

freedom and free speech. Breiter declared Dr. Lee's mild language as "combative and edgy to me."

203.    Breiter also used abusive language and profanity in a one-on-one meetings with Dr. Lee. Mr. Breiter used profanities multiple times, using language like: "I just don't understand how all this shit happened"; "I may be doing this differently than others but fuck that; I have to be myself"; and "I don't give a damn..."

204.    He also objected to a strategic planning meeting via Zoom in the spring of 2022 in which Dr. Lee criticized De Anza's policy of intentionally misspelling foreign language words like "Latino" or "Filipino" with an "x" at the end. Mr. Breiter found that Dr. Lee "continued to push a particular perspective and sense of 'right' action beyond comfortable discourse." "Comfortable discourse" at De Anza means intentionally misspelling foreign-language words contrary to the almost universally accepted usage of these words by actual speakers of the foreign language.

205.    Mr. Breiter "sens[ed]" that Dr. Lee's "adherence to particular perspectives created some resistance and conflict during [her] first year at De Anza College."

206.    The Phase II Tenure Review Committee opted not to conduct any observations of Lee's teaching and faculty events in the Winter Quarter of 2023, despite Dr. Lee's best efforts to provide the committee with dates for observation of her work.

207.    On February 7, 2023 the "reconstituted" Phase II committee met with Dr. Lee. The Tenure Review Committee concluded Phase II and issued a report, once again unanimously recommending Dr. Lee for termination.

208.    The report issued by the committee made clear that Dr. Lee would be terminated because she expressed protected speech. The report condemned her, ironically, for having

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 43 | CASE NO. 5:23-CV-03418-SVK

"one . . . particular perspective" and creating "polarizing conversations that interfere with supporting the college mission and equity goals."

209.     De Anza was, in fact, censoring Dr. Lee's speech, about which Dr. Lee complained to the Office of Communication, De Anza senior leadership, and District senior leadership. De Anza retaliated against Dr. Lee for submitting complaints about her censorship. The report referred to this as another reason to fire her.

210.     Phase II concluded with a notice of termination issued March 15, 2023.

211.     Due to her illegal termination, Dr. Tabia Lee's last day of work will be June 30, 2023.

## COUNTS

## COUNT 1:

## THE FIRST AMENDMENT / 42 USC § 1983

## (ALL INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES AND TRUSTEE DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

212.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

213.     The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

214.     The First Amendment is made affective against the states by the Fourteenth Amendment and breach of the Fourteenth Amendment is actionable under 42 USC § 1983, which states in relevant part:

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 44 | CASE NO. 5:23-CV-03418-SVK

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law suit in equity, or other proper proceeding for redress. . . .

215.    All Individual Defendants and Trustee Defendants acted as state actors under color of state law. All Individual Defendants and Trustee Defendants violated Dr. Lee's rights to free expression, either directly through censorship of her viewpoints or by retaliating against Dr. Lee for the exercise of her free expression.

216.    Defendant Dean Alicia Cortez violated Dr. Lee's right to free expression in her individual and official capacity.

217.    Defendant Thomas Ray violated Dr. Lee's right to free expression in his individual and official capacity.

218.    Defendant Lydia Hearn violated Dr. Lee's right to free expression in his individual and official capacity.

219.    Defendant President Lloyd Holmes violated Dr. Lee's right to free expression in his individual and official capacity.

220.    Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

221.    Dr. Lee is also entitled to reinstatement to her faculty position.

**COUNT 2:**

**TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D, ET SEQ.**

**(DE ANZA COLLEGE AND THE DISTRICT)**

222.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

223.     Title VI of the United States Civil Rights Act of 1964, 42 USC § 2000d states in relevant part:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

224.     De Anza and the District receive federal funding.

225.     The District and De Anza violated Title VI. Defendant District and Defendant De Anza discriminated against Dr. Lee, retaliated against Dr. Lee, and subjected Dr. Lee to a hostile environment on the basis of race.

226.     Defendants, acting within the scope of their employment and as employees of the District and De Anza, repeatedly informed Dr. Lee that she was not the "right kind of Black person."

227.     Defendants forced Dr. Lee to project hostile stereotypes of Black Americans based on race through the Office of Equity and Engagement. These stereotypes purported to praise Black Americans for being incapable of objectivity, efficiency, individualism, progress, and other traits and stereotypes adopted wholesale from 19th-century ideologues of racial supremacy.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

228.    While purporting to praise Black Americans for these stereotypes, these stereotypes are demeaning and degrading to the true capabilities and true aspirations of Black Americans.

229.    Yet when Dr. Lee pointed this out or criticized other pieties promoted by De Anza and the District in the name of "social justice," she was told she was "Whitesplaining"; and Dr. Lee was directed to "decenter" (whatever that means) "Whiteness."

230.    The Chancellor of the District has expressly made "decentering Whiteness" the official policy of the District on the basis of race.

231.    This created a hostile environment which was severe, pervasive, and objectively offensive. The District and De Anza's acts and omissions directly interfered with Dr. Lee's inability to do her job.

232.    The District and De Anza have sponsored, organized, and established segregated organs of the state on the basis of race, euphemistically called "affinity groups," and vested them with rights on the basis of race which are denied other groups of students, faculty, and staff on the basis of race, for example, and without limitation, voting rights.

233.    Dr. Lee objected to these segregated organizations created by the District and by De Anza on the basis of race and was likewise criticized and retaliated against for opposing the race-based policies promoted by these recipients of federal funding.

234.    Dr. Lee submitted grievances and complained about the District's and De Anza's race-based policies and the hostile environment created by the District and De Anza, including but not limited to Dean Cortez, Vice President of Instruction Ray, Vice President of Instruction Hearn, and Vice President of Instruction Espinosa-Pieb, and President Holmes.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 47 | CASE NO. 5:23-CV-03418-SVK

235.     Not only did Defendants do nothing to remedy racial discrimination, they censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection to the District's and De Anza's race-based discrimination.

236.     Defendants' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

237.     Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.

## COUNT 3:

## VIOLATION OF THE CALIFORNIA STATE CONSTITUTION, ART. 1, § 2(A)

## (ALL DEFENDANTS)

238.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

239.     Section 2(a) of the California State Constitution, Declaration of Rights provides that "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

240.     The California Constitution gives every person an affirmative right to free speech. Cal. Const., art. I, § 2(a). And the California Supreme Court has held that the California free speech clause is more definitive and inclusive than the First Amendment to the United States Constitution.

241.     For all the reasons set forth in Count 1, which is incorporated here by reference, Defendants acted under color of state law in suppressing, censoring, and retaliating against Dr. Lee for the exercise of her right to free expression.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 48 | CASE NO. 5:23-CV-03418-SVK

242.    Defendants terminated Dr. Lee in retaliation for her exercise of free expression.

243.    Defendants are therefore liable for direct and indirect damages in an amount to be determined at trial.

## COUNT 4:

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICYGOVERNMENT CODE SECTION 12940 ET SEQ.

## (CALIFORNIA COMMON LAW)

## (AGAINST THE DISTRICT AND DE ANZA)

244.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

245.    At all relevant times, the fundamental, formally established public policy of the State of California as expressed, without limitation, in Government Code section 12940 et seq. was and is that employees must be free from unlawful discrimination and harassment by their employers and in their places of employment.

246.    At all relevant times, the public policy of the State of California, as codified, expressed and mandated, without limitation, in Government Code section 12940 et seq., prohibited and prohibits employers from discriminating, harassing, and retaliating against any individual on the grounds of protected classifications, including race. This public policy is designed to protect all employees and to promote the welfare and well-being of the community at large.

247.    Defendants' termination of Plaintiff were wrongful and in violation of both the statutes and the public policy of this state, and known to be so.

248.     The acts of Defendants violated public policy of the State of California. Defendants' violation of public policy created intolerable, hostile, and offensive working conditions for Plaintiff. The aforementioned acts led Defendants to wrongly terminate Dr. Lee.

249.     As a proximate result of Defendants' acts and omissions, Plaintiff was terminated from her employment and sustained losses in earnings and other employment benefits.

250.     As a proximate result of Defendants' acts and omissions, Plaintiff suffered and continues to suffer general damages consisting of lost compensation for having to endure an oppressive work environment, in an amount to be proved at trial.

251.     Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the intention of injuring Plaintiff. Defendants acted out of an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Such conduct was also authorized and ratified by the officers, directors, or managing agents of Defendants.

252.     In light of Defendant's willful, knowing and intentional acts against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount to be proved at trial.

253.     Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Government Code section 12965(b).

## COUNT 5:

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY CALIFORNIA CONSTITUTOIN

## (CALIFORNIA COMMON LAW)

## (AGAINST THE DISTRICT AND DE ANZA)

254.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 50 | CASE NO. 5:23-CV-03418-SVK

255.     At all relevant times, the fundamental, formally established public policy of the state of California as expressed, without limitation, in Article I, section 8 of the California Constitution was and is that employees be free from unlawful discrimination and harassment in their employment.

256.     The acts of Defendants violated public policy of the State of California as alleged above in Counts 1-5. Defendants' violation of public policy created intolerable, hostile, and offensive working conditions for Plaintiff. The aforementioned acts caused Plaintiff to be wrongly terminated.

257.     As a proximate result of Defendants' acts and omissions, Plaintiff was terminated from her employment and sustained losses in earnings and other employment benefits.

258.     As a proximate result of Defendants' acts and omissions, Plaintiff has suffered and continues to suffer general damages consisting of compensation for having to endure an oppressive work environment, in an amount to be proved at trial.

259.     Defendants committed the acts herein alleged maliciously, fraudulently and oppressively with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiff. Such conduct was also authorized and ratified by the officers, directors, or managing agents of Defendants. In light of Defendants' willful, knowing and intentional acts against Plaintiff, Plaintiff seeks an award of punitive and exemplary damages in an amount to be proved at trial.

260.     Plaintiff is entitled to an award of attorneys' fees and costs pursuant to Government Code section 12965(b).

**COUNT 6:**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §42 U.S.C. §2000-E ET**

**SEQ.**

**(DE ANZA COLLEGE AND THE DISTRICT)**

261.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

262.    The District and De Anza violated Title VII.  Respondent District and Respondent De Anza discriminated against Dr. Lee, retaliated against Dr. Lee, and subjected Dr. Lee to a hostile environment on the basis of race.

263.    Respondents, acting within the scope of their employment and as employees of the District and De Anza, repeatedly informed Dr. Lee that she was not the "right kind of Black person."

264.    Respondents forced Dr. Lee to project hostile stereotypes of Black Americans based on race through the Office of Equity and Engagement.  These stereotypes purported to praise Black Americans for being incapable of objectivity, efficiency, individualism, progress, and other traits and stereotypes adopted wholesale from 19th-century ideologues of racial supremacy.

265.    While purporting to praise Black Americans for these stereotypes, these stereotypes are demeaning and degrading to the true capabilities and true aspirations of Black Americans.

266.    Yet when Dr. Lee pointed this out or criticized other pieties promoted by De Anza and the District in the name of "social justice," she was told she was "Whitesplaining"; and Dr. Lee was directed to "decenter" "Whiteness."

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 52 | CASE NO. 5:23-CV-03418-SVK

267.    The Chancellor of the District has expressly made "decentering Whiteness" the official policy of the District on the basis of race.

268.    This created a hostile environment which was severe, pervasive, and objectively offensive.  The District and De Anza's acts and omissions directly interfered with Dr. Lee's inability to do her job.

269.    The District and De Anza have sponsored, organized, and established segregated organs of the state on the basis of race, euphemistically called "affinity groups," and vested them with rights on the basis of race which are denied other groups of students, faculty, and staff on the basis of race, for example, and without limitation, voting rights.

270.    Dr. Lee objected to these segregated organizations created by the District and by De Anza on the basis of race and was likewise criticized and retaliated against for opposing the race-based policies.

271.    Dr. Lee submitted grievances and complained about the District's and De Anza's race-based policies and the hostile environment created by the District and De Anza, including but not limited to Dean Cortez, Vice President of Instruction Ray, Vice President of Instruction Hearn, and Vice President of Instruction Espinosa-Pieb, and President Holmes.

272.    Not only did Respondents do nothing to remedy racial discrimination, they censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection to the District's and De Anza's race-based discrimination.

273.    Plaintiff has exhausted her administrative remedies and submits her right to sue letter from the California Civil Rights Department.

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 53 | CASE NO. 5:23-CV-03418-SVK

274.     Respondents' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

275.     Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.

## COUNT 7:

## CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, CAL. GOV. CODE § 12900 ET SEQ., ("FEHA")

## (DISTRICT, DE ANZA, AND DEFENDANTS HOLMES, CORTEZ, ESPINOSA-PIEB, RAY, AND HEARN)

276.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

277.     California's Fair Employment and Housing Act (FEHA), California Government Code, § 12900 et seq., prohibits discrimination, harassment, and retaliation on the basis of race by an employer.

278.     California Government Code, § 12965 creates a private right of action to enforce the FEHA.

279.     At all relevant times the District and De Anza were Dr. Lee's employers.

280.     For all the reasons pleaded in Count 1 and 2, which is incorporated here by reference, the Respondent District and De Anza discriminated against and terminated Dr. Lee on the basis of race.

281.     The District and De Anza have acted in a clearly oppressive and malicious manner in discriminating against Dr. Lee.

282.   Under Cal. Civ. Code § 3294(a), Dr. Lee may recover punitive damages against her employer for the District" and De Anza's unlawful discrimination.

283.   Plaintiff has exhausted administrative remedies and attaches her right to sue letter from the California Civil Rights Department.

284.   Therefore, the District and De Anza are liable for violation of FEHA and Dr. Lee is entitled to direct, indirect, and punitive damages in an amount to be recovered at trial.

## PRAYER FOR RELIEF

Plaintiff prays that this Honorable Court grant the following relief:

i.   Declare Defendants liable for the violation of Dr. Tabia Lee's right to free speech under the First Amendment to the United States Constitution as applied to the State of California under the Fourteenth Amendment and 42 USC § 1983 and under the Constitution of the State of California, Art. 1, § 2(a) ;

ii.   Declare Defendants the District and De Anza in violation of Title VI of the Civil Rights Act of 1964, 42 USC 2000d, et seq. and in violation of the California Fair Employment and Housing Act (FEHA), Cal. Gov. Code, § 12900 et seq.;

iii.   Declare Defendants to have wrongfully terminated Dr. Tabia Lee under the California Common Law;

iv.   Order Defendants to reinstate Dr. Lee to her rightful employment;

v.   Order Defendants to pay Dr. Lee all front and back pay and lost income, including pre- and post-judgment interest;

vi.   Order Defendants to pay punitive damages under, without limitation, Cal. Civ. Code § 3294(a);

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 55 | CASE NO. 5:23-CV-03418-SVK

vii.   Order Defendants to pay Dr. Lee's reasonable attorneys fees and costs under, without limitation, 42 USC § 1988(b) and California Government Code section 12965(b);

viii.  Order such other legal or equitable relief as the Court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Date: September 19, 2023                                        Respectfully submitted,

Michael Thad Allen
*pro hac vice* admission pending
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

Abby Jane Moscatel
CA Bar No. 276207
LAW OFFICE OF ABBY MOSCATEL
99 S Almaden Blvd
Suite 600
San Jose CA 95113
Tel: (406) 318.7223
amoscatel@blacktailllaw.com

*for Plaintiff*

AMENDED COMPLAINTDEMAND FOR JURY TRIAL - 56 | CASE NO. 5:23-CV-03418-SVK



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 14, 2023

Tabia Lee
7889 Lichen Dr. #259
Citrus Heights, CA

RE:   **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202309-21967514
Right to Sue: Lee / Foothill-De Anza Community College District et al.

Dear Tabia Lee:

This letter informs you that the above-referenced complaint filed with the Civil Rights
Department (CRD) has been closed effective September 14, 2023 because an
immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal
Employment Opportunity Commission (EEOC) to file a complaint within 30 days
of receipt of this CRD Notice of Case Closure or within 300 days of the alleged
discriminatory act, whichever is earlier.

Sincerely,


Civil Rights Department

CRD - ENF 80 RS (Revised 02/23)