Abby Jane Moscatel
CA Bar No. 276207
LAW OFFICE OF ABBY MOSCATEL
99 S Almaden Blvd Suite 600
San Jose CA 95113
Tel: (406) 318.7223
amoscatel@blacktailllaw.com

Michael Thad Allen
*Admitted pro hac vice*
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

United States District Court for the District of

Northern California -SAN JOSE DIVISION

| | |
|---|---|
| TABIA LEE,<br><br>        Plaintiff,<br><br>        vs.<br><br>THE FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, DE ANZA COMMUNITY COLLEGE, LLOYD A. HOLMES, in his official and individual capacity; PATRICK J. AHRENS, LAURA CASAS, PEARL CHENG, PETER LANDSBERGER, GILBERT WONG in their official capacity; AND ALICIA CORTEZ, THOMAS RAY, CHRISTINA ESPINOSA-PIEB, AND LYDIA HEARN in their individual and official capacity,<br><br>        Defendants. | Case No.: 5:23-CV-03418-PCP<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>DATE: JANUARY 18, 2024<br>TIME: 10:00 A.M.<br>JUDGE: Hon. P. Casey Pitts<br>COURTROOM: 8 |

# TABLE OF CONTENTS

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    1

I.   Statement of the Issues to Be Decided                                                          1

II.   Statement of Relevant Facts                                                                    2

III.   Argument                                                                                      5

A.   Legal Standard on Defendants' Rule 12(b)(6) Motion                                              5

B.   The Trustee Defendants are Proper Defendants in their Official Capacity                          7

C.   Individual Defendants Are Properly Subject to Suit                                              10

D.   The Individual Defendants Are Not Entitled to Qualified Immunity                                11

E.   Dr. Lee's Title VII Claims Should Proceed                                                       14

1)   Dr. Lee's Hostile Environment Survives                                                          14

2)   Dr. Lee Has Also Sufficiently Pled Disparate Treatment                                          18

3)   Defendants Retaliated Against Dr. Lee                                                           19

F.   The FEHA Claim Survives for the Same Reasons that the Title VII Claim Survives                  20

IV.   Conclusion                                                                                     21

# TABLE OF AUTHORITIES

## Cases

*Alvarez v. Lake Cnty. Bd. of Supervisors*, No. CV 10-1071,

 2010 U.S. Dist. LEXIS 95109 (N.D. Cal. Sep. 13, 2010)........................................................18

*AMTRAK v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ........................17

*Anderson v. MCM Constr., Inc.*, No. 2:10-cv-2833, 2013 U.S. Dist. LEXIS 170426 (E.D. Cal. Dec. 3, 2013) .........14

*Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043 (D. Haw. 2015) ...........................17

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016)....................................7

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .................................6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) ................6

*Blaylock v. Schwinden*, 862 F.2d 1352 (9th Cir. 1988) ...............................................................10

*Bolden-Hardge v Off. of the Cal. St. Controller*, 63 F.4th 1215 (9th Cir 2023) ...........................9

*Brown v. APL Mar. Ltd.*, No. 22-cv-06999, 2023 U.S. Dist. LEXIS 133461 (N.D. Cal. Aug. 1, 2023) ....................19

*Brown v. FPI Mgmt., Inc.*, No. C-11-05414-YGR, 2012 U.S. Dist. LEXIS 24323 (N.D. Cal. Feb. 27, 2012) .............6

citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989)..................11

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) ...............................................................15

*Conley v. Gibson*, 355 U.S. 41 (1957).........................................................................................7

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006)......................................19

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) ....................................................................11, 12

*Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643 (9th Cir. 2019) .....................................6

*Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027 (9th Cir. 2005).....................................15

*Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997) .......................................................18

*Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)......................................................7

*Grigsby v. Horel*, 529 F. App'x 859, 860 (9th Cir. 2013)...........................................................12

*Hafer v. Melo*, 502 U.S. 21 (1991) ........................................................................................7, 10

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)........................................................................16

*Iqbal*, 556 U.S. at 678 ..................................................................................................................6

1   *James v. United Furniture Workers Local 89262*, No. 21-cv-03893,

2      2021 U.S. Dist. LEXIS 154023 (N.D. Cal. Aug. 16, 2021)...................................................20

3   *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158 (2008)..............................................20

4   *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)................................................................13

5   *Koala v. Khosla,* 931 F.3d 887 (9th Cir. 2019)................................................................7, 8, 9

6   *Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963 (9th Cir. 2010)...............11, 14

7   *Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988)....................................................................10

8   *Lopez v. Routt*, 17 Cal. App. 5th 1006 (2017) ....................................................................20

9   *Mack v. Town of Pinetop Lakeside*, 780 F. App'x 448 (9th Cir. 2019) ...................................16

10  *McCarthy v. Brennan*, No. 15-cv-03308, 2016 U.S. Dist. LEXIS 32635 (N.D. Cal. Mar. 14, 2016) .......................19

11  *McFadden v. City of El Centro*, No. 13cv1580, 2014 U.S. Dist. LEXIS 48355 (S.D. Cal. Apr. 4, 2014) .................19

12  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) ......................................16, 17

13  *Melendrez v. All Kids Acad.*, No. 22-cv-1725-AGS-DDL,

14      2023 U.S. Dist. LEXIS 170885 (S.D. Cal. Sep. 25, 2023) .............................................19

15  *Monell v. Dep't of Soc. Servs. of NY*, 426 U.S. 658, 690 (1978) ..........................................7

16  *O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016)..............................................................11, 14

17  *OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ......................................................11

18  *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) ...................................................14

19  *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................................................13

20  *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2009) ....................13, 14

21  *Scheuer v. Rhodes*, 416 U.S. 232 (1974) ..........................................................................11

22  *Saucier v. Katz*, 533 U.S. 194 (2001) ...............................................................................14

23  *Sharp v. Activewear, L.L.C.*, 69 F.4th 974 (9th Cir. 2023) ...............................................6, 14

24  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir. 1994)........................................17

25  *Suever v. Connell*, 579 F.3d 1047 (9th Cir. 2009) .............................................................12

26  *Sutton v. Derosia*, No. 1:11-cv-01426, 2012 U.S. Dist. LEXIS 147434 (E.D. Cal. Oct. 12, 2012) ..........................20

27  *Sweezy v. New Hampshire*, 354 U.S. 234 (1957)...............................................................13

28  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)..............................................................6

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) ........................................................16

*Winns v. DeJoy*, No. 21-cv-04264, 2022 U.S. Dist. LEXIS 39760 (N.D. Cal. Mar. 7, 2022) .....................6

*Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346 (9th Cir. 1984) ........................................21

## Statutes

42 U.S.C. §2000-e ..............................................................................................1

42 USC § 2000d ................................................................................................1

42 USC § 1983 ........................................................................................1, 11, 12

Cal. Gov. Code § 12900, et. seq. ("FEHA")............................................................1

## Rules

Fed. R. Civ. P. 8(a)(2) ........................................................................................6

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I.   STATEMENT OF THE ISSUES TO BE DECIDED

Plaintiff Tabia Lee brings the following claims in her Amended Complaint, ECF No. 27 ("AC" or the "Amended Complaint"):

> 1) Retaliation based on her protected speech under the First Amendment to the United States Constitution as applied to California under the Fourteenth Amendment and actionable under 42 USC § 1983 (AC, ¶¶ 212-221);
>
> 2) Violation of Title VII of the Civil Rights Act of 1964, § 42 U.S.C. §2000-e, et seq. (AC, ¶¶ 261-275); and
>
> 3) Violation of the California Fair Employment and Housing Act, Cal. Gov. Code § 12900, et. seq. ("FEHA") (AC, ¶¶ 276-284).[1]

Dr. Lee has sued the Trustees of the Foothill-De Anza Community College District ("District"), referred to collectively as the "Trustee Defendants" in their official capacities for the violation of her First Amendment rights.  She has also sued the President of De Anza Community College ("De Anza"), Lloyd Holmes, as well as administrators Alecia Cortez, Thomas Ray, Christina Espinosa-Pieb, and Lydia Hearn in their individual and official capacities, who will be referred to collectively as the "Individual Defendants."

With regard to her employment claims, Dr. Lee brings a Title VII claim against De Anza and the District as her employer, but she also sues the Individual Defendants under FEHA.

Defendants moved to dismiss these claims on various theories based on sovereign immunity, qualified immunity, and failure to state a claim.  ECF No. 34 ("Motion").

---

[1] Dr. Lee concedes to dismissal of Count 2 (Title VI of the Civil Rights Act, 42 USC § 2000d, et seq.); Count 3 (violation of the California State Constitution); and Count 4 and Count 5 (state law claims for wrongful termination).

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 1 | CASE NO. 5:23-CV-03418-SVK HIM

## II. STATEMENT OF RELEVANT FACTS

In August 2021, Dr. Lee joined the full-time tenure-track faculty of De Anza as Faculty Director for the Office of Equity, Social Justice, and Multicultural Education and Chairperson of the Department of Equity, Social Justice, and Multicultural Education.  AC, ¶ 31.  It was the very nature of her job to speak out on matters of public concern—a job in which controversy is inevitable, a job that was even more challenging in the atmosphere that followed the murder of George Floyd by a Minneapolis police officer the year before she joined De Anza. AC, ¶ 33.

Defendants hold themselves out as operating a public community college that guarantees academic freedom. AC ¶ 174. Dr. Lee championed academic freedom and spoke out against the ideological intolerance within the District in general and at De Anza in particular.  AC, ¶¶ 40-63. Ironically, Dr. Lee expressed mostly mainstream views that are hardly controversial among the public at large: by way of example, that all Americans, regardless of the color of their skin, are entitled to the full protections of our civil rights laws. *See, e.g.*, AC, ¶ 128-129.

Dr. Lee's inclusive approach proved to be anathema at De Anza, however.  De Anza maintains race-based and sex-based segregated "Affinity Groups," on whom it bestows special voting rights before its Academic Senate, while denying these special voting rights to other groups based on race; De Anza insists on politically approved misspelling of foreign-language words that even foreign-language speakers are forced to adopt; De Anza maintains so-called "safe spaces" on campus that are open to students and faculty of some genders and races while excluding others on the basis of race and sex; and De Anza insists on various pieties that amount to compelled speech, such as "land acknowledgments" and the forced declaration of pronouns. *See e.g.*, AC, ¶¶ 40-63.

Perhaps most obnoxiously, the District and De Anza promote the message that people of color should properly be considered incapable of core values like "objectivity," "individualism," "perfectionism," "progress," and "worship of the written word" — in other words, values and characteristics normally associated with hard work and success.  AC, ¶¶ 61-63.  Defendants condemn these values based on a bizarre race-based scheme, labeling them "Characteristics of White Supremacy Culture."  *Id.*  Thus, Defendants relegate Black Americans like Dr. Lee to ineffective but picturesque laziness.  *Id.*  Just as the white supremacists of a bygone era identified immigrants (of whatever sort) and Black Americans as inarticulate, lazy, incapable of progress, trapped by tribal or communal values, and objectively incompetent, so now Defendants peddle the same demeaning racist stereotypes.  AC, ¶ 63.  Defendants have simply swapped out the condemnation expressed by the racists of yesteryear for praise of minorities' supposed feebleminded impotence.  *Id.*  Yet the stereotypes imposed on Dr. Lee are exactly the same.

When Dr. Lee, who is Black, criticized the hostile environment these ideological pieties created at De Anza and in the District, she was immediately attacked, accused of "whitesplaining," and told that she was not the "right kind of Black person."  *See e.g.*, AC, ¶¶ 69, 107, 226.  Dr. Lee was harassed, censored, retaliated against, publicly humiliated before the District's Board, and eventually fired. AC, ¶¶ 114-118, 147-153, 210-211.

The Individual Defendants engaged in this silencing and discrimination as direct participants:

<u>Defendant Lloyd A. Holmes.</u> As President of De Anza Community College, Holmes held a pivotal role in the decision-making process regarding Dr. Lee's employment. AC, ¶ 10. As the recipient of the Phase II Tenure Review Committee's recommendation to fire Dr. Lee for her protected speech, he chose to approve the recommendation to fire her and sent the decision up

the chain of command to the Board of Trustees. AC, ¶¶ 198, 207-210.  President Holmes squelched Dr. Lee's appeals for institutional safeguards against the discrimination and censorship she encountered, further violating her right to free expression in defiance of De Anza's own policies to the contrary. AC, ¶¶ 219, 234-235.

    <u>Defendant Alicia Cortez.</u> In her capacity as the Dean of Equity and Engagement, Cortez directly oversaw Dr. Lee's professional activities and, as the de facto Chairperson of the Phase I and Phase II Tenure Review Committee, labored tirelessly to get her fired. AC, ¶¶ 11, 41-43, 163, 168, 172, 200. Cortez, along with others, criticized Dr. Lee for encouraging free and open discussion at De Anza and for daring to express unorthodox ideas; Cortez then retaliated with censorship, violating Dr. Lee's right to free expression. AC, ¶¶ 55, 113, 127, 216. Because Dr. Lee expressed the "wrong" opinions, Dean Cortez not only withheld support typically extended by Deans to faculty; but she also actively prevented Dr. Lee from doing the job De Anze hired her to do. AC, ¶¶ 108-111, 114, 234-235.  Among other things, Dean Cortez instituted never-before-heard-of procedures for approving Dr. Lee's workshops, which were never applied to other faculty or program directors at De Anza. AC, ¶¶ 121-122. Dean Cortez displayed a clear bias by endorsing events that mirrored her and the District's orthodoxy, while censoring and delisting events proposed by Dr. Lee, notably including International Holocaust Remembrance Day.  AC, ¶¶ 115, 118, 137.  Despite being notified that Dr. Lee faced racially discriminatory behavior, censorship, and harassment, Dean Cortez refused to protect Dr. Lee from attacks on her academic freedom. AC, ¶¶ 109-110, 234-235, 271-272.

    <u>Defendant Christina G. Espinosa-Pieb.</u> As Vice President of Instruction until her retirement on April 28, 2023, Espinosa-Pieb was another direct participant in the suppression of Dr. Lee's expression. AC, ¶ 12.  Espinosa-Pieb personally removed Dr. Lee's events from De

Anza College's calendar to suppress them, and she delisted Dr. Lee's workshops and events as professional education credits for faculty members—effectively putting these events on ice, rendering them worthless credits to would-be participants—all this so Espinosa-Pieb could privilege her own and De Anza's stifling orthodoxy.  AC, ¶¶ 115, 118.

Defendant Thomas Ray. As Interim Associate Vice President of Instruction, Ray was a key participant in Dr. Lee's Phase I and Phase II Tenure Review Committee.  AC, ¶¶ 13, 168, 200. His went beyond mere participation; he was directly implicated in censoring Dr. Lee.  AC, ¶¶ 117, 118, 217. Along with Dean Cortez, Ray reprimanded Dr. Lee for daring to call team meetings, silenced her, directed other faculty not to work with Lee on office matters, and instructed De Anza employees to ignore Dr. Lee's emails.  AC, ¶¶ 120, 144-145.  Ray also voted to recommend Dr. Lee's termination in retaliation for her protected speech. AC, ¶ 197.

Defendant Lydia Hearn.  Previously the Interim Associate Vice President of Instruction and a participant in Dr. Lee's Phase I Tenure Review Committee, Hearn openly attacked Dr. Lee's protected speech during her tenure review, intimidating and censoring her, which she justified with direct complaints about Dr. Lee's protected speech—in violation of De Anza's academic freedom policy and its rules of faculty ethics.  AC, ¶¶ 14, 98-103, 168, 173, 184-192, 218, 234-235.  As part of the Phase I Tenure Review Committee, Defendant Hearn not only voted to fire Dr. Lee, but also submitted one of the negative evaluations based on Dr. Lee's expressed viewpoints on which the committee relied to fire Dr. Lee.  AC, ¶¶ 184-192.

## III.  ARGUMENT

### A.  Legal Standard on Defendants' Rule 12(b)(6) Motion

"At this early stage of litigation, [the Court's] only task is to assess whether the allegations in [Dr. Lee's] complaint, taken as true, state a plausible claim…"  *Sharp v.*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 5 | CASE NO. 5:23-CV-03418-SVK HIM

*Activewear, L.L.C.*, 69 F.4th 974, 979 (9th Cir. 2023) (reversing summary judgment on hostile

environment claim) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d

868 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L. Ed. 2d

929 (2007)).  ). Dismissal is only appropriate where there is "no cognizable legal theory or an

absence of sufficient facts alleged to support a cognizable legal theory." *Depot, Inc. v. Caring for

Montanans, Inc.*, 915 F.3d 643, 652-653 (9th Cir. 2019) (internal citations omitted).

Although "'[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice'"; the Plaintiff is only required to supply "a short and plain

statement of the claim showing that the pleader is entitled to relief." *Winns v. DeJoy*, No. 21-cv-

04264, 2022 U.S. Dist. LEXIS 39760, at*8 (N.D. Cal. Mar. 7, 2022) (quoting *Iqbal*, 556 U.S. at

678, *Twombly* 550 U.S. at 555, and Fed. R. Civ. P. 8(a)(2)). A "heightened fact pleading of

specifics" is not required, "but only enough facts to state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Importantly, with regard to race discrimination in employment, the "plaintiff need not

plead a prima facie case of discrimination . . . to survive [a] motion to dismiss . . ." *Brown v.

FPI Mgmt., Inc*., No. C-11-05414-YGR, 2012 U.S. Dist. LEXIS 24323, at *9-10 (N.D. Cal. Feb.

27, 2012) (internal citations omitted). The Supreme Court has rejected a "heightened pleading

standard in employment discrimination cases [that] conflicts with Federal Rule of Civil

Procedure 8(a)(2), which provides that a complaint must include only 'a short and plain

statement of the claim showing that the pleader is entitled to relief.'" *Swierkiewicz v. Sorema

N.A*., 534 U.S. 506, 512 (2002). Dr. Lee's Amended Complaint "must simply 'give the defendant

fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

### B.  The Trustee Defendants are Proper Defendants in their Official Capacity

As Defendants acknowledge, official capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal citation omitted); *see also* Motion, at 15. Yet Defendants urge the Court to adopt the wrong standard. They claim that Dr. Lee must "identify a policy or custom of the governmental entity of which the official is an agent that was the moving force behind the violation of Dr. Lee's constitutional rights." *Id., citing Hafer*, 502 U.S. at 25 and *Monell v. Dep't of Soc. Servs. of NY*, 426 U.S. 658, 690 (1978). Of course, even if this were the standard, Dr. Lee adequately pleads that Defendants fostered a culture and promoted a policy of race-based hostility in the form of segregated faculty voting rights, racial insult, and pernicious racist stereotypes, among other race-based practices.

However, this is not what the law requires in the Ninth Circuit.  Rather than identifying De Anza's policy or custom, "[a]t the pleading stage, the complaint must simply allege 'plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct[,]' and motive may be shown with direct or circumstantial evidence." *Koala v. Khosla,* 931 F.3d 887, 905 (9th Cir. 2019) (*citing Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867-70 (9th Cir. 2016)). "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Ariz. Students'*, 824 F.3d at 867 (citing *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).

Dr. Lee more than meets the standard outlined in *Koala*. Defendants engaged in "suppressive conduct" by, among other things, firing Dr. Lee, which certainly would and did obstruct her free exercise of First Amendment rights at De Anza. This was clearly connected to Defendants' intent and motive to retaliate against her for protected speech, as the Amended Complaint makes clear. As soon as she spoke out against Defendants' race-based dogma, she was immediately informed she was not the "right kind" of Black person.  Independent thinking is, apparently at De Anza, not a "Black" person's prerogative.  Defendants first censored Dr. Lee and limited her academic freedom, then ultimately terminated her based upon her viewpoints.

Reviewing even a subset of Defendants' actions indicates that Dr. Lee sufficiently pled "plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct." *Koala*, at 905. For example, Dr. Lee pled that Cynthia Kaufman, a member of the Phase I Tenure Review Committee who pushed for Dr. Lee to be fired, turned in a negative evaluation of Dr. Lee based on her protected speech and opinions on November 4, 2021.  AC, ¶ 176-183.  These included Dr. Lee's "criticiz[ing] [Black Lives Matter founder Alicia] Garza publicly," critically classifying "the prevailing orthodoxy of De Anza and the District as a 'third wave anti-racist lens,'" characterizing the "misspelling of foreign words such as 'Latinx' and 'Filipinx,'" as "linguistic imperialism," and more.  AC, ¶¶ 178, 180.

Another member of the Phase I Tenure Review Committee, Defendant and then-Interim Associate Vice President of Instruction Lydia Hearn, "explicitly criticized Dr. Lee for voicing controversial viewpoints," including Dr. Lee's "speech on November 29, 2021, before the Academic Senate Executive Committee" in which Dr. Lee "defended academic freedom, diverse viewpoints, and free speech." AC, ¶¶ 190-191. Only four days later, it was also Hearn who "told

Dr. Lee that the Tenure Review Committee would be unanimously recommending her [for] termination." AC, ¶ 196.

Plaintiff's Phase II tenure review committee, which retained two of the members from Phase I who had already tried to fire her for her free exercise of speech, was little different.  AC, ¶ 200.  New member Salamander Breiter turned in yet another negative evaluation, faulting Dr. Lee for defending free speech and academic freedom before the Academic Senate Executive Committee and for daring to venture criticism "beyond comfortable discourse" (concerning Dr. Lee's criticism of De Anza's intentional misspelling of foreign language words like "Latinx" and "Filipinx").  AC, ¶¶ 202-205.  With Breiter's help, the Phase II committee also unanimously voted to fire Dr. Lee.  AC, ¶ 207.  Defendant President Lloyd Holmes—and then the Trustee Defendants—ratified this decision, and Dr. Lee was indeed terminated for her speech on March 15, 2023. AC, ¶¶ 114-118, 147-153, 210-211.

Finally, Defendants argue that Dr. Lee failed to state a claim for prospective injunctive relief, which is necessary under *Ex parte Young*.  *See Koala*, 931 F.3d at 895 ("whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective").

Yet Dr. Lee does plead prospective relief, which Defendants admit, as they must. Namely, Dr. Lee has pled, without limitation, a claim for reinstatement.  AC, ¶ 221 and Prayer for Relief, ¶ iv; compare Motion at 15. "With respect to prospective relief . . ., a plaintiff may have standing when she is in the process of seeking . . . reinstatement with[] the employer whose conduct she challenges . . ."  *Bolden-Hardge v Off. of the Cal. St. Controller*, 63 F.4th 1215, 1220 (9th Cir 2023).

Defendants' argument that Dr. Lee's official capacity claims should be dismissed therefore fails.

## C. Individual Defendants Are Properly Subject to Suit

Suits against state officials like the Individual Defendants, who are "sued in [their] individual . . . capacity[,] [are] not barred by the eleventh amendment." *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1988) (noting also that "[t]he Supreme Court has held that damage actions brought under 42 U.S.C. § 1983 seeking to impose 'individual and personal liability' on state officials are not barred by the eleventh amendment") (citing *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974)).

"To state a claim under § 1983 against state officials in their individual capacities, a plaintiff must plead that the officials, 'acting under color of state law, caused the deprivation of a federal right.'" *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012) (quoting *Suever v. Connell*, 579 F.3d 1047, 1060 (9th Cir. 2009) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991))). "A person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains." *Grigsby v. Horel*, 529 F. App'x 859, 860 (9th Cir. 2013) (*quoting Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988)).

As set forth in the Statement of Relevant Facts (Section II), *supra*, Dr. Lee has pleaded facts demonstrating each Individual Defendant's participation in acts or omissions that silenced her, compromised her academic freedom, and led to her retaliatory termination due to protected speech.

**D.  The Individual Defendants Are Not Entitled to Qualified Immunity**

The Individual Defendants' last-ditch defense is qualified immunity.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (*citing Krainski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010) (internal citation and quotations omitted)). Moreover, "[q]ualified immunity of course does not preclude injunctive relief," as opposed to relief in the form of money damages. *Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989)).

*Demers* also established, as Defendants acknowledge, that "[i]n the Ninth Circuit, the *Pickering* balancing test is applied to "academic speech." *Demers v. Austin*, 746 F.3d at 406; cf., Motion at 20. "[T]he *Pickering* test has two parts. First, the employee must show that his or her speech addressed 'matters of public concern.' Second, the employee's interest 'in commenting upon matters of public concern' must outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Demers* at 412.

*Demers* also instructs that this test should be interpreted broadly because of the special nature of academic speech:

> The nature and strength of the public interest in academic speech will often be difficult to assess. For example, a long-running debate in university English departments concerns the literary 'canon' that should have pride of place in the department's curriculum. This debate may seem trivial to some. But those who conclude that the composition of the canon is a relatively trivial matter do not

> take into account the importance to our culture not only of the study of literature,
> but also of the choice of the literature to be studied."

*Id.* at 413. Yet in Dr. Lee's case, the public interest in her speech is far easier to discern than in arcane disputations over the literary canon *Demers* references above. There can be little doubt that "diversity, equity, and inclusion," and issues of race relations and anti-Semitism—all of which Dr. Lee confronted head on—are at the top of the national agenda since the 2020 murder of George Floyd.  As a tenure-track professor and faculty director for the Office of Equity, Social Justice, and Multicultural Education, it was precisely Dr. Lee's job to engage in public discussion about these hotly contested issues—only to be harangued by Defendants for "whitesplaining."  AC, ¶ 33, 229.

While Defendants may assert an interest in promoting the efficiency of public services, their efforts to silence Dr. Lee went far beyond any possible justification based in the efficient administration of public education. This is particularly true given the District's decision to promulgate its Academic Freedom policy and guarantee faculty like Dr. Lee "the freedom to study, teach and express ideas and viewpoints, including unpopular and controversial ones, without censorship, political restraint or retribution," a freedom that "exists in all service areas, including but not limited to teaching, librarianship, counseling, coordinating and all faculty-student interactions."  AC, ¶ 174.

Yet, as discussed in Section III.D, *supra*, each Defendant sued in his or her individual capacity took retaliatory action against Plaintiff for her exercise of First Amendment rights to free speech and academic freedom. It strains credulity to believe that the faculty and administrators of a public community college somehow did not know, or had no reason to know, that robust First Amendment rights protected Dr. Lee.

This protection has been well-established for decades. In 1957, after New Hampshire officials had investigated a Marxist professor for academic speech, the Supreme Court gave the following unambiguous instruction:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Yet "an atmosphere of suspicion and distrust" is exactly what Dr. Lee faced when she deviated from Defendants' campus orthodoxy. And as Justice Brennan wrote a decade after *Sweezy*, "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.  That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

In the Ninth Circuit, this protection is ***more*** important, not less, when professors like Dr. Lee discuss highly controversial ideas. For example, where a faculty member advocated far more outlandish ideas than Dr. Lee (that immigration reform should be focused on maintaining a white majority), the Ninth Circuit held: "[t]he Constitution embraces such a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race, where the risk of conflict and insult is high." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2009) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)). The court continued, "Without the right to stand against society's most strongly held convictions, the marketplace of

ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched." *Id.*

There was and is no real possibility that the Individual Defendants somehow remained ignorant that the law prohibits the suppression of Dr. Lee's protected speech.  Over a decade ago in 2011, the Ninth Circuit pointed out in *O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016), that "[t]he constitutional right to be free from retaliation was clearly established at the time of defendants' actions." *Id. at* 936 (quoting *Krainski*, 616 F.3d at 969) (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). And "there is a right to be free from retaliation even if a non-retaliatory justification exists for the Defendants' action." *Id.* (internal quotations omitted).

The shield of qualified immunity does not protect the Individual Defendants in this case.

**E. Dr. Lee's Title VII Claims Should Proceed**

  1)  Dr. Lee's Hostile Environment Survives

It is long established that "[s]ubjecting employees to a racially hostile work environment can be an independent violation of Title VII." *Anderson v. MCM Constr., Inc.*, No. 2:10-cv-2833, 2013 U.S. Dist. LEXIS 170426, at *24 (E.D. Cal. Dec. 3, 2013) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 179 (1989)).

A "hostile work environment claim must show discrimination by an employer on account of membership in a protected group"—here race—that is "sufficiently severe or pervasive to alter the conditions of employment." *Sharp v. Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023) (quotations omitted) (internal citations omitted) (reversing District Court's dismissal of male employee's hostile environment claim for exposure to the derogation of women).  The Court "must assess all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance.'" *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (reversing summary judgment that hostile environment claim for sexual harassment was based on sporadic, isolated incidents) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

Here, Defendants subjected Dr. Lee to constant, demeaning stereotypes of Black Americans.  It does not matter that Defendants masqueraded this toxic disparagement in terms like "white supremacy," "whitesplaining," "white fragility," and "white privilege," ostensibly insulting only white people.  AC, ¶¶ 30, 45, 56-63, 69, 72-76.  Defendants portrayed Black Americans as incapable of objectivity, individuality, punctuality, and other characteristics traditionally associated with success and hard work—relegating Black employees to some sort of picturesque but ineffective laziness and resurrecting, in the guise of "antiracism," an anachronistic vocabulary of race hatred from two centuries ago.  AC,¶¶ 56-63.  Nor can Defendants claim a "safe haven" by pretending their bigotry valorizes Black Americans, say by praising the supposed inability of BIPOC Americans to be objective, to make progress, or to be individualistic, while vilifying Whites for these same traits.  And Defendants cannot claim that faculty, including other Black faculty, somehow embraced this debasement by dubbing it "antiracist," thus creating some sort of "opposite world" where racism is somehow benevolent.  AC, ¶ ¶ 75-78, 101, 106-107, 139-140, 151, 178-79; *see also Sharp*, 69 F.4th at 982 (holding defendants "cannot find a safe haven by embracing intolerable, harassing conduct that pervades the workplace"). In fact, *Sharp* reversed the dismissal of a man's Title VII hostile environment

claim for the denigration of women.[2]  *Id*.  The court made clear that the "same principle holds true in the context of race discrimination" and "held that a white coworker's 'use of racially charged words to goad both black and white employees makes his conduct more outrageous, not less so.'" *Id*. at 982 (quoting *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1118 (9th Cir. 2004)).

The principle is simple: "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). In addition, when Dr. Lee objected to De Anza's racist stereotypes, she was attacked directly and in person as "not" the "right kind of Black person."  AC, ¶ 226.

Dr. Lee's experience thus satisfies each element of a hostile environment claim: 1) De Anza subjected her to conduct of a racial nature, which permeated the workplace; 2) the conduct was not welcome, as demonstrated by her vocal opposition; and 3) it altered the conditions of her employment as her colleagues and supervisors made her work impossible and humiliated her publicly, not limited to a public struggle session before the District's Board, written reprimands, and eventually, termination.  *See also Mack v. Town of Pinetop Lakeside*, 780 F. App'x 448, 451 (9th Cir. 2019) (reversing summary judgment where "it [did] not matter that [employer's] racial slurs were used in [plaintiff's] presence, rather than directed at him, because . . . hostile conduct

---

[2] Under Title VII, the same analysis applies to both race and sex discrimination. *See e.g*., *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998).

need not be directly targeted at the plaintiff to be relevant to . . . hostile work environment claim").

Although Dr. Lee survives dismissal on a disparate treatment theory as well (see *infra*); a "Black plaintiff," like Dr. Lee here, "[i]s not 'required to prove that white employees were not subject to similar harassment.'" *Sharp*, 69 F.4th at 982 (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 807 (9th Cir. 2001)); *compare* Motion at 24-26. Defendants cannot assert an "equal opportunity harasser" defense. *Id.* Where De Anza demeaned white workers alongside Black workers like Dr. Lee, **with the same stereotypes**, it is a reversible error to ignore the central "racial animus" that "motivates a harasser"; in fact, "a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff." *McGinest*, 360 F.3d at 1117-1118. "It is enough . . . if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job. . ." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).

Last, Defendants also argue that Dr. Lee failed to exhaust administrative remedies and did not proceed to sue within 300 days of at least some of De Anza's illegal actions (which ones they do not specify). Motion at 23-24. Yet Defendants do not dispute that Dr. Lee secured a right to sue letter from the EEOC. *See* ECF No. 24. Dr. Lee received her notice of termination on March 15, 2023, which took effect on June 30, 2023, and her suit is well within the 300-day deadline (which does not fall until January 9, 2024). AC, ¶¶ 210-211.

Defendants' own authorities emphasize the well-established "distinction between discrete acts of discrimination or retaliation, and hostile work environment claims." *See, e.g., Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043, 1053 (D. Haw. 2015). Whereas a "discrete act," by way of example, Dr. Lee's firing, consists of "an unlawful practice that 'occurred' on the

day it 'happened'[;] . . . hostile work environment claims 'are based on the cumulative effect of individual acts' [that] 'occur[] over a series of days or perhaps years.'" *Id.*, (quoting *AMTRAK v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). "[I]n direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* But if any illegal discrimination "occurs within the filing period, the entire time period of the hostile environment may be considered" and "the employee need only file a charge within [the relevant period] of any act that is part of the hostile work environment." *Morgan*, 536 U.S. at 117-18.

In sum, Dr. Lee has pled more than enough facts to satisfy the requirements of her hostile environment claim, she has satisfied the administrative exhaustion requirement, and Defendants' Motion should be denied.

2) Dr. Lee Has Also Sufficiently Pled Disparate Treatment

The elements of a disparate treatment claim under Title VII are:

(1) The Plaintiff is a member of a protected class, here race;

(2) The Plaintiff was qualified for the position or task;

(3) Defendants interfered or denied some benefit of employment despite her qualifications; and

(4) Defendants treated a comparator, or similarly situated party, more favorably during a period relatively near the time in which they discriminated against the Plaintiff.

See e.g., *Alvarez v. Lake Cnty. Bd. of Supervisors*, No. CV 10-1071, 2010 U.S. Dist. LEXIS 95109, at *33 (N.D. Cal. Sep. 13, 2010) (citing *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997)).

Defendants' sole objection under this well-established standard is that Dr. Lee failed to distinguish her treatment, as a Black employee under Defendants' racist ideology, from the treatment of similarly situated employees of a different race, presumably meaning White people.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS - 18 | CASE NO. 5:23-CV-03418-SVK HIM

Motion at 24-26.  Yet, by way of example, Dr. Lee pleads that De Anza established illegal

faculty voting rights based on race in which she was treated differently as a Black faculty

member from white faculty or Jewish faculty members.  AC, ¶¶ 124-125, 129, 153, 232, 269.

She also pleads that she was admonished by her White supervisor for even referring to, without

specifically naming, a colleague in a Faculty Academic Senate meeting who espoused De Anza's

racist ideology. AC, ¶¶ 95-96, 99-103, 148.  However, when it came time to subject Dr. Lee to a

struggle session before Defendants' Board, it was perfectly acceptable to pillory Dr. Lee by

name as a Black faculty member. AC, ¶ 147-153.

   Thus, Dr. Lee was treated disparately because of race.

   3) Defendants Retaliated Against Dr. Lee

   To establish retaliation under Title VII "a plaintiff must demonstrate:

      (1) a protected activity;

      (2) an adverse employment action; and

      (3) a causal link between the protected activity and the adverse employment
      action.

*Brown v. APL Mar. Ltd*., No. 22-cv-06999, 2023 U.S. Dist. LEXIS 133461, at *22 (N.D. Cal.

Aug. 1, 2023) (*citing Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir.

2006). As to the first element, Dr. Lee submitted a grievance about Defendants' race-based

policies and harassment, but Defendants did nothing, particularly her immediate supervisor

Defendant Dean Cortez.  AC, ¶¶ 107-110, 234-35.

   Even Defendants' authorities hold that "[t]here is no doubt that . . . grievances . . . are

protected activities." *McCarthy v. Brennan*, No. 15-cv-03308, 2016 U.S. Dist. LEXIS 32635, at

*34 (N.D. Cal. Mar. 14, 2016) (quoting *McFadden v. City of El Centro*, No. 13cv1580, 2014

U.S. Dist. LEXIS 48355, at *2, *6 (S.D. Cal. Apr. 4, 2014)). Not only that, when Dr. Lee raised

the issue at a meeting of the Faculty Academic Senate, she was admonished, including in her formal tenure review; and then Defendants subjected her to a struggle session before the Board. AC, ¶ 148.

As to the second element, eventually Dr. Lee was fired. AC, ¶¶ 210-211.  *See e.g., Melendrez v. All Kids Acad.,* No. 22-cv-1725-AGS-DDL, 2023 U.S. Dist. LEXIS 170885, at *5 (S.D. Cal. Sep. 25, 2023) ("termination" is "an adverse employment action") (quoting *Wilson v. Cable News Network, Inc*., 7 Cal. 5th 871, 713 (Cal. 2019)).

Finally, there can be no dispute about but-for causation. Defendants have always spoken the quiet part out loud.  Their hostility to Dr. Lee, especially as a Black woman, for objecting to De Anza's racial pieties and policies was written into her promotion and tenure reviews.  AC, ¶¶ 178-181; 202-205.

### F.  The FEHA Claim Survives for the Same Reasons that the Title VII Claim Survives

For the same reasons argued above regarding Plaintiff's Title VII claim, Dr. Lee's FEHA claim survives.

The two statutes are analyzed by the same standards.  *See, e.g., Sutton v. Derosia*, No. 1:11-cv-01426, 2012 U.S. Dist. LEXIS 147434, at *62 (E.D. Cal. Oct. 12, 2012).

However, there is one crucial difference.  FEHA permits claims against individual employees.  Thus, even where De Anza or the District enjoy sovereign immunity from state-law claims, the Individual Defendants do not.  "An employee . . . is personally liable for any harassment prohibited by [FEHA] that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action."  *Lopez v. Routt*, 17 Cal. App. 5th 1006, 1015 (2017) (quoting Cal. Gov. Code § 12940(j)(3)).  "This is clear language imposing personal

liability on all employees for their own harassing actions." *Id.* (quoting *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158, 1162 (2008)).

Defendants object that Dr. Lee has not exhausted administrative remedies with regard to FEHA.  It is true enough that FEHA requires administrative exhaustion, just as does Title VII, yet where a "plaintiff initiated the lawsuit before obtaining her right to sue letter, the subsequent issuance of the letter prior to trial cure[s] any procedural defect."  *Sutton v. Derosia*, 2012 U.S. Dist. LEXIS 147434 at *63.  *See also James v. United Furniture Workers Local 89262*, No. 21-cv-03893, 2021 U.S. Dist. LEXIS 154023, at *28 (N.D. Cal. Aug. 16, 2021) (holding plaintiff "is able to amend to cure . . . administrative exhaustion"). "[T]here is no evidence that . . . premature filing precluded the state from performing its administrative duties, especially in light of the fact that plaintiff requested an immediate right to sue notice." *Id.* (citing *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1351 (9th Cir. 1984)).

Here, Defendants pushed the Court to adopt a hyper-technical interpretation of California law that would forever bar suit where a plaintiff complies with FEHA's exhaustion requirement, but only by catching up after filing her civil action. Motion at 28-29. The courts do not interpret the exhaustion requirement to impose such a hyper-technical interpretation.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Date: November 2, 2023

Respectfully submitted,

Michael Thad Allen
*Admitted pro hac vice*
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

Abby Jane Moscatel
CA Bar No. 276207
LAW OFFICE OF ABBY MOSCATEL
99 S Almaden Blvd Suite 600
San Jose CA 95113
Tel: (406) 318.7223
amoscatel@blacktailllaw.com

*For Plaintiff*