UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TABIA LEE,<br><br>          Plaintiff,<br><br>     v.<br><br>FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, et al.,<br><br>          Defendants. | Case No.  23-cv-03418-PCP<br><br>**ORDER ON MOTION TO DISMISS**<br>Re: Dkt. No. 34 |

Dr. Tabia Lee brings this action against her former employer, De Anza Community College/the Foothill-De Anza Community College District, as well individual members of the District's board of trustees and certain District employees. Her causes of action include claims under the First Amendment, Title VII, and the California Fair Employment and Housing Act. For the reasons that follow, these three claims are dismissed with leave to amend. The other claims (which Dr. Lee concedes are not adequately pleaded) are dismissed without leave to amend.

**I.    Background**

The following allegations from the complaint are accepted as true in resolving this motion.

Dr. Lee is an educational sociologist. Complaint, Dkt. No. 27, at ¶ 21. In August 2021, De Anza Community College hired her as a full-time tenure track faculty member to direct the Office of Equity, Social Justice, and Multicultural Education and chair the Department of Equity, Social Justice, and Multicultural Education. Compl. ¶ 31. Her duties included "facilitating an institution-wide transformation that realizes and promotes our commitment to equity, social justice, and multicultural education," "supporting the college's equity plan by working collaboratively with and mentoring teaching and non-teaching faculty and classified professionals in culturally

responsive and transformative curriculum and pedagogy, promoting culturally responsive services, and … promoting an inclusive campus environment." Compl. ¶¶ 32–33.

Dr. Lee names several individual De Anza staff members as defendants. These include Lloyd Holmes, the President of De Anza; Alicia Cortez, the Dean of Equity and Engagement (and Dr. Lee's supervisor); Thomas Ray, the Interim Associate Vice President of Instruction; Christina Espinosa-Pieb, the Vice President of Instruction; and Lydia Hearn, the Interim Associate Vice President of Instruction. Compl. ¶¶ 10–14. These defendants are sued in both their official and individual capacities. Dr. Lee also sues members of the District's board in their official capacities, as well as the College and the District.

Dr. Lee alleges that defendants "actively retaliated against, discriminated against, and censored" her because of her "open expression of her ideas and exercise of her academic freedom." Compl. ¶ 104. Her allegations include several specific examples.

The first set of allegations involves statements to or about Dr. Lee by other De Anza staff members. According to Dr. Lee, Dean Cortez "criticized" her for allowing students to ask questions to a guest speaker after Dean Cortez had told Dr. Lee not to ask the speaker unscripted questions. Compl. ¶¶ 52, 55. Dr. Lee also contends that Tony Santa Ana, a program coordinator in the Office of Equity, Social Justice, and Multicultural Education, "accused" Dr. Lee (who is Black) of "'White speak,' being 'transactional,' and 'Whitesplaining'" at a team meeting. Compl. ¶¶ 46-67, 57. Dr. Lee asserts that Mr. Santa Ana "essentially suggested that Dr. Lee was carrying water for white supremacy and cast Dr. Lee in racist stereotypes of the 'Uncle Tom,' which have historically been used to discredit free-thinking Black intellectuals who express the 'wrong' opinions." Compl. ¶ 107. Dr. Lee states that Mr. Santa Ana never apologized.

Dr. Lee also alleges that after she made a presentation to the Academic Senate, Ms. Hearn "confronted Dr. Lee and informed her that … Dr. Lee was 'burning bridges' and did not have 'allies' on campus." Compl. ¶¶ 95–99. Dr. Lee says Ms. Hearn expressed her "criticism" with "clear hostility" to Dr. Lee's protected speech, and that the "clear message was that Dr. Lee should shut up." Compl. ¶ 103. As another example, Dr. Lee contends that an instructor "accused Dr. Lee of 'getting in the way of anti-racist progress.'" Compl. ¶ 106. Finally, at a June 2022 District

board meeting, seven De Anza faculty members, on behalf of the De Anza Latinx Association and the De Anza Asian Pacific American Staff Association, allegedly "condemned" Dr. Lee based on harm and harassment they said they suffered because of Dr. Lee's statements. Compl. ¶¶ 147–52.

The second set of allegations involves failures to adequately respond to complaints by Dr. Lee. For example, Dr. Lee alleges that Dean Cortez "did nothing" after Dr. Lee complained about the "hostile environment" created by Mr. Santa Ana's comments. Compl. ¶ 107. (Dean Cortez agreed to "attend team meetings in the future to ensure that a tone of civility was maintained," but Dr. Lee alleges that she never actually did so, Compl. ¶ 111). Dr. Lee also contends that no action was taken after Dr. Lee reported suppression of Jewish events on campus. Compl. ¶¶ 132–33.

The third set of allegations involves limitations on Dr. Lee's ability to use, affiliate with, or participate in De Anza's official platforms and organizations. According to Dr. Lee, De Anza specified in October 2022 that Dr. Lee's presentations and teaching "were not 'official activities of the Office of Equity and Engagement' and 'will not be promoted through official college channels.'" Compl. ¶ 116. Dr. Lee was allegedly blocked from posting on the office webpage. Compl. ¶ 123. In addition, Dean Cortez, Ms. Espinosa-Pieb, and Mr. Ray purportedly directed that Dr. Lee's events be removed from the Events Calendar and "de-listed" as available for "professional growth activity hours" (a form of continuing education), even though the workshops had previously been approved. Compl. ¶¶ 115, 117–18. Dr. Lee contends that she was subject to "procedures" to have her workshops "approved." Compl. ¶¶ 121–22. Further, Dean Cortez told Dr. Lee that she was not a department chair and prevented her from meeting with faculty about "curriculum …, student learning outcomes assessments, instructional program review and other instructional and/or faculty matters." Compl. ¶ 119. Dean Cortez and Mr. Ray also allegedly "reprimanded" Dr. Lee for calling team meetings for the Office of Equity, Social Justice, and Multicultural Education, and directed Adriana Garcia, an assistant in the office, not to work with Dr. Lee and to ignore her emails. Compl. ¶¶ 48, 120. Ms. Garcia purportedly asked Dr. Lee not to use Ms. Garcia's name, title, or picture in slides Dr. Lee used at workshops. Compl. ¶ 136. Finally, Dean Cortez, Ms. Garcia, and others allegedly "excluded" Dr. Lee from the "Equity Action Council." Compl. ¶ 144.

The fourth and final set of allegations involves Dr. Lee's tenure review and dismissal. In November 2021, Dr. Lee's seven-member Phase I tenure review committee told Dr. Lee that they wanted to "see more of her" in the next quarter. Compl. ¶ 194. In January 2022, a committee member told Dr. Lee that the committee would unanimously recommend her termination. Compl. ¶ 196. The Phase I review concluded that month with a unanimous recommendation that Dr. Lee be terminated. Compl. ¶ 197. Dr. Lee alleges that this would normally have led to her immediate separation, but President Holmes overrode the recommendation and allowed Dr. Lee to continue to Phase II. Compl. ¶ 198.

According to Dr. Lee, the Phase II tenure review committee did not observe her teaching and events. Compl. ¶ 206. More than a year later, in February 2023, the Phase II committee concluded its review and, as before, unanimously recommended that Dr. Lee be terminated. Compl. ¶ 207. Dr. Lee says that the committee's report makes clear that Dr. Lee was terminated "because she expressed protected speech," and condemned her for having "one … particular perspective" and creating "polarizing conversations that interfere with supporting the college mission and equity goals." Compl. ¶ 208. Dr. Lee received a notice of termination on March 15, 2023. Compl. ¶ 210. Her last day of work at the College was June 30, 2023. Compl. ¶ 211.

Dr. Lee filed this action against the College, the District, and several individual trustee and employee defendants on July 10, 2023. She later filed the present amended complaint.

Dr. Lee asserts seven claims in her amended complaint. She has conceded that four of the claims—her claims under Title VI of the Civil Rights Act of 1964 and the California Constitution as well as her two state law claims for wrongful termination—should be dismissed. Counts 2, 3, 4, and 5 are therefore dismissed without leave to amend.

Three claims remain. The first is a claim under the First Amendment and 42 U.S.C. § 1983. Dr. Lee claims that the individual defendants violated her free expression rights by censoring her and retaliating against her. She seeks damages and reinstatement. The second is a claim under Title VII of the Civil Rights Act. Dr. Lee claims that she was discriminated against, retaliated against, and subjected to a hostile environment on the basis of race. The third is a claim under the California Fair Employment and Housing Act, which parallels the Title VII claim.

4

## II. Legal Standard

Federal Rule of Civil Procedure 8 requires a "short and plain statement of the claim showing that the pleader is entitled to relief," with allegations that are "simple, concise, and direct." A complaint must "plausibly suggest" entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). It must also give "fair notice" and "enable" the defendant "to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A pleading cannot be "so vague or ambiguous" that an opponent "cannot reasonably prepare a response." *See* Fed. R. Civ. P. 12(e).

A complaint that does not state a claim upon which relief can be granted can be dismissed under Rule 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678. Legal conclusions "can provide the framework of a complaint" but must be "supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations" and "construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

## III. Analysis

Dr. Lee's complaint sets forth many policy and legal disagreements between Dr. Lee and the College and its employees. She lays out at least 12 "dissenting viewpoints" that she publicly expressed but which she claims were "not permitted" at De Anza. *See* Compl. ¶ 153. She states that De Anza fostered an environment of "ideological intolerance," and that its administrators and policies suppressed academic freedom and censored free speech. Compl. ¶ 41. She characterizes De Anza's policies as not only "illiberal" but also "illegal." *Id.*

These are serious disagreements on important issues faced not only by De Anza but also by many institutions. This order does not address the merits of these disputes, though, important as they may be. Instead, the Court's task in resolving this motion to dismiss is to accept Dr. Lee's factual allegations and consider whether they are sufficient to state the specific legal claims she asserts against the defendants in this case. For the reasons set out in more detail below, the Court concludes that Dr. Lee's current allegations are not sufficient to state a claim under any of the three theories she is pursuing. These three claims are therefore dismissed with leave to amend.

### A. First Amendment

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." The Fourteenth Amendment extends this restriction to states and their officials. *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925). 42 U.S.C. § 1983 provides a cause of action to sue individual state officials who deprive anyone of protected free speech rights.

A Section 1983 claim has two elements: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury," which requires "both causation-in-fact and proximate causation." *Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2008).

The First Amendment prevents government officials both from censoring protected speech before it can be issued and from retaliating against the speaker after the fact. *See, e.g.*, *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014) ("Prior restraints on speech are disfavored and carry a heavy presumption of invalidity."); *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (elements of retaliation claim).

Here, Dr. Lee sues "all individual defendants in their official and individual capacities and trustee defendants in their official capacities" under Section 1983 for violating her First Amendment speech rights. She asserts that these individuals "violated Dr. Lee's rights to free expression, either directly through censorship of her viewpoints or by retaliating against Dr. Lee for the exercise of her free expression." Compl. ¶ 215. She seeks both damages and injunction reinstating her to her to her faculty position.

***Protected Speech.*** The first question is whether any of Dr. Lee's relevant speech was protected by the First Amendment. Although public employees "do not surrender all their First Amendment rights," when they "make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 421 (2006). The Ninth Circuit has held, however, that "*Garcetti* does not … apply to teaching and

6

academic writing that are performed pursuant to the official duties of a teacher and professor." *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) (cleaned up). Instead, academic speech is governed by the two-part balancing test from *Pickering v. Board of Education*, 391 U.S. 563 (1968). "First, the employee must show that his or her speech addressed matters of public concern. Second, the employee's interest in commenting upon matters of public concern must outweigh the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Demers*, 746 F.3d at 412 (cleaned up).

Thus, to plead that particular speech is protected by the First Amendment, Dr. Lee must plausibly allege that it was either (1) academic speech on a matter of public concern and thus potentially protected under *Demers*, or (2) not made pursuant to her official responsibilities and thus potentially protected under *Garcetti*.

In the existing complaint, Dr. Lee has not adequately pleaded that the speech at issue here was protected under either *Demers* or *Garcetti*. Dr. Lee was the Faculty Director for the Office of Equity, Social Justice, and Multicultural Education. She states that her formal job responsibilities included "facilitating an institution-wide transformation that realizes and promotes our commitment to equity, social justice, and multicultural education for students, classified professionals, faculty and administrators"; "supporting the college's equity plan by working collaboratively with and mentoring teaching and non-teaching faculty and classified professionals in culturally responsive and transformative curriculum and pedagogy"; "making 'report-outs' to the Academic Senate"; and "designing instructional workshops and programs." Compl. ¶¶ 31–33. Many of the statements Dr. Lee discusses in her complaint appear to be speech that was made pursuant to Dr. Lee's official duties but that involved neither teaching nor academic writing. *See, e.g.*, Compl. ¶¶ 56–57 (statements at team meeting), 66–75 (same), 77–82 (email to Office of Research), 84–86 (unspecified "objection" to land acknowledgement), 92–101 ("report-out" to Academic Senate). Dr. Lee alleges in general terms that she "publishes scholarship, speaks at conferences, and appears in the media, where she speaks on matters of public concern." Compl. ¶ 37. But even if this speech all constitutes academic speech under *Demers* (which seems likely), the complaint does not identify any specific publications, speeches, or media appearances, let alone

7

allege that this speech, as opposed to statements made in Dr. Lee's official but non-academic capacity, constituted the basis for any alleged censorship or retaliation. Because she has not sufficiently alleged that she was prevented from making any protected speech or retaliated against on the basis of such speech, Dr. Lee's has not adequately stated a First Amendment violation, and her claim must therefore be dismissed with leave to amend. In any amended complaint, Dr. Lee must identify the specific academic or non-official speech that she contends was censored or a basis for retaliation against her.

*Censorship*. Dr. Lee asserts that her free expression rights were violated through censorship. Dr. Lee alleges that the College "erased" Dr. Lee from its website; declined to endorse Dr. Lee's presentations and pedagogical materials as "official activities"; removed Dr. Lee's events from the "College Events Calendar"; "delisted" Dr. Lee's events as available for continuing education credit for faculty; and prevented Dr. Lee from publishing on the office's webpage. Compl. ¶¶ 38, 116, 118, 123, 135. But the First Amendment "does not prevent the government from declining to express a view." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). As currently presented, Dr. Lee's allegations do not suggest any ways in which the College or any of the individual defendants prevented her from speaking or imposed any sort of prior restraint. Instead, the existing allegations suggest instances where the College declined to promote, endorse, or circulate Dr. Lee's speech. As pleaded, these allegations therefore do not support a claim that any of the defendants violated Dr. Lee's speech rights by directly censoring her.

*Retaliation*. Finally, "[t]o state a First Amendment retaliation claim, a plaintiff must plausibly allege that (1) [s]he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (cleaned up). The "plaintiff must show that the defendant's retaliatory animus was a 'but-for' cause" of the plaintiff's injury, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* As pleaded, Dr. Lee's retaliation theory is stronger than her censorship theory. But the complaint is still impermissibly vague under Rule 8. Dr. Lee's

8

complaint asserts broadly that all defendants violated her free expression rights, including by retaliating against her. But the complaint does not specify which of the individual defendants she claims retaliated against her and how, nor does it explain how each defendant's actions proximately caused her harm as required. Additionally, as discussed above, not all of the speech discussed in the complaint is equally protected by the First Amendment. It is not entirely clear which speech Dr. Lee asserts was the basis for each defendant's alleged retaliation, and whether that speech was academic speech or speech made pursuant to Dr. Lee's official job duties. The retaliation claim as currently drafted is not clear enough to enable each of the individual defendants to respond. The claim therefore must also be dismissed with leave to amend. In an amended complaint, Dr. Lee should, for each claim, identify the protected speech, how particular defendants violated her free expression rights with respect to that speech, and how defendants' actions caused her injuries.

***Remedies.*** In her First Amendment claim seeking both damages and an injunction, Dr. Lee names "all individual defendants in their official and individual capacities and trustee defendants in their official capacities." California community college districts are considered arms of the state and therefore cannot be sued directly under Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Cerrato v. S.F. Cmty. Coll. Dist.,* 26 F.3d 968, 972 (9th Cir. 1994). State officials, including individual community college employees, can be sued in an official capacity for injunctive relief but cannot be sued in an official capacity for damages. *Will*, 491 U.S. at 71 & n.10. Accordingly, to the extent Dr. Lee asserts a claim for damages against any of the individual defendants in an official capacity, those claims are dismissed without leave to amend. Dr. Lee can only seek damages from the individual defendants in their non-official capacities.[1]

---

[1] Government officials sued in an individual capacity are entitled to "qualified immunity," which protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. Cnty. of L.A.*, 974 F.3d 1012, 1018 (9th Cir. 2020) (cleaned up). Because Dr. Lee has not clearly set forth her claims against the individual defendants, the Court cannot determine based on the complaint whether any of the alleged conduct violated clearly established rights of which a reasonable person would have known.

1    Dr. Lee also seeks an injunction—specifically, reinstatement to the position from which she was terminated. Community college officials can be sued in an official capacity for injunctive relief under Section 1983 because sovereign immunity "does not bar claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)). "To bring such a claim, the plaintiff must identify a practice, policy, or procedure that animates the constitutional violation at issue." *Id.* A complaint must "allege[] an ongoing violation of federal law and seeks relief properly characterized as prospective." *Koala v. Khosla*, 931 F.3d 887, 895 (9th Cir. 2019).

While a "plaintiff seeking injunctive relief … is not required to allege a named official's personal involvement in the … constitutional violation," a complaint must "name the official … who can appropriately respond to injunctive relief." *Id.* Here, Dr. Lee's complaint names *all* of the individual defendants in their official capacities but does allege that *any* of them have the power to reinstate her. Because the complaint does not identify which (if any) of the defendants can provide the relief she seeks, Dr. Lee's claims for reinstatement is also dismissed with leave to amend.

\*   \*   \*

For the foregoing reasons, Dr. Lee's First Amendment/Section 1983 claim for damages (against the individual defendants in their individual capacities) and for reinstatement is dismissed with leave to amend. Dr. Lee's official-capacity First Amendment/Section 1983 damages claim is dismissed without leave to amend.

### B.   Title VII of the Civil Rights Act of 1964

Title VII makes it "an unlawful employment practice for an employer … to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or … to limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Dr. Lee claims that District and the College discriminated against her, retaliated against her, and subjected her to a hostile environment on the basis of race. Compl. ¶ 262. The Court addresses each of these three theories in turn.

***Disparate Treatment.*** Title VII outlaws discrimination by employers on the basis of race. Title VII disparate treatment claims like Dr. Lee's "are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006). At the pleading stage this requires a plaintiff to make "a prima facie case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 803.

To articulate a prima facie case of disparate treatment, Dr. Lee must show that "(1) [she] is a member of a protected class; (2) [she] was qualified for his position; (3) [she] experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Dr. Lee clearly pleads that she is a member of a protected class (race) and was qualified for her position. So her claim turns on whether Dr. Lee has shown, for any adverse employment action, that College employees who are not Black were treated more favorably than her or that there are other circumstances from which the Court can infer discrimination.

At the outset, it is important to note that Dr. Lee does *not* contend in the existing complaint that she was denied tenure and terminated on the basis of her race. Although termination was undoubtedly an adverse employment action, Dr. Lee alleges that she was terminated because of her *views* about race, *see, e.g.*, Compl. ¶ 197, rather than because of her race itself, and she does not specifically assert that she was treated differently during her tenue review process on the basis of her race (as opposed to on the basis of her speech and ideas).

Instead, Dr. Lee points to two ways she was allegedly treated differently because she is Black. The first is that the College offered special voting privileges in the Academic Senate to "affinity groups" for minority faculty and that similar rights were denied to other groups of

11

students. Compl. ¶¶ 124–25, 232, 269. Dr. Lee states that these affinity groups were "segregated," and suggests that similar resources and privileges were not offered to "white faculty, staff, and students as well as numerous other racial and ethnic groups that are not presently reflected in the … 'affinity groups.'" Compl. ¶ 128. Dr. Lee alleges that she questioned this structure. Compl. ¶ 153. As pleaded, however, Dr. Lee's allegations do not suggest that she *herself* was treated differently from other employees because of her race. Dr. Lee's complaint does not state whether Dr. Lee was a member of any of these affinity groups, whether she ever tried to join one, or whether she was granted or denied entry. It thus fails to allege that Dr. Lee herself experienced any adverse employment action in the form of diminished voting rights. Because Dr. Lee's allegations do not suggest any way that she herself was treated differently because of her race, they do not support a prima facie case of disparate treatment in violation of Title VII.

The second difference Dr. Lee points to is the alleged variation in response to two events. The first event was Dr. Lee's presentation to the Academic Senate at which she related the following experience with an unnamed colleague:

> Recently, one of my colleagues that I highly respect met with me. They explained that they work from an anti-racist perspective and that because I have recently been advocating for our state and local senates to remain ideologically neutral and/or at least more ideologically inclusive in their resolutions and actions, they felt that they could no longer advance the anti-racist work that they had worked hard to advance over many years. I was floored to hear this. I explained to my colleague that I was baffled by how they somehow connected two completely unrelated items to a reflection on their personal pedagogical practice and I also shared with them that this extrapolation concerns me deeply. How could my personal advocacy for faculty academic freedom lead them to such a conclusion? Thankfully, we worked together to unpacked it.

Compl. ¶ 95. Dr. Lee states that after this presentation, Ms. Hearn "confronted" her and suggested that making this presentation without the unnamed faculty member's permission was "disrespectful and unprofessional." Compl. ¶ 100.

The second event was a district board meeting which Dr. Lee argues shows that similarly situated individuals outside of her protected class were treated differently. At this board meeting,

Dr. Lee alleges that several De Anza faculty members stated that they had been hurt by Dr. Lee's speech and "condemned" her for her statements and actions. Compl. ¶¶ 147–51.

Dr. Lee claims that these two events show disparate treatment because she was "admonished" for her statement at the Faculty Senate while the public commenters at the district board meeting were not. Even assuming these two events are completely analogous, though, Dr. Lee's allegations to not suggest that she was treated differently *because of her race*. As an initial matter, the allegations suggest that both Dr. Lee and the board meeting presenters were *all* allowed to share their respective statements. And even if Ms. Hearn's statements to Dr. Lee after her presentation could constitute an employment action by the College or District (the circumstances of this alleged confrontation are not entirely clear), the allegations do not establish that Dr. Lee was treated differently because of her race as opposed to because of the content of her statement to the Academic Senate and the fact that she shared a private conversation without permission.

In sum, Dr. Lee has not pleaded facts establishing a prima facie case of disparate treatment on the basis of race. Her disparate treatment claim is therefore dismissed with leave to amend.

***Retaliation.*** Dr. Lee also claims that the District and the College retaliated against her for opposing their allegedly race-based policies. Compl. ¶ 270. She alleges that she "submitted grievances and complained about the … race-based policies and the hostile environment." Compl. ¶ 271. In response, the District and the College allegedly "censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection." Compl. ¶ 272.

To state a prima facia retaliation case, Dr. Lee must "show that she engaged in protected activity, that she suffered a materially adverse action, and that there was a causal relationship between the two." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013). "An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Id.*

The complaint is not clear about which grievances and complaints Dr. Lee alleges that the District and the College retaliated against her for pursuing. Dr. Lee points to only one specific allegation that she made a complaint: Dr. Lee alleges that an instructor accused her of "getting in the way of anti-racist progress." Compl. ¶ 106. Dr. Lee alleges that, in response to this accusation,

13

she complained to Dean Cortez about this "hostile environment," but that Dean Cortez "did nothing." Compl. ¶ 107. But it is not clear from the facts as pleaded that Dr. Lee was complaining about an employment practice she believed violated Title VII, as opposed to a single comment made by another employee. Without more details, the Court cannot evaluate the potential causal connection between that complaint and the adverse action Dr. Lee points to in her opposition brief—her ultimate termination. As pleaded this claim is therefore deficient under Rule 8.

Accordingly, Dr. Lee's retaliation claim is also dismissed with leave to amend. In any amended pleading, Dr. Lee should specifically identify the complaints or grievances she believes she was retaliated against for making, and the adverse employment actions she believes resulted.

***Hostile Environment.*** Finally, Dr. Lee claims that the District and the College subjected her to a hostile environment on the basis of her race.

Hostile environment claims depend on the context:

> [A] plaintiff bringing a hostile work environment claim must show discrimination by an employer on account of membership in a protected group…. The offensive conduct must be sufficiently severe or pervasive to alter the conditions of employment. Notably, individual targeting is not required to establish a Title VII violation. It is enough … if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position. When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.
>
> Context matters. Workplace conduct is to be viewed cumulatively and contextually, rather than in isolation. This approach makes common sense in order to screen out one-off, isolated events and yet benchmark conduct in the context of a specific workplace. … Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discrimination. These parameters prevent Title VII from expanding into a general civility code….

*Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978–79 (9th Cir. 2023).

Dr. Lee points to several allegations to support her claim of a hostile environment:

- "Those who publish in [Free Black Thought] are sometimes accused, as Defendants accuse Tabia Lee at De Anza, of not being the 'right' sort of Black voices, of being

- 'Oreos,' 'whitesplaining,' perpetuating 'white supremacy,' … and other racist stereotypes and tropes." Compl. ¶ 30.
- "Deviation from … orthodoxy, which identifies 'Whiteness,' 'White supremacy,' and 'White colonialism' as the root of all ills, is met at De Anza with severe retaliation." Compl. ¶ 45.
- In October 2021, at a meeting, Mr. Santa Ana stated that the campus "Women, Gender, and Sexuality Center" was "for people of color" and that it was "our safe space we have made." Compl. ¶ 69. Mr. Santa Ana, Ms. Garcia, and another staff member told Dr. Lee that "the physical Office of Equity, Social Justice, and Multicultural Education is for students, faculty and staff of color only, and that White people or others who do not fit that definition are not welcome in the Office of Equity." Compl. ¶ 72. The other staff member stated that "we … are intentionally decentering Whiteness." Compl. ¶ 73.
- Around November 2021, at a meeting, Mr. Santa Ana "accused Dr. Lee of 'White speak,' being 'transactional,' and 'Whitesplaining.'" Compl. ¶ 57.
- In June 2022, De Anza hosted a presentation by a UC Davis staff member. The slides featured a graphic that listed "worship of the written word," "objectivity," "individualism," "perfectionism," and "progress" as elements of "white supremacy culture." Compl. ¶¶ 59–62.

As drafted, the first two allegations are too vague to support Dr. Lee's claims. It is unclear whether Dr. Lee is discussing the kinds of accusations that are "sometimes" made against scholars like Dr. Lee or the way that "deviation" can be treated at the College, or whether Dr. Lee is specifically asserting that any of the identified defendants actually acted that way in her own case.

That leaves Dr. Lee's allegations regarding three specific events: one comment directed at Dr. Lee directly, one comment discussing race generally but not directed at Dr. Lee, and one presentation discussing race generally. As pleaded, and considered in the context of an academic workplace in which discussing topics related to race appears to have been central to Dr. Lee's job responsibilities, this conduct does not appear severe and pervasive enough to have interfered with Dr. Lee's performance of her job or otherwise alter the conditions of her employment. Dr. Lee

may have disagreed with the ideas presented, but showing a hostile work environment requires more than disagreement or academic discussion of offensive ideas. Indeed, Dr. Lee herself "recognizes that even obnoxious ideas may form part of diverse discussions of ideas at any college." Compl. ¶ 44. Dr. Lee's hostile work environment claim is therefore dismissed with leave to amend. In any amended complaint, Dr. Lee should identify the specific conduct she contends created a hostile work environment and explain why that conduct, when considered in the specific academic context of her position, was sufficiently severe and pervasive to violate Title VII.

### C. California Fair Employment and Housing Act

Dr. Lee's final claim is for a violation of the California Fair Employment and Housing Act (FEHA). She asserts this claim against the District, the College, and several individual defendants.

The FEHA claim against the College and the District is dismissed without leave to amend. As Dr. Lee appears to concede, these state entities are immune under the Eleventh Amendment.

Dr. Lee argues that her FEHA claim against individual defendants survives for the same reasons as her Title VII claims. Because Dr. Lee's Title VII claims are not adequately pleaded, however, the Court will similarly dismiss the individual FEHA claims with leave to amend.

## IV. Conclusion

For the reasons set forth above, all of Dr. Lee's claims are dismissed, some without leave to amend and some with leave to amend. An amended complaint, should Dr. Lee choose to file one, is due May 31, 2024. The June 27, 2024 Case Management Conference is reset to September 26, 2024. The parties shall submit a Joint Case Management Statement by September 12, 2024.

**IT IS SO ORDERED.**

Dated: May 7, 2024

P. Casey Pitts
United States District Judge