1  NEAL S. ZASLAVSKY, ESQ. (SBN 277543)
     neal@nszlegal.com
2  **LAW OFFICE OF NEAL S. ZASLAVSKY,**
   **A PROFESSIONAL CORPORATION**
3  8335 Sunset Boulevard, Suite 101
4  West Hollywood, California 90069
   Telephone: (323) 389-1881
5  Facsimile: (323) 389-1885

6  MICHAEL THAD ALLEN (admitted *pro hac vice*)
     mallen@allenharrislaw.com
7  **ALLEN HARRIS PLLC**
8  PO Box 404
   Quaker Hill, Connecticut  06357
9  Telephone:  (860) 772-4738

10 *Attorneys for Plaintiff, Dr. Tabia Lee*

11

12              **UNITED STATES DISTRICT COURT**

13   **FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

14

15 | **TABIA LEE,** | Case No.: 5:23-cv-03418-PCP |

16 |              Plaintiff, | *Assigned for all purposes to:* |

17 |        v. | *Hon. P. Casey Pitts, United States District Judge* |

18 | **THE FOOTHILL-DE ANZA** |

19 | **COMMUNITY COLLEGE DISTRICT,** | **SECOND AMENDED COMPLAINT AND** |
   | **DE ANZA COLLEGE, PATRICK J.** | **DEMAND FOR JURY TRIAL** |

20 | **AHRENS, LAURA CASAS, PEARL** |
   | **CHENG, PETER LANDSBERGER, LEE** |

21 | **LAMBERT, and GILBERT WONG, in** |
   | **their official capacities; CHRISTINA** |

22 | **ESPINOSA-PIEB, in her official and** |
   | **individual capacities; ALICIA CORTEZ,** |

23 | **LYDIA HEARN, LLOYD A. HOLMES,** |
   | **and THOMAS RAY, in their individual** |

24 | **capacities,** |

25

26 |              Defendants. |

27

28

Plaintiff Dr. Tabia Lee, who is Black, stood up for free speech, academic freedom, humanism, and equal treatment for all students and faculty, regardless of race, as a faculty member of De Anza College ("De Anza") within Defendant Foothill-De Anza Community College District ("District"). She was accused of "Whitesplaining" and not being the "right kind of Black person."

Dr. Lee refused to knuckle under to campus orthodoxy concerning purely performative "land acknowledgments," to the intentional misspelling of foreign words such as "Latinos" as "Latinx" (which no one uses other than campus bureaucrats and self-proclaimed "social justice" advocates), to the segregation of students and faculty into so-called "affinity groups," and to other race-based pieties enforced by the Defendant Foothill – De Anza Community College District ("District") and De Anza College ("De Anza").

Dr. Lee also objected to racial stereotypes peddled by Defendants that targeted both White and Black Americans, bizarrely celebrating Blacks as incapable of objectivity, individualism, efficiency, progress, and other grossly demeaning stereotypes, while condemning Whites for promoting these same values, which Defendants label "colonialism" and "White supremacy."

Defendants, as state actors, then retaliated against Dr. Lee and censored her free speech in violation of the First Amendment, Title VII of the Civil Rights Act of 1964, and the California Fair Employment and Housing Act.

## I.    **JURISDICTION**

1.      This action arises under the Constitution and laws of the United States, and this Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C § 1343; the requested declaratory relief pursuant to 28 USC § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

2.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C § 1367(a).

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

II.  **VENUE**

3.     Venue is proper in this District pursuant to 28 U.S.C § 1391(b) because Defendants reside in this District and the acts described in this Complaint occurred in this District.

III.  **DIVISIONAL ASSIGNMENT**

4.     San Jose is the proper division of Court pursuant to Civil L.R. 3-2(c) because De Anza Community College is located in Cupertino, California. Cupertino is part of Santa Clara County. Santa Clara County cases are assigned to San Jose District pursuant to N.D. Cal. Civ. L.R. 3-2.

IV.  **PARTIES**

5.     Plaintiff Dr. Tabia Lee ("Dr. Lee") was, until the date of her termination, a full-time tenure-track faculty member, and Faculty Director for the Office of Equity, Social Justice, and Multicultural Education at De Anza Community College in Cupertino, California. Dr. Lee resides in Sacramento, California.

6.     The Foothill-De Anza Community College District ("District") is a public entity that operates a system of public community colleges, including De Anza College, and its principal place of business is also located in Santa Clara County, at 12345 El Monte Road, Los Altos Hills, California 94022. The Foothill-De Anza Community College District receives federal funding.

7.     De Anza Community College ("De Anza") is a public institution of post-secondary education with principal place of business at 21250 Stevens Creek Blvd, Cupertino, California 95014. De Anza receives federal funding.

8.     Christina G. Espinosa-Pieb was, at all times relevant to the events pleaded in the Complaint, Vice President of Instruction for De Anza and a member and "elder" of the segregated De Anza Latinx [sic.] Association, retiring April 28, 2023. She returned and is currently Acting President of De Anza College.  In her position at present, Espinosa-Pieb has the authority to grant all injunctive relief sought in this civil action.  Espinosa-Pieb resides within the jurisdiction of the

1   Northern District of California. Defendant Espinosa-Pieb acted under color of state law and is sued

2   in both her individual and official capacities.

3       9.      Lee Lambert is the Chancellor of the Foothill-De Anza Community College District.

4   He is sued in his official capacity.  In his position, he has the authority to grant all injunctive relief

5   sought in this civil action.

6       10.     Lloyd A. Holmes was at all relevant times President of De Anza Community College

7   and resides within the jurisdiction of the Northern District of California. Holmes was the ultimate

8   supervisor of all faculty and staff of De Anza. Holmes is being sued in his individual capacity.

9       11.     Alicia Cortez is and was at all relevant times Dean of Equity and Engagement at De

10  Anza. In this role she was Plaintiff Dr. Lee's direct supervisor. Cortez is a member of the De Anza

11  Latinx [sic.] Association and was the de facto chair of Plaintiff's Phase I and Phase II Tenure

12  Review Committee. Cortez resides within the jurisdiction of the Northern District of California.

13  Defendant Cortez acted under color of state law and is sued in her individual capacity.

14      12.     Thomas Ray is Interim Associate Vice President of Instruction and participated in

15  Dr. Lee's Phase I and Phase II Tenure Review Committee. Ray resides within the jurisdiction of the

16  Northern District of California. Defendant Ray acted under color of state law and is sued in his

17  individual capacity.

18      13.     Lydia Hearn was formerly Interim Associate Vice President of Instruction and

19  participated in Dr. Lee's Phase I Tenure Review Committee. Hearn is a member of the segregated

20  De Anza Asian Pacific American Staff Association. Hearn resides within the jurisdiction of the

21  Northern District of California. Defendant Hearn acted under color of state law and is sued in her

22  individual capacity.

23      14.     The following Defendants, as more fully enumerated in ¶¶ 15-19, *infra*, are members

24  of the District Board of Trustees ("Board Defendants"). The Board has ultimate supervisory

25  authority over the District and De Anza and has ultimate responsibility to ensure that De Anza and

26  the District follow their own rules and policies and that all faculty, staff, and employees of De Anza

27  and the District are properly supervised. The Board also makes the final decision concerning

28

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

1   whether to grant tenure to a faculty candidate for tenure such as Dr. Lee.  The Board Defendants

2   have the authority to grant all injunctive relief sought in this civil action.

3          15.     Patrick J. Ahrens is the President of the District Board of Trustees and resides within

4   the jurisdiction of the Northern District of California. Ahrens is sued in his official capacity.

5          16.     Laura Casas is Vice President at Large of the District Board of Trustees and resides

6   within the jurisdiction of the Northern District of California. Casas is sued in her official capacity.

7          17.     Pearl Cheng is a trustee of the District Board of Trustees and resides within the

8   jurisdiction of the Northern District of California. Cheng is sued in her official capacity.

9          18.     Peter Landsberger is a trustee at large of the District Board of Trustees and resides

10  within the jurisdiction of the Northern District of California. Landsberger is sued in his official

11  capacity.

12         19.     Gilbert Wong is a trustee at large of the District Board of Trustees and resides within

13  the jurisdiction of the Northern District of California. Wong is sued in his official capacity.

14

15  **V.      FACTUAL BACKGROUND**

16          **A.     TABIA LEE**

17         20.     Plaintiff Dr. Tabia Lee is an educational sociologist and California native. She

18  happens to be Black, but first and foremost, Dr. Lee is a teacher dedicated to humanism and civil

19  rights. She teaches that people should not be judged by the color of their skin but by the content of

20  their character. De Anza is hostile to this concept.

21         21.     Dr. Lee espouses the idea, abhorrent in the District, that people, especially teachers,

22  must treat people like human beings, not political abstractions reduced to unchangeable attributes

23  ascribed by the characteristics of race and gender beloved by De Anza's ideologues.

24         22.     In 1999, Dr. Lee received a Bachelor of Arts in sociology from the University of

25  California, Davis. By 2004, she achieved a Masters in Education, and in 2009, she earned her

26  Doctor of Education from the University of California, Irvine and California State University, Los

27  Angeles.

28

23.     Before that, from 1999-2009, Dr. Lee worked as a National Board Certified Teacher in the Los Angeles Unified School District. Dr. Lee taught middle school, in which she established a widely praised civic education program. The Los Angeles Unified School District Board of Education praised Dr. Lee's civic education program for its positive impact on the lives of students and community members. Dr. Lee also facilitated mock elections and community awareness panels, served as faculty mentor for student-led voter registration drives, and participated in other programs. For her fellow teachers, Dr. Lee provided school-wide training to promote culturally inclusive programs for gifted and mainstream education and facilitated the adoption of new technologies for pedagogy. She became chair of her school's Social Studies Department.

24.     From 2009 to the present, Dr. Lee has served as an education technology consultant providing training and advisement to K-12 expert teacher trainers, teachers, schools, and districts to build capacity around technological integration and transformation, pedagogy, curriculum, and evaluation. Dr. Lee also presents expert lectures, workshops, and invited presentations at state, local, national, and international educational conferences on these topics.

25.     From 2013-2015, Dr. Lee served as a Part-Time Online Instructor/Capstone Course developer in the online Masters program in Teaching English to Speakers of Other Languages ("TESOL") for the University of San Francisco, serving teaching professionals, including administrators, current instructors, and teacher candidates.

26.     From 2017-2020, Dr. Lee worked as an instructional designer for undergraduate programs and Part-Time Senior Lecturer for an online Masters degree program in Teaching English to Speakers of Other Languages ("TESOL") for Notre Dame de Namur University. Dr. Lee taught courses to graduate student teacher candidates, administrators, and current instructors. She provided individual and departmental coaching, resources, and supports for faculty, including development of an integrated course design certification program to assist faculty with designing or updating their courses for more humanistic and holistic student learning outcomes.

27.     In 2020, Dr. Lee joined the faculty of the College of San Mateo as a temporary tenure-track Faculty Instructional Designer providing campus-wide leadership and faculty support for holistic instructional design including serving as a faculty leader for multiple advisory

1  committees, conducting individual and departmental consultations and collaborations, peer

2  mentorship, and developing course enhancement and course evaluation and redesign tools and

3  resources for faculty.

4       28.    Among her many other endeavors, Dr. Lee is a founding member, author, and

5  director of Free Black Thought ("FBT"). FBT[1] is an online journal and community of heterodox

6  scholars and public intellectuals dedicated to the rich diversity of thought among and about Black

7  Americans. Authors of Free Black Thought strive for an accurate analysis of and observations about

8  Black lives beyond the relatively narrow spectrum of views promoted by mainstream outlets

9  purporting to define "the Black perspective." FBT promotes itself as frequently non-conforming,

10 often provocative, and sometimes contrarian.

11     **B.    DR. LEE IS HIRED AS A FULL-TIME TENURE-TRACK FACULTY AT**

12         **DE ANZA**

13     29.    In August 2021, Dr. Lee joined De Anza as Faculty Director for the Office of Equity,

14 Social Justice, and Multicultural Education and Chairperson of the Department of Equity, Social

15 Justice, and Multicultural Education.  This was a full-time, tenure-track faculty position.

16     30.    According to her job description, Dr. Lee's primary responsibility as a De Anza

17 Community College Professor and Faculty Director was to address issues of pedagogy at De Anza.

18 Her role was defined as "facilitating an institution-wide transformation that realizes and promotes

19 our commitment to equity, social justice, and multicultural education for students, classified

20 professionals, faculty and administrators ... The position is responsible for supporting the college's

21 equity plan by working collaboratively with and mentoring teaching and non-teaching faculty and

22 classified professionals in culturally responsive and transformative curriculum and pedagogy,

23 promoting culturally responsive services, and for promoting an inclusive campus environment."

24     31.    Dr. Lee's role as a faculty member may best be described as a teacher of teachers.  It

25 is impossible, as a real-world practical matter, to separate Dr. Lee's position as a professor who

26

27

───────────────

28 [1] See https://freeblackthought.com/about.

SECOND AMENDED COMPLAINT
                                        AND DEMAND FOR JURY TRIAL

taught at De Anza and as the Faculty Director and Chairperson of the Office of Equity, Social Justice, and Multicultural Education.

32.    In her role at De Anza, she was responsible for designing and teaching instructional workshops and programs for teachers and all members of the learning community including administrators, classified professionals, students, and the community-at-large, and for developing workshops and seminars for faculty programs within and outside the District, in addition to other duties.

33.    But for De Anza's obstruction of Dr. Lee's teaching, Dr. Lee's work would have substantially altered the nature of what was taught at the school by creating a more culturally responsive curriculum and pedagogy.

34.    Among other things, Dr. Lee was responsible for making "report-outs" to the Academic Senate.  This meant she was required to speak publicly to the full faculty on matters of public concern that implicate her work focused on substantially altering the nature of what was taught at De Anza.

35.    Dr. Lee also publishes scholarship, speaks at conferences, and appears in the media, where she speaks on matters of public concern.

36.    De Anza has unlawfully retaliated against and discriminated against Dr. Lee for doing her job, and De Anza has censored her public, protected speech.

37.    Defendants retaliated against Dr. Lee by terminating her in June 2023 because of her viewpoints and protected public speech and because of De Anza and the District's ideological opposition to Dr. Lee's humanism in the classroom.

C.    DE ANZA'S IDEOLOGICAL INTOLERANCE

38.    When Dr. Lee assumed her position as a full-time, tenure track faculty member in August of 2021, she brought her deep experience and expertise to De Anza's learning community.

39.    However, shortly after Dr. Lee's arrival, it became clear that her academic unit was committed to suppressing academic freedom, retaliating against free speech, and discriminating on the basis of race. In particular, these illegal and illiberal policies were promoted by Dean Cortez, President Holmes, Vice President Espinosa-Pieb, and Interim Associate Vice President Ray.

1    40.    Defendant Cortez was Dr. Lee's direct supervisor as Dean of Equity and

2   Engagement.

3    41.    Before Dr. Lee could even complete employee onboarding, Dean Cortez ordered Dr.

4   Lee to attend a "Decentering Whiteness" webinar. This was repugnant to Dr. Lee because it singled

5   out a specific group on the basis of race.  Disseminating such so-called training was and is a

6   practice and policy of Defendants, which subjects all De Anza employees to a hostile environment

7   on the basis of racial stereotypes.

8    42.    Dr. Lee registered to attend two of the so-called workshops.

9    43.    Unfortunately, the so-called workshops conveyed the orthodoxy enforced by

10  Defendants. Deviation from this orthodoxy, which identifies "Whiteness," "White supremacy," and

11  "White colonialism" as the root of all ills, is met at De Anza with severe retaliation.

12    44.    Upon information and belief, Defendants Holmes, Ray, Hearn, and Espinosa-Pieb

13  monitored, supervised, and approved all such content on campus.

14    45.    Dr. Lee opposed and opposes this ideology, which has been defined as "third wave

15  antiracism," a term Dr. Lee uses in her scholarship and used in her teaching at De Anza.  This

16  included a publication in the Journal of Free Black Thought, published February 28, 2023, in the

17  midst of her tenure evaluation.[2]

18    46.    Dr. Lee's teaching and scholarship expressly criticized the ideological movement of

19  "third wave antiracism" that has captured the District and which Defendants enforce as orthodoxy

20  on campus.

21    47.    "Third Wave Anti-Racism" is defined in, and Dr. Lee has relied on, the scholarship

22  of the Black Columbia linguist and public intellectual, John McWhorter.  Professor McWhorter

23  defines "Third Wave Anti-Racism" (also called "neo-racism") as follows:

24    First Wave Antiracism battled slavery and legalized segregation. Second Wave Antiracism,

25  in the 1970s and 1980s, battled racist attitudes and taught America that being racist was a flaw. Third

26  Wave Antiracism, becoming mainstream in the 2010s, teaches that because racism is baked into the

27  _____

28  [2] https://freeblackthought.substack.com/p/race-ideology-in-practice.

5:23-cv-03418-PCP

structure of society, whites' "complicity" in living within it constitutes racism itself, while for black people, grappling with the racism surrounding them is the totality of experience and must condition exquisite sensitivity towards them, including a suspension of standards of achievement and conduct.

Under this paradigm, all deemed insufficiently aware of this sense of Existing While White as eternal culpability require bitter condemnation and ostracization, to an obsessive, abstract degree that leaves most observers working to make real sense of it. . .[3]

48.     Even lower-level staff members enforced De Anza's inflexible and illiberal approach to ideologically driven, race-based teaching, with the full knowledge, praise, and approval of Defendants Cortez, Holmes, Ray, Hearn, and Espinosa-Pieb.

49.     For example, De Anza employee Tony Santa Ana served as program coordinator of the Office of Equity, Social Justice, and Multicultural Education before resigning from his role in August 2022. Since January 2023, he has been listed as an adjunct instructor in the Ethnic Studies Department at De Anza College. Mr. Santa Ana is a self-proclaimed "community organizer" and "artivist [sic.]."

50.     Mr. Santa Ana's "artivism" is generally directed toward De Anza faculty and staff whose viewpoints conflict with what he considers to be correct viewpoints. He holds himself out as an "educator and globe trotter that seeks to contribute to humanity and also an instructor in Intercultural Studies."

51.     The same day Dean Cortez suggested Dr. Lee attend the "Decentering Whiteness" webinar, Mr. Santa Ana emailed Dr. Lee to inform her and others in the campus community that the Office of Equity, Social Justice, and Multicultural Education would provide free copies of a book by Black Lives Matter founder Alicia Garza, *The Purpose of Power: How We Come Together When We Fall Apart*.

52.     On October 8, 2021, Dr. Lee was assigned to moderate an event with students and the author, Ms. Garza, about *The Purpose of Power* and the Black Lives Matter movement.

---

[3] See https://johnmcwhorter.substack.com/p/the-elect-neoracists-posing-as-antiracists

SECOND AMENDED COMPLAINT
          AND DEMAND FOR JURY TRIAL

53.     Dr. Lee's moderation of this event was one of her teaching and pedagogical activities, for which she was evaluated as part of her tenure and promotion process.

54.     In preparation for the teaching event, Dr. Lee compiled, with students, a list of questions that the De Anza students wished to ask Ms. Garza about her book as part of their learning experience.

55.     Ms. Garza's book agent, however, insisted that Dr. Lee restrict questions to Ms. Garza from a list of scripted questions they had prepared. Dr. Lee expressed that the students' questions reflected "a deeper reading and understanding of the issues presented by the author" than the "sanitized" questions prepared by Ms. Garza's agents. Dr. Lee believed the students' learning experience would be enhanced by the use of the students' questions.

56.     To allow the students to gain maximal pedagogical benefit from the event, Dr. Lee encouraged the students to put forward their questions to Ms. Garza as "follow-up questions."

57.     This prompted Ms. Garza to turn off her video conference camera. Later, De Anza employee and one of Dr. Lee's evaluators at tenure time, Cynthia Kaufman, claimed that Dr. Lee undermined Black Lives Matter by criticizing Ms. Garza.

58.     In fact, what Dr. Lee was doing was trying to optimize the educational value for California students participating in the workshop — a workshop that was observed as part of Dr. Lee's tenure review process, in particular by Defendant Cortez.

59.     De Anza's intolerance was demonstrated again about a month later, on or around November 1, 2021. Bizarrely, in the "social justice" ideology the District has imposed, the efficient organization of meetings, punctuality, objectivity, and the like are condemned as "white supremacy." Thus, when Dr. Lee chaired a team meeting which included Mr. Santa Ana and attempted to set a meeting agenda and identify ways to collaborate, Mr. Santa Ana objected.

60.     Mr. Santa Ana accused Dr. Lee of "White speak," being "transactional," and "Whitesplaining."  Apparently, to Mr. Santa Ana and De Anza College, simply articulating a different perspective was enough to revoke Dr. Lee's "Black card" and somehow transform the words of an educated Black woman into "White speak."

61.     Whereas real White supremacists of the 19th century condemned people of color for being supposedly genetically incapable of punctuality, efficient work, facility with the written word, and "perfectionism," the District and at De Anza have turned these racist stereotypes upside down. De Anza now celebrates these racist stereotypes as somehow indicating the ***superiority*** of people of color. The consequence is that any Black person, such as Dr. Lee, who believes in hard work, individualism, efficiency, doing well at mathematics, writing well, and many other attributes, is treated as some sort of race traitor. This is what Mr. Santa Ana conveyed to Dr. Lee in the November 2021 meeting.

62.     This racial stereotyping was further exemplified by indoctrination sponsored by De Anza on June 7, 2022, which Defendants Dean Cortez, Espinosa-Pieb, Ray, Hearn, and Holmes promoted and actively participated in.

63.     De Anza sponsored a presentation by University of California Davis administrator Laura Bohorquez Garcia, a mid-level staff member at UC Davis with no more than a BA in "American Cultural Studies." Bohorquez Garcia's presentation was titled "White Supremacy Culture, Professionalism and the 'Good' Immigrant Narrative."

64.     This was again part of the drumbeat of in hostile racial stereotypes promoted by the District and Defendants Cortez, Espinosa-Pieb, Hearn, Ray, and Holmes.

65.     Over 50 members of the campus learning community attended, including administrators, faculty, classified professionals, and students.

66.     Bohorquez Garcia circulated the following slide identifying so-called "CHARACTERISTICS OF WHITE SUPREMACY CULTURE" (all caps in original), in which values such as "worship of the written word," "objectivity," "individualism," "perfectionism," and "progress" are vilified as vials of poison.

///

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



67.     The District also promoted the ideology that "WHITE SUPREMACY IS A PROJECT OF COLONIZATION" (emphasis in original), in which Whiteness supposedly "colonizes our minds, our bodies, our psyches, our spirits, or emotions … as well as the land and the water in the sky and air we breathe."



68.     This document is just as demeaning to Black Americans and other minorities as it is to white people.  Just as real white supremacists of a bygone era identified immigrants (of whatever sort) as inarticulate, lazy, incapable of progress, trapped by tribal, communal values, and objectively incompetent, so too, Defendants peddle the same stereotypes. Defendants simply substitute praise of

1   all these demeaning, racist stereotypes for the condemnation expressed by the racists of yesteryear.

2   Defendants bizarrely condemn all the stereotypical "White" qualities that racists once praised as

3   evidence of "White" genetic superiority.

4   **D.      TABIA LEE EXPRESSES VIEWPOINTS THAT THE DISTRICT FINDS**

5   **INTOLERABLE**

6   69.     As early as October 2021, Dr. Lee began to encounter difficulty expressing even

7   mainstream viewpoints in her teaching and advocacy of pedagogical change at De Anza because of

8   Defendants' retaliation.

9   70.     Dr. Lee discovered that De Anza purposefully maintains campus facilities to exclude

10   students, faculty, and staff on the basis of race, which created a hostile environment for Dr. Lee.

11   71.     At all times relevant to this Complaint, Adriana Garcia was an administrative

12   assistant in the Office of Equity, Social Justice, and Multicultural Education and an avid member of

13   De Anza's segregated Latinx [sic] Association. To Ms. Garcia, this was an overtly ideological job.

14   She held herself out as not just keeping the administrative affairs of the office in good order but

15   advocating for "immigrant rights campaigns and womyn [sic] wellness through a human rights and

16   social justice lens" (whatever that means) and "international solidarity with local people's

17   movements such as police brutality, gender equity, racial justice and environmental justice,

18   especially when it involves art for the people."

19   72.     On October 4, 2021, Dr. Lee chaired a team meeting with Ms. Garcia, Mr. Santa

20   Ana, and Instructor of English Francesca Caparas. Leading these team meetings was one of Dr.

21   Lee's responsibilities as Faculty Director for the Office of Equity, Social Justice, and Multicultural

22   Education and Chairperson of the Department of Equity, Social Justice, and Multicultural

23   Education.  These team meetings convened to address substantial changes to pedagogy at De Anza.

24   73.     At the time, Ms. Caparas served as Faculty Coordinator for the "Women, Gender,

25   and Sexuality Center, also known as the Jean Miller Resource Room" ("WGSC" / "JMRC"). While

26   Ms. Caparas was not on the staff of the Office of Equity, Social Justice, and Multicultural

27   Education, the WGSC/JMRC's physical space on campus is in that office. Therefore, she often

28   attended these team meetings in the Fall 2021 quarter.

74.     Ms. Caparas explained that "more than one administrator has told me that White people, faculty members, are not feeling welcome at the Center . . . so where is this complaint coming from?"

75.     On information and belief, Ms. Caparas was referring, without limitation, to Defendants Cortez, Espinosa-Pieb, and Holmes, who endorsed the exclusion of "white" people from the Center.

76.     Ms. Caparas added, "I am not trying to make this a space for White gays and lesbians. They have the whole campus already."

77.     Mr. Santa Ana, the Program Coordinator who had accused Dr. Lee of "Whitesplaining," readily agreed, chiming in, "Our whole center is for people of color. That is our safe space we have made."

78.     In the meeting, Dr. Lee expressed the view, to which De Anza and the District were openly hostile, that resources of a state community college should be available to all students, regardless of race, and to all students seeking a non-threatening and welcoming environment to discuss their sexuality—of whatever persuasion.  Dr. Lee directly addressed the issue of what pedagogical resources should be made available at De Anza.

79.     Dr. Lee emphasized that the Office should be a space for all members of the learning community who seek refuge or solace, regardless of race.

80.     Ms. Caparas, Mr. Santa Ana, and Ms. Garcia then informed Dr. Lee that the physical Office of Equity, Social Justice, and Multicultural Education is for students, faculty and staff of color only, and that White people or others who do not fit that definition are not welcome in the Office of Equity or in the Jean Miller Resource Room (i.e., the Women, Gender, and Sexuality center).

81.     Ms. Caparas stated that "we," meaning the whole De Anza administration including Defendants Cortez, Espinosa-Pieb, Hearn, and Holmes, "are intentionally decentering Whiteness here."  Defendants Cortez, Espinosa-Pieb, Hearn, Ray, and Holmes knew of and endorsed Ms. Caparas' creation of a center that excluded people on the basis of race and gender orientation.

82.     Once again, race-based hostility was polluting Dr. Lee's workplace.

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

83.     Ms. Garcia announced that "We built this space for our voices and our stories, not for White people's voices, and that "they," apparently meaning anyone who is White, "have the whole campus already. They are trying to Whitewash our space."

84.     This conversation revealed how, despite the disgraceful tradition of segregation in America, De Anza and the District still promote illegal segregation, which is suddenly in vogue among so-called "anti-racists."

85.     Dr. Lee directly complained to both Dean Cortez and Associate Vice President Ray about the race and gender-based discrimination that pervaded the meeting.  They did nothing.

86.     Defendants' new-found celebration of segregation is similar to Defendants' endorsement of other 19th-century racist stereotypes and practices, such as stereotyping non-Whites as somehow incapable of objectivity, individualism, etc. They must now be segregated as well in the name of "safe spaces."

87.     In mid-November 2021, Dr. Lee spoke out on a matter of public concern and pedagogy at De Anza.  She began to express concerns about De Anza's use of recently invented labels such as "Latinx" and "Filipinx" in student-facing communications. Dr. Lee expressed her viewpoint that placing these terms in De Anza's Educational Master Plan — a Plan that set the practice, patterns of behavior, and process that would impact both curriculum and classroom pedagogy — would impose a toxic ideology that everyone at the college would have to work under and follow.

88.     Dr. Lee outlined her objections to including these terms in the Educational Master Plan in an email to De Anza's Office of Research, writing "Some folks have shared with me that literally, one day they were directed, 'We will now refer to Latino or Latina as Latinx' without explanation or rationale . . . As for me, I do not use those newly invented terms out of respect for the cultures and languages of the working-class communities where I have worked for decades and also because a reasonable rationale and origin has not been provided to justify their use."

89.     As Dr. Lee explained, these terms are, for all intents and purposes, unrecognized by actual Latin Americans or Filipinos, and imposing such terms on large swaths of historically underprivileged populations, in opposition to their own preferences, may be "cultural imperialism."

Dr. Lee also encouraged the Office of Research to consider using the racial and ethnic category names provided by California agencies, which do not include the alien misspellings "Latinx" and "Filipinx."

90.     De Anza imposes this and other arcane vocabulary, utterly incomprehensible to the vast majority of Californians. To most people, the substitution of "y" for "e" in the common spelling of "women" or forcing Spanish speakers to cancel the gender declination of Spanish nouns is simply misspelling. But at De Anza, Defendants have developed practices, policies, and processes for enforcing the intentional misspelling of foreign languages.  At De Anza and in the District, this counts as "social justice."  Defendants have embedded this in De Anza's Educational Master Plan.

91.     This constant drumbeat and enforcement of racial stereotypes not only created a hostile environment, but in addition, Dr. Lee's dissent from this kind of magical thinking quickly made her a target for retaliation that included public shaming and, eventually, her termination.

92.     Another example of Dr. Lee's ideological indiscretion was her asking questions about the performative nature and accuracy of De Anza's "land acknowledgement," another sacred cow in the District, whose veneration is required by the practices, policies, and processes of the District and in De Anza.

93.     De Anza maintains the following "land acknowledgment," which all state employees of its Office of Equity are forced to adopt, and which students are encouraged to perform at the beginning of school-wide events and proceedings like some sort of substitute Pledge of Allegiance or morning prayer.

> Office of Equity staff members humbly work in unceded Ohlone territory, here in De Anza College also known as the South Bay and or Silicon Valley.  We live among the original caretakers and stewards, The Muwekma Ohlone Tribe of the San Francisco Bay Area. We recognize De Anza College sits on the crux of Raymatush and Tamien tribal lands,. For more information about the Muwekma, please visit their website.
>
> Our vision is to continue a beautiful legacy of ancestral wisdom and cultural keeping in relationship to the land with much love and respect. We understand we do this work with the contradiction that we are in occupied territory after the massacre and genocide of Ohlone peoples, with western definitions of political borders.  Thus with more conviction, we are determined to educate ourselves, as staff, faculty, students and as community members to decolonize and deconstruct, to make room for ongoing unschooling, to learn cultural humility, giving life to

> social justice inside and outside the classroom centering first nation peoples and
> through relationship building.  In this way, we stay true to an indigenous way of
> life, to the core value that involves "To All My Relations."

See https://www.De Anza.edu/equityoffice/land.html.[4]  Defendants instructed the faculty and students that they must treat De Anza's "land acknowledgment" like the National Anthem.

94.     Dr. Lee objected, among other things, that De Anza's "land acknowledgment" is not even accurate; it gets the names of indigenous tribal nations wrong and does not do anything to incorporate practices recommended by the Tribal Nations Resource Center. Like fetishizing "x" in misspelling foreign words, it demonstrates contempt for the actual minority populations it claims to recognize.

95.     Dr. Lee objected a faculty member addressing issues of public concern that directly had an impact on pedagogy at the community college.

96.     She also did so in order to highlight the hostile environment created by such racist mischaracterizations, which Defendants made part of the practices, policies, and procedures of the community college.

97.     The "land acknowledgment" is yet another empty "anti-racism" gesture, and another indulgence of 19th-century race-based stereotypes, so beloved by Defendants, in this case the stereotype of the "noble savage."

98.     On information and belief, no one in the District, certainly no Defendant, has ever "decolonized" the Bay Area by sacrificing their personal property or time to do actual work for Native Americans. On information and belief, neither the District nor De Anza has ever returned any property to supposed tribes who were "original caretakers and stewards" of the land which De Anza claims to have appropriated.

99.     The only significant action taken by Defendants has been to discriminate against and retaliate against Dr. Lee for her failure to conform to the constant drumbeat of race-based stereotypes, for her insistence on speaking her mind on matters of public concern as a faculty

---

[4] According to Cal State East Bay's, C.E. Smith Museum of Anthropology, Virtual Museum, De Anza's "land acknowledgement" does not even appear to be historically/anthropologically accurate. See https://www.csueastbay.edu/museum/virtual-museum/native-california/5-gen/tribal.html.

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

1   member, for her opposition to unlawful and immoral discrimination, and, to paraphrase the 19th-

2   century racist tropes which Defendants repeatedly resurrect, for her persistence in being an "uppity"

3   Black woman.

4   **E.     DR. TABIA LEE ADDRESSES DE ANZA'S DISCRIMINATORY "ANTI-**

5   **RACISM" BEFORE THE ACADEMIC SENATE**

6   100.    As part of Dr. Lee's job responsibilities, she provided regular "report outs" to the De

7   Anza Academic Senate, before whom she was required to address issues that substantially affect

8   pedagogy at the community college and throughout the District.

9   101.    The Academic Senate holds meetings that are open to the public.  It is not strictly an

10  internal administrative body.  The Academic Senate is an organization whose primary function is to

11  make recommendations on academic pedagogy and professional matters in the District, and its

12  operations substantially affect pedagogy that has an impact on the California taxpayers and students

13  that De Anza purports to serve.

14  102.    As part of their role in judging Dr. Lee's promotion and tenure process, Defendants

15  Cortez, Holmes, and Ray evaluated her performance based on her reports to the Academic Senate.

16  103.    The Academic Senate includes all faculty members.

17  104.    On November 29, 2021, Dr. Lee presented in front of the Academic Senate.

18  105.    Dr. Lee included the full newsletter text of her presentation in her quarterly

19  newsletter circulated by email on December 1, 2021 to all faculty and members of the De Anza

20  community.  The newsletters that Dr. Lee circulated addressed serious suggestions about the future

21  course of important issues of teaching and pedagogy at the community college.  She did not address

22  personal complaints or the minutiae of particular individuals' roles amongst the faculty.

23  106.    Dr. Lee's message directly addressed pedagogy at De Anza, stating that "my

24  approach is one of unity and inclusion of diverse faculty ideological perspectives and learning

25  together that intentionally centers respect for academic freedom and diversity of thought."  Dr.

26  Lee's message addressed broad proposals to change the direction and focus of De Anza, in

27  particular due to its hostility to academic freedom in proportion to its fascination with race-based

28  dogma.

107.     Without identifying a colleague by name, Dr. Lee related the following:

Recently, one of my colleagues that I highly respect met with me. They explained that they work from an anti-racist perspective and that because I have recently been advocating for our state and local senates to remain ideologically neutral and/or at least more ideologically inclusive in their resolutions and actions, they felt that they could no longer advance the anti-racist work that they had worked hard to advance over many years. I was floored to hear this. I explained to my colleague that I was baffled by how they somehow connected two completely unrelated items to a reflection on their personal pedagogical practice and I also shared with them that this extrapolation concerns me deeply. How could my personal advocacy for faculty academic freedom lead them to such a conclusion? Thankfully, we worked together to unpacked it.

108.     Dr. Lee also expressed to the Academic Senate:

**We have to all work together in this world and in our learning community for greater equity. In the scope of this Academic Senate body, for me working together means protecting Academic Freedom for all even those we may be in disagreement with.** When we inevitably disagree with one another, please understand for real that I am not the great Black hope for Equity, so please don't try to cast me as such. **I am just a person, a colleague, a human being. If you have not yet had a conversation with me, have a conversation with me. If you have not yet come to my workshops, come to them. At my workshops by design you may hear or be exposed to diverse ideas, controversies, different thoughts, and utterances. It's fun!**

(Emphasis in original.)

109.     Dr. Lee's plea for academic freedom and diversity of opinion in the classroom and beyond quickly caused an uproar, especially among faculty and administrators, including Defendants Cortez, Espinosa-Pieb, and Holmes, who consider themselves "social justice" activists.

110.     Defendant Lydia Hearn, from August 2021 the Interim Associate Vice President of Instruction at De Anza, is a teacher of English who has taught at De Anza for over 20 years. She is an active member of De Anza's segregated Asian Pacific American Staff Association "affinity group."

111.     Defendant Hearn confronted Dr. Lee and informed her that by opposing the prevailing campus ideology on things like land acknowledgements, misspelling Spanish words, questioning the actions of any Black Lives Matter leader, and failing to kowtow to District orthodoxy, Dr. Lee was "burning bridges" and did not have "allies" on campus.

112.    Defendant Hearn also took umbrage at Dr. Lee's statements referencing the "seemingly difficult conversation between her and a colleague, who was mentioned anonymously, regarding the varying approaches to their work," suggesting that doing so without that person's permission was disrespectful or unprofessional.

113.    It is important to note that, as even Defendant Hearn acknowledged, Dr. Lee kept this person's identity anonymous. Dr. Lee even referred to this person as "one of my colleagues that I highly respect…" However, Dr. Lee had dared to question her colleague's "anti-racist" views, which in Defendant Hearn's view was highly inflammatory and "disrespectful."

114.    Defendant Hearn expressed this criticism of Dr. Lee, indicating a clear hostility to her protected speech and dissent from the orthodox ideology of the District.  Dr. Lee's advocacy for academic freedom and viewpoint diversity in De Anza's pedagogy was a substantial factor motivating Defendant Hearn's and all defendants' hostile treatment of Dr. Lee.

115.    The clear message was that Dr. Lee should shut up or be fired.  Dr. Lee did not and would not shut up, and she was fired.

**F.    DE ANZA CONTINUES TO IGNORE DR. LEE'S COMPLAINTS OF A HOSTILE ENVIRONMENT**

116.    Because of Dr. Lee's expression of unpopular views concerning De Anza's race-based pedagogy, Defendants actively retaliated against Dr. Lee.

117.    Because of Dr. Lee's opposition to De Anza's race-based discrimination, Dr. Lee was singled out and targeted by the De Anza community, with full knowledge and approval of all Defendants.

118.    For example, Political Science Instructor Nicky Yuen accused Dr. Lee of "getting in the way of anti-racist progress." Black women who think freely are not acceptable at De Anza, and Yuen told Dr. Lee point blank that he would not allow anyone to get "in the way" of "the progress we have made in anti-racism" at De Anza.

119.    By contrast, accusing a Black woman of "White speak" and "Whitesplaining," as Mr. Santa Ana did, has no consequences and does not "get in the way" of "anti-racist progress" at De Anza.

120.    Dr. Lee repeatedly complained to Dean Cortez of this hostile environment, but Dean Cortez did nothing, with the full knowledge and approval of Defendants Hearn, Ray, Holmes, and Espinosa-Pieb.

121.    Dr. Lee repeatedly notified De Anza officials of the hostile Environment to which she was being subjected.  Upon information and belief, Defendants Espinosa-Pieb and Holmes knew of these complaints, were responsible for supervising Dean Cortez, and fully approved of the hostile environment and Dean Cortez's complete lack of any initiative to do anything about it.

122.    Dr. Lee complained to Defendant Cortez about the racialized insults hurled at her by Tony Santa Ana in November 2021, but neither Defendant Cortez nor anyone else ever took any action in response to her complaint.

123.    On March 31, 2022, Lee submitted a formal grievance complaint detailing allegations of discrimination and harassment in violation of the District's policies.  She expressly complained about the October 4, 2021 meeting with Garcia, Caparas, and Santa Ana in which they openly expressed their intent to discriminate against California citizens on the basis of race and sexual orientation.

124.    The March 31, 2022 grievance complaint also complained of Santa Ana's accusations that, when Dr. Lee refused to conform to racist stereotypes, she was engaging in "White speak" and "White-splaining."

125.    Dr. Lee also complained that she had met personally with Defendant Cortez to discuss concerns about anti-Semitism on campus and hostility towards Jewish students.  As part of her efforts to address pedagogy on campus, starting in spring of 2021 and continuing over the course of the next year, Dr. Lee had advocated for Jewish-American Heritage Month and International Holocaust Remembrance Day.

126.    However, in the spring of 2021, Jewish students presenting a resolution to De Anza's so-called "Equity Action Council" promoting these ideas were shouted down with chants of "from the river to the sea, Palestine will be free."  Although purportedly championing "diversity, equity, and inclusion," Jewish students who wish to promote their own heritage are not part of the "diversity" and "inclusion" that Defendants wish to support.  Dean Cortez, with the knowledge and

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

1    approval of Defendants Holmes and Espinosa-Pieb, once again did nothing when Dr. Lee brought

2    this to her attention.

3        127.    In 2022, Dr. Lee learned that professor of philosophy and Director of the

4    Vasconcellos Institute for Democracy in Action, Cynthia Kaufman (former mentor to "artivist"

5    Tony Santa Ana and a member of Dr. Lee's Phase I Tenure Review Committee), participated in and

6    organized the suppression of Jewish events on campus. Dr. Lee again reported this racist

7    discrimination and intolerance to Dean Cortez.

8        128.    No action was taken. Nothing was done and neither Dean Cortez nor De Anza

9    investigated these issues.

10       129.    Defendants openly opposed the celebration of Jewish culture, remembrance, or

11   heritage on campus. Defendants encouraged the shouting down and cancelation of Jewish culture,

12   remembrance, and heritage on campus.

13       130.    Dr. Lee's teaching on campus included a Jewish Inclusion Summit, held on February

14   24, 2022, which addressed "Defining Anti-Semitism" with Alyza D. Lewin of the Lewis D.

15   Brandeis Center for Human Rights under Law and Rabbi Dr. Mark Goldfeder, Esq.  from the

16   National Jewish Advocacy Center.

17       131.    Upon the announcement of this initiative, Cynthia Kaufman, who sat in judgment on

18   Dr. Lee's promotion and tenure committee, responded with a single word: "barf."

19       132.    Troublingly, antiracism at De Anza that dares to address racism against the Jews

20   makes Defendants "barf."

21       133.    Dean Cortez, Ms. Garcia, and Mr. Santa Ana obstructed Dr. Lee from presenting

22   workshops on the topic of Jewish culture, remembrance, and heritage. Dean Cortez refused to

23   promote or list events Dr. Lee organized on Jewish Inclusion and Anti-Semitism Community

24   Education on the De Anza college calendar.

25       134.    Ms. Garcia attended a workshop where Dr. Lee urged students to report instances of

26   anti-Semitism on campus to the Office of Equity and Engagement, whereupon Ms. Garcia

27   demanded, with Dean Cortez's support, that Dr. Lee remove Ms. Garcia's name, picture, title, and

28   any reference from all slides at all workshops Dr. Lee facilitated going forward.

SECOND AMENDED COMPLAINT
                                        AND DEMAND FOR JURY TRIAL

135.    Dr. Lee also raised with Dean Cortez her concern that De Anza should recognize International Holocaust Remembrance Day and Jewish-American Heritage Month in the same way that it recognized heritage months or similar celebrations for other historically oppressed ethnic communities. Dean Cortez advised her that this was not a priority or important.

136.    On January 26, 2022, Hillel of Silicon Valley and the National Jewish Advocacy Center reported concerns to the De Anza's Equity Action Council "for the Jewish student community at De Anza College." They suggested that the De Anza take action to address longstanding concerns of anti-Semitism.

137.    In response during the meeting, in the chat, Ms. Garcia posted resources about anti-Zionist and anti-Israel organizations to antagonize the representatives of Hillel and the National Jewish Advocacy Center.

138.    Dr. Lee objected later that this was disrespectful. Dean Cortez, Ms. Garcia, and Mr. Santa Ana then ganged up on Dr. Lee. Ms. Garcia told Dr. Lee, in Dean Cortez's presence, that there was no reason to lift up "White oppressors" when De Anza's focus was on "decentering Whiteness" (whatever that means).

139.    This too was included in the March 31, 2022 grievance, expressly complaining of the hostile environment of race-based stereotypes at De Anza.

140.    On November 7, 2022, Dr. Lee filed an additional grievance complaint again alleging a hostile environment.

141.    Dr. Lee complained that she was retaliated against for filing her previous grievance and was being prevented from performing the job she was hired to do as punishment because she did not align with the "political perspectives" by Defendants Ray, Cortez, and Salamander Breiter (who attacked Dr. Lee in vulgar screeds for her viewpoints in her Phase II tenure review).

142.    Dr. Lee specifically complained about the hostile environment created in her office by Adriana Garcia, among others. Dr. Lee also specifically complained about De Anza's retaliation against her for speaking out against land acknowledgments. And Dr. Lee complained about the censorship of her teaching and workshops which were rooted in her expressed criticism of Defendants' "third wave antiracism."

143.    One of these publications and teaching materials was a module titled "The Race and Racial Equity," that Dr. Lee eventually published in the Journal of Free Black Thought on January 17, 2023, but which she circulated to the faculty and administration at De Anza as early as October 2022.

144.    On November 16, 2022, Dr. Lee complained that race-based stereotypes were polluting her workplace.  She said, in an email to Defendant Espinosa-Pieb and copied to Defendants Cortez and Ray, "I hope to receive the supports that I need to conduct my job duties in an environment that is free from the terrible and exhausting constraints of hostility, harassment, bullying, and discrimination."

145.    Dr. Lee told Defendant Espinosa-Pieb that "an ongoing pattern of harassment and bullying from my Dean and her aligned colleagues based on perceptions about my race, ideological perspective, political orientation, and medical condition," and expressed that "these behaviors have been relentless since my hire date."

146.    Dr. Lee's complaints detailed how doing her job was becoming impossible because of the hostile environment promoted and supported at all levels of leadership, including by all Defendants, at De Anza.

147.    Despite repeated notification of this racially discriminatory behavior, Defendants Cortez, Holmes, Ray, Hearn, and Espinosa-Pieb refused to take any action.

148.    On information and belief, De Anza took no action on any of Dr. Lee's complaints.

149.    For example, when Defendant Cortez received Dr. Lee's complaints about racist comments made toward her, Defendant Cortez agreed to Dr. Lee's request that she would attend team meetings in the future to ensure that a tone of civility was maintained and have Tony Santa Ana apologize for these racist comments. This never happened.

150.    Dean Cortez instead took over Dr. Lee's meetings herself, in which she added to the cacophony of criticism of Dr. Lee when Dr. Lee expressed unorthodox ideas.  This was another manifestation of Defendants' institutional practices, policies, and processes for enforcing its race-based dogma, which Dr. Lee continued to publicly criticize as "third wave antiracism" and "woke ideological perspectives."

**G.    DE ANZA'S RETALIATION AGAINST DR. LEE**

151.    Dean Cortez and others engaged in an active campaign to retaliate against Dr. Lee and prevent her from doing the job she was hired to do. Dr. Lee was targeted because she expressed the wrong opinions for a Black woman in the eyes of the Defendants.

152.    On information and belief, Vice President of Instruction, Defendant Christina Espinosa-Pieb, and Dean Cortez ordered the removal of Dr. Lee's events from De Anza's College Events Calendar.

153.    In October 2022, De Anza suddenly imposed on Dr. Lee the requirement that her presentations and pedagogical materials were not "official activities of the Office of Equity and Engagement" and "will not be promoted through official college channels."  This severely compromised Dr. Lee's ability to perform her job as Faculty Director for the Office of Equity, Social Justice, and Multicultural Education Director and Department Chair of the Office of Equity, Social Justice, and Multicultural Education Director.

154.    In November 2022, Defendant Thomas Ray, then Interim Associate Vice President of Instruction, directed the De Anza communications team to remove all promotion of Dr. Lee's fall workshops from the College Events Calendar.

155.    Defendants Cortez, Ray, and Espinosa-Pieb delisted Dr. Lee's workshops and events as available for professional growth activity hours ("PGA" hours), which are continuing professional education credits for faculty. Prior to Dean Cortez's recommendation of termination to Dr. Lee's Phase I Tenure Review Committee, Dr. Lee's presentations were listed as approved for PGA hours.

156.    Although De Anza continued to hold out Dr. Lee as the Department Chair of the Office of Equity, Social Justice, and Multicultural Education,[5] Dean Cortez instructed Dr. Lee that she was not, in fact, department chair in an email dated February 9, 2023. Dean Cortez thus prevented Dr. Lee from holding meetings with faculty "on Academic Senate topics related to

---

[5] See https://www.De Anza.edu/gov/academicsenate/department-chairs.html.

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

1  curriculum updates and revisions, new curriculum, student learning outcomes assessments,

2  instructional program review and other instructional and/or faculty matters."

3     157. While Dr. Lee was held out as Faculty Director for the Office of Equity, Social

4  Justice, and Multicultural Education, Dean Cortez and Thomas Ray reprimanded Dr. Lee for calling

5  team meetings for Dr. Lee's office, effectively silencing her.  Defendants Cortez and Ray directed

6  Administrative Assistant and acting Program Coordinator Garcia not to attend meetings or work

7  with Dr. Lee on office matters and to ignore Dr. Lee's email communications.

8     158. Dean Cortez instituted never-before-heard-of procedures for approving Dr. Lee's

9  workshops. On information and belief, the procedures imposed on Dr. Lee were not applied to other

10  faculty or program directors at De Anza.

11     159. Before Dean Cortez began to advocate for Dr. Lee's termination, Dr. Lee was not

12  required to gain such "approval" and her events were held on campus without this obstruction.

13     160. Administrative assistant and self-proclaimed "social justice" advocate Adriana

14  Garcia repeatedly locked the Office of Equity, Social Justice, and Multicultural Education webpage

15  to prevent Dr. Lee from publishing content on topics of public concern, especially messages openly

16  dissenting from campus orthodoxy. Nominally, Ms. Garcia worked under and for Dr. Lee, but

17  Defendants permitted and approved Ms. Garcia's censorship of Dr. Lee in Dr. Lee's own office.

18     161. These measures were not merely administrative reshuffling.  They were the

19  equivalent of placing Dr. Lee in a virtual rubber room or lightless basement office, where

20  performing her job was now intentionally impossible.

21     162. In the spring of 2022, De Anza proposed and eventually implemented a policy of

22  giving some minority faculty, whom De Anza segregated into "affinity groups," special voting

23  rights in the Academic Senate.

24     163. But Dr. Lee had the habit – tragically misguided in the eyes of her state employer –

25  of taking her job description literally. Her faculty position called for her to "facilitate inclusive

26  processes that empower ***all constituent groups*** to be part of institutional transformation" and to

27  work with shared governance groups, including the Academic Senate, to perform these duties.

28

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

164.     Whenever Dr. Lee attempted to perform these duties in a non-discriminatory manner, however, Dean Cortez attacked her and attacked any who refused to abandon Dr. Lee and her principles of universal civil and human rights.

165.     Dr. Lee spoke out on this issue to the Academic Senate.  Dr. Lee suggested to the Academic Senate that if the District, as an arm of the state, was going to sponsor segregated organizations by race and was going to incorporate members of segregated groups into privileged governance structures, then it should offer such "resources" to white faculty, staff, and students as well as numerous other racial and ethnic groups that are not presently reflected in the segregated "affinity groups" of De Anza.

166.     De Anza rejected the suggestion that members of different racial groups be treated equally. De Anza and the District prefer to grant privileges, including privileged voting rights, to faculty members and students on the basis of race and national origin and deny voting rights to others based on skin color.

167.     This once again institutionalized De Anza's mania for race-based and gender-based dogma in its policies, practices and processes throughout the community college system, further polluting Dr. Lee's workplace with race-based stereotypes.

168.     De Anza rejected all recommendations from the Jewish advocacy groups. Dean Cortez also informed Dr. Lee that the Office of Equity and Engagement would not update the District's webpages to condemn anti-Semitism because it was not important.

169.     Ms. Garcia, who edits the office's website, opined that statements on the website condemning anti-Asian hate and supporting Black Lives Matter were good enough.

170.     Dean Cortez, Ms. Garcia, and others excluded Dr. Lee from the Equity Action Council going forward, even as her job description stated that she was to serve as "Faculty Lead" for the Equity Action Council.

171.     At around this time (December 6, 2022), the Chancellor of the District Judy Miner welcomed the incoming President of Foothill, Dr. Christina Whalen, with a letter. Chancellor Miner announced that Dr. Whalen "provided oversight to redesign the curriculum development process to . . . work toward decentering whiteness as the standard guiding policy and practice."  This

1  announced the District's official policy to target one group, in this case White people, on the basis of

2  race.

3        **H.**     **THE RETALIATION ESCALATES:  DR. LEE FACES A JUNE 13, 2022**

4                 **"STRUGGLE SESSION" BEFORE THE BOARD DEFENDANTS**

5        172.    On June 13, 2022, the District dedicated a Board of Trustees meeting to condemning

6  Dr. Lee by name because she voiced what De Anza and the Defendants considered the wrong kinds

7  of opinions and thoughts.

8        173.    De Anza College Academic Senate President Cheryl Balm led the condemnation of

9  Dr. Lee.

10        174.    Faculty members Erick Aragon, Maristella Tapia, Jorge Morales, Noemi Teppang,

11  Andrea Santa Cruz, and Linda Conroy claimed to speak on behalf of the following race-based (that

12  is, segregated) "affinity groups": De Anza Latinx [sic.] Association ("DALA") and De Anza Asian

13  Pacific American Staff Association ("APASA").  They submitted written statements and came

14  forward to speak about their "harm," "harassment," or other subjective feelings that they claimed

15  had been hurt because they disagreed with Dr. Lee's protected speech.

16

17        175.    In particular, they condemned Dr. Lee for criticizing De Anza policies that she found

18  racist; they condemned Dr. Lee for advocating the removal of "third wave anti-racism" signifiers

19  from De Anza's official statements; they condemned Dr. Lee for criticizing De Anza's race-based,

20  segregated "affinity groups"; they condemned Dr. Lee for criticizing the Black Lives Matter

21  organization, they condemned Dr. Lee for not using what they characterized as "gender neutral"

22  foreign language words like "Latinx" and "Filipinx"; and they condemned Dr. Lee for hosting an

23  event on March 2, 2022, titled "Protecting Freedom of Expression on Campus."  They condemned

24  Dr. Lee for supporting Jewish heritage events and recognizing the prevalence of anti-Semitism.

25

26

27

28

176.    On information and belief, none of the faculty members who expressly condemned Dr. Lee by name were ever warned or evaluated negatively for using Dr. Lee's name in their vicious diatribes before the Board.

177.    The speakers repeatedly called for Dr. Lee to be fired because of her protected speech.

178.    The Board and these official organizations of De Anza created and condoned a hostile environment for Dr. Lee based on their perceptions about her race and the opinions she expressed. These would-be "social justice" activists condemned Dr. Lee because, they claimed, she supposedly created a "hostile environment" *for them* by encouraging critical thinking and expression of improper opinions.

179.    Many of these criticisms found their way into Dr. Lee's promotion and tenure review evaluations, which were eventually endorsed by all Defendants.

180.    In sum, before De Anza and the District decided to recommend her termination, Dr. Lee had publicly expressed the following dissenting viewpoints addressing substantive pedagogical changes at the community college but which are not permitted at De Anza:

- Support for Israel and Jewish Heritage Month and opposition to anti-Semitism.

- Opposition to the public shout-down (the "heckler's veto") of Jewish events.

- Opposition to stripping the gender declension from Spanish words like "Latino."

- Promotion of free speech on campus.

- Promotion of academic freedom on campus.

- Questioning granting voting rights based on racial preference to some students and student groups while suppressing the vote of other racial groups.

- Objection to De Anza's purely performative and historically dubious "land acknowledgment."

- Permitting students to question a leader from the Black Lives Matter organization.

- Criticizing racial segregation, euphemistically called "affinity groups" and "safe spaces."

- Criticizing racial stereotypes of Black Americans and others as somehow incapable of objectivity, mastery of the written word, individualism, progress, and other attributes De Anza disparages as "white supremacy" and "colonialization."

- Criticizing De Anza's orthodoxy of "anti-racism" as the only way to approach diversity, equity, and inclusion.

**I.     DE ANZA TERMINATES DR. LEE IN RETALIATION FOR HER PROTECTED SPEECH AND ACTIVITY AND IN RETALIATION FOR HER COMPLAINTS ABOUT DE ANZA'S RACE-BASED HOSTILE ENVIRONMENT**

181.    The District's employment probation, tenure review, and promotion policy is set forth in the District Tenure Review Handbook 2019-2022: A Guide for Faculty and Administrators ("Handbook").

182.    Under Article 6A, the District sets forth its process for evaluating faculty who are hired to a probationary period pending promotion to tenured faculty. This policy applied to Dr. Lee.

183.    During the probationary period, there is a "rigorous process of evaluation during which a review of the candidate's performance is conducted and a recommendation is made to the Board of Trustees, which makes the final decision on whether to grant tenure to the candidate."

184.    Tenure review, in its entirety, is a four-year process divided into three phases.

185.    Phase I takes place in the fall and winter quarter of the first year of employment.

186.    Phase II follows in the spring quarter of the first year. It then continues in the fall and winter quarters of the second year of employment.

187.    Phase III begins in the spring quarter of the second year and ends in the winter quarter of the fourth year.

188.    Each of these years from Phase I through Phase III is considered a "Probationary Year."

189.    The President of De Anza appoints a Tenure Review Coordinator, with concurrence of the Faculty Association (union) and the De Anza Academic Senate. The Chair coordinates all tenure review activities.

190.    De Anza convenes a "Core Committee" to evaluate the probationary faculty member.  The Core Committee is composed of the Division Dean (in this case Defendant Dean Cortez) and two tenured faculty members from within the division, at least one of whom, if possible, "shall be from the same department as the probationary faculty employee."

191.    In Phases I and II, the appropriate Vice President or his or her delegate and a third tenured faculty member from the at-large faculty outside the division join the Core Committee. These five members comprise the Tenure Review Committee.

192.    The two tenured faculty members in the Core Committee must be nominated by the appropriate division faculty and confirmed by the De Anza Academic Senate.

193.    The at-large faculty member who joins the Tenure Review Committee in Phase I and II is appointed by the Academic Senate.

194.    The Chair of the tenure review committee is elected by the Core Committee.

### 1.    Phase I of Dr. Lee's Tenure Review

195.    Dr. Lee's Phase I Tenure Review Committee was composed of the following De Anza employees:

Julie Wilson served as Chairperson and Core Committee member. Wilson teaches English and Language Arts at De Anza and, ironically, holds herself out as addressing "anti-Blackness embedded in our society."  She received tenure at De Anza in 2020 but has never earned a Ph.D.

Cynthia Kaufman served as part of the Core Committee. Kaufman was also the former mentor and teacher of "artivist" Tony Santa Ana and had responded with the single word, "barf," to Dr. Lee's teaching initiatives on anti-Semitism. Kaufman holds herself out as a "lifelong social change activist" (whatever that means) and serves as Director of the De Anza Vasconcellos Institute for Democracy in Action—where she projects messages vilifying people on the basis of race, namely that "White supremacy remains a core part of every aspect of our society."

Doli Bambhania served as at-large member of the Tenure Review Committee in at-large capacity. Bambhania is a mathematics instructor and member of the segregated APASA "affinity group."

1
2

<u>Dean Alicia Cortez</u> served as Division Dean and Dean of Equity and Engagement, and she is also member of the segregated "affinity group" DALA.

3
4
5

<u>Lydia Hearn</u> is a member of the segregated "affinity group" APASA, served as Interim Associate Vice President of Instruction, and she returned to the faculty after predicting that Dr. Lee would be unanimously recommended for termination in Phase I.  Lydia Hearn has been referenced above and proved especially hostile to Dr. Lee's ideas and public expression.

6
7
8

<u>Thomas Ray</u> followed Hearn as Interim Associate Vice President of Instruction and Dean of Language Arts, and he took over when Lydia Hearn stepped down on or around January 31, 2022 – just days after the Phase I delivered (as predetermined) a unanimous vote against Dr. Lee.

9
10

<u>Veronica Acevedo Avila</u> served briefly as a member of the Tenure Review Committee at the end of Phase I, replacing at-large member Doli Bambhania. She is Instructor of English and reading and member of the DALA "affinity group."

11

12
13

196.    Student and faculty evaluations of Dr. Lee's workshops and classes were positive and were submitted to the Tenure Review Committee. But these were not considered.

14
15
16

197.    During Phase I, *at least three* probationary evaluations must be performed, one by each of the Core Committee members. Additional probationary evaluations may be called for by the Tenure Review Committee, at the discretion of the committee.

17

198.    Dr. Lee received three positive evaluations and two negative evaluations.

18
19
20
21

199.    The Chair of the Tenure Review Committee, Wilson, informed Dr. Lee on October 24, 2021 and on other occasions, that Dean Cortez acted as de facto Chair of the committee and that Wilson, as a professor only recently granted tenure, had little authority. She told Dr. Lee that she acted more like Dean Cortez's secretary, and had to make sure paperwork was filed on time.

22

200.    Thus, Defendant Cortez directly intervened to get Dr. Lee fired.

23
24
25

201.    Each of the two negative evaluations in Phase I criticized Dr. Lee's protected academic speech, in direct violation of the First Amendment, De Anza's academic freedom policy, and its rules of faculty ethics.

26
27
28

202.    The Handbook provides that academic freedom and free speech are protected at De Anza by policy and not just by the inherent protections granted by the United States and California Constitution:

# ACADEMIC FREEDOM

Academic freedom encompasses the freedom to study, teach and express ideas and viewpoints, including unpopular and controversial ones, without censorship, political restraint or retribution. Academic freedom allows for the free exchange of ideas in the conscientious pursuit of truth. This freedom exists in all service areas, including but not limited to teaching, librarianship, counseling, coordinating and all faculty-student interactions. Academic Freedom is the bedrock principle of all institutions of learning and must be extended to all faculty regardless of their status as full-time, part-time, or probationary.

Faculty members have the principal right and responsibility to determine the content, pedagogy, methods of instruction, the selection, planning and presentation of course materials, and the fair and equitable methods of assessment in their assignment in accordance with the approved curriculum and course outline and the educational mission of the District, and in accordance with state laws and regulations. These rights and responsibilities include, but are not limited to, the faculty member's choice of textbooks and other course materials, assignments and assessment methods, teaching practices, grading and evaluation of student work, and teaching methods and practices.

Special vigilance must be paid to the protection of the Academic Freedom Rights of probationary faculty undergoing the tenure process. While the tenure process is, at its core, an evaluative process, the evaluation of probationary faculty must never be used as a pretense for abridging or restricting the Academic Freedom rights of a tenure candidate. All members of a probationary faculty member's tenure review committee should bear in mind that differences between their own teaching methods and practices and beliefs and those of the tenure candidate should never be the basis for their evaluation of a probationary faculty member. These differences are protected by the tenure candidate's Academic Freedom. The evaluation of a probationary faculty member should be based solely on those criteria described in the negotiated faculty evaluation instruments and those listed in the advertised job description under which the tenure candidate was hired.

203.    The Handbook also sets forth standards for faculty ethics, including, Section 3, which imposes the obligation on De Anza and District personnel, including all Defendants, to respect the freedom of inquiry and to refrain from harassing their colleagues:

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL

1    204.    Ms. Kaufman submitted the first negative evaluation of Phase I on November 4,

2    2021.

3    205.    Ms. Kaufman's criticism turned on Dr. Lee's insistence on expressing dissenting

4    thoughts and ideas. Ms. Kaufman criticized Dr. Lee for "criticiz[ing] [Black Lives Matter founder

5    Alicia] Garza publicly" — by criticizing Ms. Garza's willingness to engage openly with students

6    who had prepared questions about her book.

7    206.    Ms. Kaufman also criticized Dr. Lee for having "too many concepts and ideas," two

8    of which were "quite controversial," because it is apparently impermissible for an educated Black

9    woman to have so many impermissible thoughts at De Anza.

10    207.    In particular, Ms. Kaufman expressed that Dr. Lee, in her teaching and scholarship,

11    had impermissibly criticized the prevailing orthodoxy of De Anza as a "third wave anti-racist lens."

12    To Ms. Kaufman, this "raised some concerns" that "anyone who considered themselves anti-racist

13    would have felt unfairly criticized by this analysis."  Dr. Lee's mandate to "facilitat[e] an

14    institution-wide transformation that realizes and promotes our commitment to equity, social justice,

15    and multicultural education for students, classified professionals, faculty and administrators" did not

16    include the right to criticize so-called "anti-racism."

17    208.    Ms. Kaufman's criticism expressly targeted Dr. Lee's viewpoints, expressed over the

18    course of her employment with Defendants, concerning land acknowledgments, Black Lives Matter,

19    race-based segregation and safe spaces, anti-Semitism, opposition to "Latinx" and other intentional

20    misspellings of foreign languages, and her advocacy for academic freedom and free speech.

21    209.    Ms. Kaufman insisted Dr. Lee's critique of De Anza's orthodoxy "seemed

22    counterproductive" because it confronted De Anza students "with something quite challenging . . ."

23    At De Anza, students may not be challenged, according to Ms. Kaufman.  Ms. Kaufman aimed this

24    criticism directly at Dr. Lee's teaching and content in the classroom.

25    210.    Defendant Lydia Hearn submitted the second negative evaluation in the Phase I

26    process on January 14, 2022.

27    211.    Ms. Hearn graded Dr. Lee down to "satisfactory but needs improvement in specific

28    areas" in the following four categories:

- • Demonstrate cooperation and sensitivity and working with colleagues and staff;
- • Develops instructional and institutional resources;
- • Provides leadership and coordinates programs effectively; and
- • Communicate information clearly, concisely, and effectively.

212. However, these were pretextual to criticize Dr. Lee's protected speech and attack her academic freedom because Dr. Lee had dissented from the prevailing De Anza orthodoxy.

213. Tenure review at De Anza, by express policy of the District, may not be an ideological litmus test. Yet Ms. Hearn's review of Dr. Lee's performance explicitly criticized Dr. Lee for voicing controversial viewpoints.

214. Ms. Hearn specifically criticized Dr. Lee for her speech on November 29, 2021 before the Academic Senate Executive Committee (quoted in part above). In that speech, Dr. Lee had defended academic freedom, promoted viewpoint diversity, and free speech. This was somehow controversial at De Anza and in the District.

215. Ms. Hearn went on to work tirelessly for Dr. Lee's termination, invoking ever-more pretextual reasons for retaliating against Dr. Lee on the basis of her protected speech and also on the basis of race—because Dr. Lee is not, as Mr. Santa Ana had indicated, the "right kind" of Black person.

216. The District's Handbook requires the findings and recommendations of the Phase I tenure review process to be reviewed and committed to writing for presentation to the probationary faculty member, in this case to Dr. Lee.

217. That meeting took place on November 19, 2021. Yet nothing was presented to Dr. Lee in writing. Instead, the Tenure Review Committee, led de facto by Dean Cortez, informed Dr. Lee that they wanted to "see more of her" in the winter quarter. The Tenure Review Committee did not specify any specific areas in which Dr. Lee needed to improve, nor did they describe specific recommendations for improvement.

218.    To summarize – of the twenty-eight scores assigned to Dr. Lee by her evaluators, Dr. Lee received a score of "Unsatisfactory" in only one. Furthermore, Dr. Lee received the highest possible rating for twenty-two of the twenty-eight scores.

219.    Nevertheless, on January 18, 2022, Interim Associate Vice President of Instruction, Defendant Lydia Hearn, one of the two "evaluators" who had criticized Dr. Lee for her protected speech and open advocacy of academic freedom, told Dr. Lee that the Tenure Review Committee would be unanimously recommending her for termination.

220.    And true enough, on January 25, 2022, Phase I concluded with a unanimous recommendation that Dr. Lee should be terminated, in particular due to her dissent from De Anza's race-based orthodoxy.

221.    Ordinarily, this would have led to Dr. Lee being separated from the college. However, then-President Lloyd Holmes overrode the Tenure Review Committee's retaliation against Dr. Lee, and she continued into Phase II. Although Defendant Holmes was supposed to notify Dr. Lee directly, he never did so. Instead, Dr. Lee found out she would be allowed to advance to Phase II only by consulting an on-line list of faculty candidates who were being advanced to Phase II.

**2.    Phase II of Dr. Lee's Tenure Review Continues to Single Her Out for Protected Speech**

222.    On May 3, 2022, Dr. Lee was given her Phase II tenure review schedule. The members of the Phase II Tenure Review Committee were:

Richard Lopez, mathematics Instructor and Chairperson;

Luis Limcolioc, English full-time faculty; and self-proclaimed social justice advocate;

Salamander Breiter, the co-Chair of the Humanities at De Anza. Breiter earned a bachelor's degree from Fairhaven College in 1995 followed by a Masters degree from Western Washington University in 2000. Like so many of the faculty called upon to pass judgment on Dr. Lee, however,, he conceives of his job less as an instructor of an academic discipline, but more as a social activist. He designs his classes "to build commitment to civic and moral responsibility for diverse, equitable, healthy and sustainable communities," expecting students "to recognize themselves as members of larger social fabrics and to develop the abilities and motivation to take informed action for change."

1    223.    In addition, Defendant Cortez continued to exert influence over the process, as did

2    Defendant Ray, both of whom remained on the Tenure Review Committee for Phase II.

3    224.    In Phase II of the tenure and promotion process, each member of the Tenure Review

4    Committee must perform at least one additional probationary evaluation.

5    225.    Mr. Breiter submitted an evaluation of Dr. Lee on November 7, 2022, as had Ms.

6    Hearn and Ms. Kaufman (fellow self-proclaimed "social justice" advocates) in Phase I.  Mr. Breiter

7    again found fault with Dr. Lee's November 29, 2021 speech to the Academic Senate which

8    defended academic freedom, viewpoint diversity, and free speech. Mr. Breiter declared Dr. Lee's

9    mild language as "combative and edgy to me" —  a pretext for his condemnation of the content of

10   Dr. Lee's speech.

11   226.    This is ironic because Mr. Breiter used the most abusive profanity in a one-on-one

12   meeting with Dr. Lee, saying things like: "I just don't understand how all this shit happened"; "I

13   may be doing this differently than others but fuck that; I have to be myself"; and "I don't give a

14   damn..." as he condemned Dr. Lee.

15   227.    He also objected in the spring of 2022 two Dr. Lee's criticism of De Anza's

16   intentional abuse of the Spanish-language by misspelling foreign words like "Latino" or "Filipino"

17   with an "x."  Mr. Breiter found that Dr. Lee "continued to push a particular perspective and sense of

18   'right' action beyond comfortable discourse."

19   228.    Again, the criticism of Dr. Lee's protected speech and expressions of orthodox

20   viewpoints was express: Mr. Breiter said the quiet part out loud and "sens[ed]" that Dr. Lee's

21   "adherence to particular perspectives created some resistance and conflict during [her] first year at

22   De Anza College."

23   229.    Mr. Breiter referred to Dr. Lee's dissent from De Anza's semi-religious sacralization

24   of land acknowledgments, Black Lives Matter, its race-based segregation and safe spaces, the

25   prevalence of anti-Semitism, her opposition to "Latinx" and other misspellings, and her advocacy of

26   academic freedom and free speech.

27

28

230.     The Phase II Tenure Review Committee opted not to conduct any observations of Dr. Lee's teaching and faculty events in the Winter Quarter of 2023, despite Dr. Lee's best efforts to provide the committee with dates for observation of her work.

231.     On February 7, 2023 the "reconstituted" Phase II committee met with Dr. Lee. The Tenure Review Committee concluded Phase II and issued a report, once again unanimously recommending Dr. Lee for termination after expressly criticizing her outspoken views on pedagogy and teaching within the District on issues such as land acknowledgments, anti-Semitism, academic freedom, viewpoint diversity, segregate affinity groups and "safe spaces," Black Lives Matter, and bastardizations like "Latinx."

232.     But for Dr. Lee's exercise of her right to free expression in her teaching, in her opposition to "third wave antiracism" including but not limited to her publication in Free Black Thought, and in her advocacy for substantive pedagogical changes at the De Anza, Defendants would not have fired Dr. Lee.  Both her protected speech and her protected activity in grieving the hostile environment in the District and at De Anza were substantial and motivating factors in Defendants' conduct.

233.     The report issued by the committee made clear that Dr. Lee would be terminated because of her protected speech. The report condemned her, ironically, for having "one . . . particular perspective" and creating "polarizing conversations that interfere with supporting the college mission and equity goals."

234.     De Anza was, in fact, censoring Dr. Lee's speech, about which Dr. Lee complained to the Office of Communication, De Anza senior leadership, and District senior leadership. De Anza retaliated against Dr. Lee for submitting complaints about her censorship. The report referred to this as another reason to fire her.

235.     Phase II concluded with a notice of termination issued March 15, 2023.

236.     Dr. Tabia Lee's last day of work was June 30, 2023.

///

///

///

**COUNT 1:**

**VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST**

**AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

**— RETALIATION —**

*(Against the Board Defendants, Lambert, and Espinosa-Pieb in their Official Capacities and against Defendants Cortez, Hearn, Holmes, Ray, and Espinosa-Pieb in their individual capacities)*

237.    All the foregoing allegations are incorporated by reference into this Count as if fully restated here.

238.    Each Defendant sued in their official capacity has the authority to grant all injunctive relief requested in this civil action.

239.    Each Defendant sued in their individual capacity had clear notice that their suppression and retaliation against Dr. Lee for speaking on matters of pedagogy, scholarship, and public concern was a First Amendment violation, not least through *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).

240.    Plaintiff engaged in constitutionally protected speech, including but not limited to the following, and was subjected to severe retaliation as a result:

   a.    Reports to the public sessions of the Academic Senate.

   b.    Emails and newsletters to all De Anza faculty and administrators.

   c.    Criticism of Defendants' practice and policy of intentionally misspelling foreign words like "Latino."

   d.    Opposition to illegally segregated "affinity groups" and "safe spaces."

   e.    Criticism of Defendants' "land acknowledgment."

   f.    Criticism of Black Lives Matter and leading students in posing benign questions to its founder Ms. Garza.

   g.    Opposition to prevalent anti-Semitism on the District campuses and advocacy of Jewish heritage events.

1          h.     Criticism of "third-wave antiracism," including but not limited to her

2                 publication on this topic in the Journal of Free Black Thought.

3          241.   All writings and speech on these subject matters by Dr. Lee were related to

4   pedagogy, scholarship, and/or matters of public concern.

5          242.   Defendant Cortez took multiple retaliatory actions against Dr. Lee for her protected

6   academic speech. These actions gradually stripped Dr. Lee of her ability to do her job until finally,

7   with Defendant Cortez's help, Dr. Lee was terminated.  Among other things, Defendant Cortez

8   ordered the removal of Dr. Lee's events from the college calendar; de-listed Dr. Lee's events and

9   workshops from eligibility for professional development credits; declared that Dr. Lee was no

10  longer department chair when she was still listed as such on the website; directed others not to work

11  with Dr. Lee; instituted new and onerous procedures for the approval of Dr. Lee's workshops;

12  excluded Dr. Lee from participation in the Equity Action Council; and ultimately, participated in

13  the decision to terminate Dr. Lee in retaliation for her protected speech.

14         243.   Defendant Ray took multiple retaliatory actions against Dr. Lee for her protected

15  academic speech.

16         244.   Defendant Ray's actions gradually stripped Dr. Lee of her ability to do her job until

17  finally, with Defendant Ray's direct help, Dr. Lee was terminated. Among other things, Defendant

18  Ray directed the De Anza communications team to remove all promotion of Dr. Lee's workshops

19  from the College Events Calendar; de-listed Dr. Lee's events and workshops from eligibility for

20  professional development credits; directed others not to work with Dr. Lee; and ultimately,

21  participated in the decision to terminate Dr. Lee.

22         245.   Defendant Hearn took multiple retaliatory actions against Dr. Lee for her protected

23  academic speech.

24         246.   Defendant Hearn's actions gradually stripped Dr. Lee of her ability to do her job

25  until finally, with Defendant Hearn's help, Dr. Lee was terminated. Among other things, Defendant

26  Hearn submitted a retaliatory evaluation as part of Dr. Lee's tenure review process, explicitly citing

27  Dr. Lee's expression of controversial viewpoints as the reason for the negative evaluation, and

28  ultimately, participated in the decision to terminate Dr. Lee.

247.     Defendant Holmes retaliated against Dr. Lee for her protected academic speech by participating in her termination with full knowledge that her termination was in retaliation for her protected academic speech. Among other things, Defendant Holmes refused to act on and even condoned the behaviors complained about in Dr. Lee's grievances submitted through the formal channels of the District, and presided over her termination through a pretextual tenure and promotion review process in which she was expressly condemned for her viewpoints.

248.     Defendant Espinosa-Pieb took multiple retaliatory actions against Dr. Lee for her protected academic speech. These actions gradually stripped Dr. Lee of her ability to do her job until Dr. Lee was terminated. Specifically, Defendant Espinosa-Pieb directed the De Anza communications team to remove all promotion of Dr. Lee's workshops from the College Events Calendar, and de-listed Dr. Lee's events and workshops from eligibility for professional development credits.

249.     Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

250.     Dr. Lee is also entitled to reinstatement to her faculty position. Upon information and belief, the President, the Chancellor, and the Trustee Defendants have the authority to overturn the decision to terminate Dr. Lee from De Anza College and provide the requested injunctive relief.


**<u>COUNT 2</u>:**

**VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST**

**AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

**— CENSORSHIP —**

*(Against the Board Defendants, Lambert, and Espinosa-Pieb in their Official Capacities and against Defendants Cortez, Hearn, Holmes, Ray, and Espinosa-Pieb in their individual capacities)*


251.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

252.    As part of her scholarship and teaching, Dr. Lee developed and published workshop materials titled "The Race and Racial Equity What's It to You?"  These materials were published in the Journal of Free Black Thought.

253.    As part of her teaching duties and public speaking on issues of future pedagogical initiatives at the District and De Anza, Dr. Lee sought to present these materials at De Anza, including but not limited to in October 2022.

254.    To prevent these materials from being taught and heard by students, Defendants directed the De Anza communications team to remove all promotion of Dr. Lee's workshops from the College Events Calendar, and de-listed Dr. Lee's events and workshops from eligibility for professional development credits.

255.    Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

256.    Dr. Lee is also entitled to reinstatement to her faculty position. Upon information and belief, the President, the Chancellor, and the Trustee Defendants have the authority to overturn the decision to terminate Dr. Lee from De Anza College and provide the requested injunctive relief.

257.    Dr. Lee also published in the Journal of Free Black Thought during her tenure and promotion review process the article Race Ideology in Practice (February 28, 2023).  This expressed Dr. Lee's criticism of "third-wave antiracism," among other things.

258.    Dr. Lee had taught on this issue as part of her faculty duties and her criticism of third-wave antiracism was expressed repeatedly as part of her expressions on matter of public concern at De Anza

259.    Expressly to prevent the spread of such impermissible thoughts among the student body and faculty of De Anza, even before the publication became available, Dr. Lee was fired, her teaching canceled.

260.    These measures were not merely administrative reshuffling.  They were the equivalent of placing Dr. Lee in a virtual rubber room or lightless basement office, where performing her job was now intentionally impossible.

261.    Dr. Lee's protected speech was a substantial motivating factor in imposing adverse employment actions, including but not limited to her termination.  But for Dr. Lee's expression of protected speech on matters of public concern, Defendants would not have imposed adverse employment consequences on Dr. Lee.

262.    Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

263.    Dr. Lee is also entitled to reinstatement to her faculty position and is entitled to all back pay, front pay, and interest.

264.    All Defendants named in their official capacities have the authority to grant the injunctive relief requested in this civil action.

## COUNT 3:

### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §42 U.S.C. §2000-E ET SEQ. – HOSTILE ENVIRONMENT –

*(Against De Anza College and the District)*

265.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

266.    At all relevant times the District and De Anza were Dr. Lee's employers.

267.    Throughout her employment, Dr. Lee was subjected to a workplace permeated with racial stereotypes and insults.  Even when and if she was not personally the target of these racial stereotypes that demeaned Black Americans, they polluted Dr. Lee's workplace.

268.    Defendants, acting within the scope of their employment and as employees of the District and De Anza, repeatedly informed Dr. Lee that she was not the "right kind of Black person."

269.    This conduct would be severe and pervasive racial harassment in any context because Defendants continually peddled — and tried to force Dr. Lee to peddle — racial

1  stereotypes depicting Black Americans as incapable of objectivity, efficiency, individualism,

2  progress, and other traits and stereotypes adopted wholesale from 19th-century ideologues of racial

3  supremacy.  Such stereotypes are and should be abhorrent to all Americans committed to civil rights

4  and equality.

5          270.    While purporting to praise Black Americans for these stereotypes, these stereotypes

6  are demeaning and degrading to the true capabilities and true aspirations of Black Americans.

7          271.    Defendants established so-called "affinity groups," a euphemism for segregated

8  institutions bestowed with special voting rights and privileges, as well as so-called "safe spaces"

9  which were segregated by race.

10         272.    Segregation is and should be abhorrent to all Americans committed to the proud

11  tradition of civil rights, and in any context, not least in an academic context supposedly dedicated to

12  free thought, teaching, and learning, institutionalized segregation as practiced by Defendants was

13  severe and pervasive and offensive enough to create a hostile environment.

14         273.    When Dr. Lee proposed additional "affinity groups" for other racial groups such as

15  Jews, white people, etc., she was treated with utmost hostility.  In one instance, her proposal to

16  celebrate Jewish heritage and teach about the dangers of anti-Semitism on campus were greeted by

17  a member of her tenure and review committee with the single word: "barf."

18         274.    Through De Anza's Educational Master Plan and other institutional documents, as

19  well as through established practices and patterns of workplace management, Defendants

20  maintained a practice, policy, and process of systemic discrimination based on race.

21         275.    Yet when Dr. Lee criticized the race-based pieties promoted by De Anza and the

22  District in the name of "social justice," she was told she was "Whitesplaining"; and Dr. Lee was

23  directed to "decenter" "Whiteness."  Attacking a Black American for "acting white" is no less a

24  racial epithet then labeling a Black American by other racial slurs.  A workplace, especially in

25  academic workplace supposedly committed to free thought, teaching, and learning, would never

26  tolerate racial stereotypes in which white people were criticized for "acting black," speaking like a

27  Black person, and rightly so.  Special vitriol was reserved for Dr. Lee precisely because she is Black

28  but dissented from De Anza's "antiracist" orthodoxy.

276.    The Chancellor of the District has expressly made "decentering Whiteness" the official policy of the District on the basis of race.  When Dr. Lee submitted grievances complaining about the hostile environment in her workplace, these were brushed aside and ignored.  She had no recourse.

277.    Dr. Lee submitted grievances and complained about the District's and De Anza's race-based policies and the hostile environment created by the District and De Anza, including but not limited to Defendants Cortez, Ray, Hearn, Espinosa-Pieb, and Holmes.

278.    Not only did Respondents do nothing to remedy racial discrimination, they censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection to the District's and De Anza's race-based discrimination.

279.    Plaintiff has exhausted her administrative remedies and submits her right to sue letter from the California Civil Rights Department.

280.    Respondents' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

281.    Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.


**<u>COUNT 4</u>:'**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §42 U.S.C. §2000-E ET SEQ.**

**– RETALIATION –**

(*Against De Anza College and the District*)


282.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

283.    At all relevant times the District and De Anza were Dr. Lee's employers.

284.    Dr. Lee submitted multiple grievances objecting to the hostile environment created as part of the policies, practices, and processes of Defendants.

285.    Dr. Lee's grievances went nowhere and were effectively ignored.

286.    Dr. Lee also complained to her supervisors about the racial epithets and racial stereotypes peddled by the Anza and the name of "antiracism" and "social justice."

287.    Dr. Lee also spoke out publicly and criticized "third wave antiracism" for peddling racist stereotypes, not least racial stereotypes of Black Americans as incapable and ineffective citizens.

288.    Submitting grievances, complaining to her supervisors, and publicly speaking out against Defendants' racist policies are protected activities.

289.    In retaliation, Defendants imposed measures were not merely administrative reshuffling.  They were conditions of work that placed Dr. Lee in a virtual rubber room or lightless basement office, where performing her job was intentionally impossible.

290.    Defendants subjected Dr. Lee to struggle sessions before the Board in retaliation, among other things, for her opposition to state-sponsored segregation in the District.

291.    Eventually, Defendants fired Dr. Lee.

292.    Defendants therefore retaliated against Dr. Lee because of her protected activities under Title VII.

293.    Plaintiff has exhausted her administrative remedies and submits her right to sue letter from the California Civil Rights Department, attached as **Exhibit A**.

294.    Respondents' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

295.    Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.

///

///

///

///

///

///

**<u>COUNT 5</u>**:

1
2
3
4
5

**CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**

**CAL. GOV. CODE § 12900 ET SEQ.,**

**("FEHA")**

*(Against District, De Anza, and Defendants Holmes, Cortez, Espinosa-Pieb, Ray, and Hearn)*

6       296.    All foregoing allegations are incorporated by reference into this Count as if fully

7   restated here.

8       297.    California's Fair Employment and Housing Act (FEHA), California Government

9   Code, § 12900 et seq., prohibits discrimination, harassment, and retaliation on the basis of race by

10   an employer.

11       298.    California Government Code, § 12965 creates a private right of action to enforce the

12   FEHA.

13       299.    At all relevant times the District and De Anza were Dr. Lee's employers.

14       300.    For all the reasons pleaded in Count 3 and 4, which are incorporated here by

15   reference, the Respondent District and De Anza discriminated against and terminated Dr. Lee on the

16   basis of race.

17       301.    The District and De Anza have acted in a clearly oppressive and malicious manner in

18   discriminating against Dr. Lee.

19       302.    Under Cal. Civ. Code § 3294(a), Dr. Lee may recover punitive damages against her

20   employer for the District's and De Anza's unlawful discrimination.

21       303.    Plaintiff has exhausted administrative remedies and attaches her right to sue letter

22   from the California Civil Rights Department as **Exhibit B**.

23       304.    Therefore, the District and De Anza are liable for violation of FEHA and Dr. Lee is

24   entitled to direct, indirect, and punitive damages in an amount to be recovered at trial.

25   ///

26   ///

27   ///

28                                      **PRAYER FOR RELIEF**

5:23-cv-03418-PCP

1    Plaintiff prays that this Honorable Court grant the following relief:

2        i.        Declare Defendants liable for the violation of Dr. Tabia Lee's right to free

3                  speech under the First Amendment to the United States Constitution as

4                  applied to the State of California under the Fourteenth Amendment and 42

5                  USC § 1983 and under the Constitution of the State of California, Art. 1, §

6                  2(a) ;

7        ii.       Declare Defendants the District and De Anza in violation of Title VII of the

8                  Civil Rights Act of 1964, 42 USC 2000d, et seq. and in violation of the

9                  California Fair Employment and Housing Act (FEHA), Cal. Gov. Code, §

10                 12900 et seq.;

11       iii.      Order Defendants to reinstate Dr. Lee to her rightful employment;

12       iv.       Order Defendants to pay Dr. Lee all front and back pay and lost income,

13                 including pre- and post-judgment interest;

14       v.        Order Defendants to pay punitive damages under, without limitation, Cal.

15                 Civ. Code § 3294(a);

16       vi.       Order Defendants to pay Dr. Lee's reasonable attorneys fees and costs under,

17                 without limitation, 42 USC § 1988(b) and California Government Code

18                 section 12965(b);

19       vii.      Order such other legal or equitable relief as the Court finds just and proper.

20

21                              **DEMAND FOR JURY TRIAL**

22   Plaintiff, Dr. Tabia Lee, demands a trial by jury on all claims so triable.

23   ///

24   ///

25   ///

26   ///

27   ///

28

Date: May 31, 2024

Respectfully submitted,

MICHAEL THAD ALLEN (*pro hac vice*)
  mallen@allenharrislaw.com
**ALLEN HARRIS PLLC**
PO Box 404
Quaker Hill, Connecticut  06357
Telephone:  (860) 772-4738

NEAL S. ZASLAVSKY, ESQ. (SBN 277543)
  neal@nszlegal.com
**LAW OFFICE OF NEAL S. ZASLAVSKY,
A PROFESSIONAL CORPORATION**
8335 Sunset Boulevard, Suite 101
West Hollywood, California 90069
Telephone: (323) 389-1881
Facsimile: (323) 389-1885

*Attorneys for Plaintiff, Dr. Tabia Lee*

# Exhibit A



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**San Jose Local Office**
96 N Third St, Suite 250
San Jose, CA 95112
Office: (408) 889-1950
Email: sanjgov@eeoc.gov
Website:  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: September 19, 2023

**To:** Dr. Tabia Lee
7889 Lichen Dr., #259
CITRUS HTS, CA 95621

Charge No: 556-2023-01048

EEOC Representative and email:    ANDREA NUNEZ
Sr. Investigator
sanjgov@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Margaret Ly

Digitally signed by
Margaret Ly
Date: 2023.09.19
14:30:50 -07'00'

Margaret Ly
Local Director

**Cc:**
Dorene  Novotny
Foothill De Anza Community College District
12345 El Monte Road
Los Altos Hills, CA 94022

Michael T Allen
ALLEN HARRIS PLLC
Connecticut Office  PO Box 404
Quaker Hill, CT 06375

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request

identifying your request as a "FOIA Request" for Charge Number 556-2023-01048 to the District Director at Nancy Sienko, 450 Golden Gate Avenue 5 West PO Box 36025

San Francisco, CA 94102.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 556-2023-01048 to the District Director at Nancy Sienko, 450 Golden Gate Avenue 5 West PO Box 36025

San Francisco, CA 94102.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# Exhibit B



STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

September 14, 2023

Tabia Lee
7889 Lichen Dr. #259
Citrus Heights, CA

RE:   **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202309-21967514
Right to Sue: Lee / Foothill-De Anza Community College District et al.

Dear Tabia Lee:

This letter informs you that the above-referenced complaint filed with the Civil Rights
Department (CRD) has been closed effective September 14, 2023 because an
immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal
Employment Opportunity Commission (EEOC) to file a complaint within 30 days
of receipt of this CRD Notice of Case Closure or within 300 days of the alleged
discriminatory act, whichever is earlier.

Sincerely,


Civil Rights Department

CRD - ENF 80 RS (Revised 02/23)