Neal S. Zaslavsky
CA Bar No. 277543
LAW OFFICE OF NEAL S. ZASLAVSKY, A PROFESSIONAL CORPORATION
8335 Sunset Boulevard, Suite 101
West Hollywood, CA 90069
Tel: (323) 389-1881
neal@nszlegal.com

Michael Thad Allen
*admitted pro hac vice*
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

NORTHERN CALIFORNIA -SAN JOSE DIVISION

| | |
|---|---|
| TABIA LEE,<br><br>Plaintiff,<br><br>vs.<br><br>THE FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, DE ANZA COLLEGE, PATRICK J. AHRENS, LAURA CASAS, PEARL CHENG, PETER LANDSBERGER, LEE LAMBERT, and GILBERT WONG, in their official capacities; CHRISTINA ESPINOSA-PIEB, in her official and individual capacities; ALICIA CORTEZ, LYDIA HEARN, LLOYD A. HOLMES, and THOMAS RAY, in their individual capacities,<br><br>Defendants. | Case No.: 5:23-cv-03418-SVK<br><br>**SECOND AMENDED COMPLAINT DEMAND FOR JURY TRIAL** |

Plaintiff Dr. Tabia Lee, who is Black, stood up for free speech, academic freedom,

humanism, and equal treatment for all students and faculty, regardless of race, as a faculty

SECOND AMENDED COMPLAINT AND JURY DEMAND 1| CASE NUMBER: 5:23-CV-03418-SVK

---

Deleted: Abby Jane Moscatel¶

Deleted: 276207

Deleted: ABBY MOSCATEL

Deleted: 99 S Almaden Blvd¶

Deleted: 600

Deleted: San Jose CA 95113Tel: (406) 318.7223¶
amoscatel@blacktaillaw.com¶
¶

Formatted: Space Before:  12 pt

Deleted: ¶
¶

Deleted: COMPLAINT
DEMAND FOR JURY TRIAL¶

Deleted: COMMUNITY

Deleted: LLOYD A. HOLMES, in his official and individual capacity; …

Deleted: capacity; AND

Formatted: Not All caps

Deleted: CHRISTINA ESPINOSA-PIEB, AND LYDIA HEARN

Deleted: and official capacity

Deleted: 1

Formatted: Centered

member of De Anza College ("De Anza") within Defendant Foothill-De Anza Community

College District ("District"). She was accused of "Whitesplaining" and not being the "right kind

of Black person."

Dr. Lee refused to knuckle under to campus orthodoxy concerning purely performative

"land acknowledgments," to the intentional misspelling of foreign words such as "Latinos" as

"Latinx" (which no one uses other than campus bureaucrats and self-proclaimed "social justice"

advocates), to the segregation of students and faculty into so-called "affinity groups," and to

other race-based pieties enforced by the Defendant Foothill – De Anza Community College

District ("District") and De Anza College ("De Anza").

Dr. Lee also objected to racial stereotypes peddled by Defendants that targeted both

White and Black Americans, bizarrely celebrating Blacks as incapable of objectivity,

individualism, efficiency, progress, and other grossly demeaning stereotypes, while condemning

Whites for promoting these same values, which Defendants label "colonialism" and "White

supremacy."

Defendants, as state actors, then retaliated against Dr. Lee and censored her free speech in

violation of the First Amendment, Title VII of the Civil Rights Act of 1964, and the California

Fair Employment and Housing Act.

## I. JURISDICTION

1.  This action arises under the Constitution and laws of the United States, and this Court has

original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has

authority to award the requested damages pursuant to 28 U.S.C § 1343; the requested declaratory

relief pursuant to 28 USC § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

SECOND AMENDED COMPLAINT AND JURY DEMAND 2| CASE NUMBER: 5:23-CV-
03418-SVK

2. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C §
   1367(a).

   **II.    VENUE**

3. Venue is proper in this District pursuant to 28 U.S.C § 1391(b) because Defendants reside in this
   District and the acts described in this Complaint occurred in this District.

   **III.    DIVISIONAL ASSIGNMENT**

4. San Jose is the proper division of Court pursuant to Civil L.E. 3-2(c) because De Anza
   Community College is located in Cupertino, California. Cupertino is part of Santa Clara County.
   Santa Clara County cases are assigned to San Jose District pursuant to N.D. Cal. Civ. L.R. 3-2.

   **IV.    PARTIES**

5. Plaintiff Dr. Tabia Lee was, until the date of her termination, a full-time tenure-track faculty
   member, Faculty Director for the Office of Equity, Social Justice, and Multicultural Education at
   De Anza Community College in Cupertino, California. Dr. Lee resides in Sacramento,
   California.

6. The Foothill-De Anza Community College District ("District") is a public entity that operates a
   system of public community colleges, including De Anza College, and its principal place of
   business is 12345 El Monte Road, Los Altos Hills, California 94022. The Foothill-De Anza
   Community College District receives federal funding.

7. De Anza Community College ("De Anza") is a public institution of post-secondary education
   with principal place of business at 21250 Stevens Creek Blvd, Cupertino, California 95014. De
   Anza receives federal funding.

8. Christina G. Espinosa-Pieb was, at all times relevant to the events pleaded in the Complaint,
   Vice President of Instruction for De Anza and a member and "elder" of the segregated De Anza

   SECOND AMENDED COMPLAINT AND JURY DEMAND 3| CASE NUMBER: 5:23-CV-
   03418-SVK

Latinx [sic.] Association, retiring April 28, 2023. She returned and is currently Acting President of De Anza College.  In her position at present, Espinosa-Pieb has the authority to grant all injunctive relief sought in this civil action.  Espinosa-Pieb resides within the jurisdiction of the Northern District of California. Defendant Espinosa-Pieb acted under color of state law and is sued in her individual and official capacities.

9.  Lee Lambert is the Chancellor of the Foothill-De Anza Community College District. He is sued in his official capacity.  In his position, he has the authority to grant all injunctive relief sought in this civil action.

10. Lloyd A. Holmes was at all relevant times President of De Anza Community College and resides within the jurisdiction of the Northern District of California. Holmes was the ultimate supervisor of all faculty and staff of De Anza. Holmes is being sued in his individual capacity.

11. Alicia Cortez is and was at all relevant times Dean of Equity and Engagement at De Anza. In this role she was Plaintiff Dr. Lee's direct supervisor. Cortez is a member of the De Anza Latinx [sic.] Association and was the de facto chair of Plaintiff's Phase I and Phase II Tenure Review Committee. Cortez resides within the jurisdiction of the Northern District of California. Defendant Cortez acted under color of state law and is sued in her individual capacity.

12. Thomas Ray is Interim Associate Vice President of Instruction and participated in Plaintiff's Phase I and Phase II Tenure Review Committee. Ray resides within the jurisdiction of the Northern District of California. Defendant Ray acted under color of state law and is sued in his individual capacity.

13. Lydia Hearn was formerly Interim Associate Vice President of Instruction and participated in Plaintiff's Phase I Tenure Review Committee. Hearn is a member of the segregated De Anza Asian Pacific American Staff Association. Hearn resides within the jurisdiction of the Northern

SECOND AMENDED COMPLAINT AND JURY DEMAND 4| CASE NUMBER: 5:23-CV-03418-SVK

---

**Margin annotations:**

Moved (insertion) [2]

Moved (insertion) [3]

**Deleted: Individual Defendants¶**
The following Defendants are sued in their official and individual capacities.¶

**Deleted:** is and

**Deleted:** both

**Deleted:** and official

**Deleted:** being

**Deleted:** both

**Deleted:** and official

Moved up [1]: <#>Christina G.

Moved up [2]: <#>Association, retiring April 28, 2023.

Moved up [3]: <#>Espinosa-Pieb resides within the jurisdiction of the Northern District of California.

**Deleted:** <#>Espinosa-Pieb was Vice President of Instruction for De Anza and a member and "elder" of the segregated De Anza Latinx [sic.] …

**Deleted:** <#>Espinosa-Pieb is being sued in both her individual and official capacity.¶

**Deleted:** <#>being

**Deleted:** <#>both

**Deleted:** <#> and official

**Deleted:** 4

**Formatted:** Centered

District of California. Defendant Hearn acted under color of state law and is sued in her

individual capacity.

14. The following Defendants are members of the District Board of Trustees ("Board Defendants").

The Board has ultimate supervisory authority over the District and De Anza and has ultimate

responsibility to ensure that De Anza and the District follow their own rules and policies and that

all faculty, staff, and employees of De Anza and the District are properly supervised. The Board

also makes the final decision concerning whether to grant tenure to a faculty candidate for tenure

such as Dr. Lee.  The Board Defendants have the authority to grant all injunctive relief sought in

this civil action.

15. Patrick J. Ahrens is the president of the District Board of Trustees and resides within the

jurisdiction of the Northern District of California. Ahrens is sued in his official capacity.

16. Laura Casas is Vice President at Large of the District Board of Trustees and resides within the

jurisdiction of the Northern District of California. Casas is sued in her official capacity.

17. Pearl Cheng is a trustee of the District Board of Trustees and resides within the jurisdiction of

the Northern District of California. Cheng is sued in her official capacity.

18. Peter Landsberger is a trustee at large of the District Board of Trustees and resides within the

jurisdiction of the Northern District of California. Landsberger is sued in his official capacity.

19. Gilbert Wong is a trustee at large of the District Board of Trustees and resides within the

jurisdiction of the Northern District of California. Wong is sued in his official capacity.

V. FACTUAL BACKGROUND

A. Tabia Lee

20. Plaintiff Tabia Lee is an educational sociologist and California native. She happens to be Black,

but first and foremost, Dr. Lee is a teacher dedicated to humanism and civil rights. She teaches

SECOND AMENDED COMPLAINT AND JURY DEMAND 5 | CASE NUMBER: 5:23-CV-03418-SVK

that people should not be judged by the color of their skin but by the content of their character. De Anza is hostile to this concept.

21. Dr. Lee espouses the idea, abhorrent in the District, that people, especially teachers, must treat people like human beings, not political abstractions reduced to unchangeable attributes ascribed by characteristics of race and gender beloved by De Anza's ideologues.

22. In 1999, Dr. Lee received a Bachelor of Arts in sociology from the University of California, Davis. By 2004, she achieved a Masters in Education, and in 2009, she earned her Doctor of Education from the University of California, Irvine and California State University, Los Angeles.

23. Before that, from 1999-2009, Dr. Lee worked as a National Board Certified Teacher in the Los Angeles Unified School District. Dr. Lee taught middle school, in which she established a widely praised civic education program. The Los Angeles Unified School District Board of Education praised Dr. Lee's civic education program for its positive impact on the lives of students and community members. Dr. Lee also facilitated mock elections and community awareness panels, served as faculty mentor for student-led voter registration drives, and participated in other programs. For her fellow teachers, Dr. Lee provided school-wide training to promote culturally inclusive programs for gifted and mainstream education and facilitated the adoption of new technologies for pedagogy. She became chair of her school's Social Studies Department.

24. From 2009 to the present, Dr. Lee has served as an education technology consultant providing training and advisement to K-12 expert teacher trainers, teachers, schools, and districts to build capacity around technological integration and transformation, pedagogy, curriculum, and evaluation. Dr. Lee also presents expert lectures, workshops, and invited presentations at state, local, national, and international educational conferences on these topics.

SECOND AMENDED COMPLAINT AND JURY DEMAND 6| CASE NUMBER: 5:23-CV-03418-SVK

Deleted: race and gender

Deleted: presented

Deleted: 6

Formatted: Centered

25. From 2013-2015, Dr. Lee served as a Part-Time Online Instructor/Capstone Course developer in the online Masters program in Teaching English to Speakers of Other Languages ("TESOL") for the University of San Francisco, serving teaching professionals, including administrators, current instructors, and teacher candidates.

26. From 2017-2020, Dr. Lee worked as an instructional designer for undergraduate programs and Part-Time Senior Lecturer for an online Masters degree program in Teaching English to Speakers of Other Languages ("TESOL") for Notre Dame de Namur University. Dr. Lee taught courses to graduate student teacher candidates, administrators, and current instructors. She provided individual and departmental coaching, resources, and supports for faculty, including development of an integrated course design certification program to assist faculty with designing or updating their courses for more humanistic and holistic student learning outcomes.

27. In 2020, Dr. Lee joined the faculty of the College of San Mateo as a temporary tenure-track Faculty Instructional Designer providing campus-wide leadership and faculty support for holistic instructional design including serving as a faculty leader for multiple advisory committees, conducting individual and departmental consultations and collaborations, peer mentorship, and developing course enhancement and course evaluation and redesign tools and resources for faculty.

28. Among her many other endeavors, Dr. Lee is a founding member, author, and director of Free Black Thought ("FBT").[1] FBT[1] is an online journal and community of heterodox scholars and public intellectuals dedicated to the rich diversity of thought among and about Black Americans. Authors of *Free Black Thought* strive for an accurate analysis of and observations about Black lives beyond the relatively narrow spectrum of views promoted by mainstream outlets purporting

---

[1] See https://freeblackthought.com/about.

SECOND AMENDED COMPLAINT AND JURY DEMAND 7| CASE NUMBER: 5:23-CV-03418-SVK

to define "the Black perspective." FBT promotes itself as frequently non-conforming, often provocative, and sometimes contrarian.

**B.  Dr. Lee is Hired as a Full-Time Tenure-Track Faculty at De Anza**

29. In August 2021, Dr. Lee joined De Anza as Faculty Director for the Office of Equity, Social Justice, and Multicultural Education and Chairperson of the Department of Equity, Social Justice, and Multicultural Education.  This was a full-time, tenure-track faculty position.

30. According to her job description, Dr. Lee's primary responsibility as a De Anza Community College Professor and Faculty Director was to address issues of pedagogy at De Anza.  Her role was defined as "facilitating an institution-wide transformation that realizes and promotes our commitment to equity, social justice, and multicultural education for students, classified professionals, faculty and administrators ... The position is responsible for supporting the college's equity plan by working collaboratively with and mentoring teaching and non-teaching faculty and classified professionals in culturally responsive and transformative curriculum and pedagogy, promoting culturally responsive services, and for promoting an inclusive campus environment."

31. Dr. Lee's role as a faculty member may best be described as a teacher of teachers.  It is impossible, as a real-world practical matter, to separate Dr. Lee's position as a professor who taught at De Anza and as the Faculty Director and Chairperson of the Office of Equity, Social Justice, and Multicultural Education.

32. In her role at De Anza, she was responsible for designing and teaching instructional workshops and programs for teachers and all members of the learning community including administrators, classified professionals, students, and the community-at-large, and for developing workshops and seminars for faculty programs within and outside the District, in addition to other duties.

SECOND AMENDED COMPLAINT AND JURY DEMAND 8 | CASE NUMBER: 5:23-CV-03418-SVK

33. But for De Anza's obstruction of Dr. Lee's teaching, Dr. Lee's work would have substantially altered the nature of what was taught at the school by creating a more culturally responsive curriculum and pedagogy.

34. Among other things, Dr. Lee was responsible for making "report-outs" to the Academic Senate. This meant she was required to speak publicly to the full faculty on matters of public concern that implicate her work focused on substantially altering the nature of what was taught at De Anza.

35. Dr. Lee also publishes scholarship, speaks at conferences, and appears in the media, where she speaks on matters of public concern.

36. De Anza has unlawfully retaliated against and discriminated against Dr. Lee for doing her job, and De Anza has censored her public, protected speech.

> **Deleted:** censored
>
> **Deleted:** De Anza has already erased Tabia Lee from its website promoting the Office of Equity, Social Justice and Multicultural Education.

37. Defendants retaliated against Dr. Lee by terminating her in June 2023 because of her viewpoints and protected public speech and because of De Anza and the District's ideological opposition to Dr. Lee's humanism in the classroom.

> **Deleted:** informed
>
> **Deleted:** that she would be terminated

**C. De Anza's Ideological Intolerance**

38. When Dr. Lee assumed her position as a full-time, tenure track faculty member in August of 2021, she brought her deep experience and expertise to De Anza's learning community.

> **Deleted:** was excited and optimistic about the prospect of bringing
>
> **Deleted:** Anza College's

39. However, shortly after Dr. Lee's arrival, it became clear that her academic unit was committed to suppressing academic freedom, retaliating against free speech, and discriminating on the basis of race. In particular, these illegal and illiberal policies were promoted by Dean Cortez, President Holmes, Vice President Espinosa-Pieb, and Interim Associate Vice President Ray.

> **Deleted:** the Department of Equity and Engagement
>
> **Deleted:** to censoring
>
> **Deleted:** to discrimination
>
> **Deleted:** through the Office of Equity, Social Justice, and Multicultural Education and other offices

40. Defendant Cortez was Dr. Lee's direct supervisor as Dean of Equity and Engagement.

> **Deleted:** 9
>
> **Formatted:** Centered

41. Before Dr. Lee could even complete employee onboarding, Dean Cortez ordered Dr. Lee to attend a "Decentering Whiteness" webinar. This was repugnant to Dr. Lee because it singled out a specific group on the basis of race. Disseminating such so-called training was and is a practice and policy of Defendants, which subjects all De Anza employees to a hostile environment on the basis of racial stereotypes.

42. Dr. Lee registered to attend two of the so-called workshops.

43. Unfortunately, the so-called workshops conveyed the orthodoxy enforced by Defendants. Deviation from this orthodoxy, which identifies "Whiteness," "White supremacy," and "White colonialism" as the root of all ills, is met at De Anza with severe retaliation.

44. Upon information and belief, Defendants Holmes, Ray, Hearn, and Espinosa-Pieb monitored, supervised, and approved all such content on campus.

45. Dr. Lee opposed and opposes this ideology, which has been defined as "third wave antiracism," a term Dr. Lee uses in her scholarship and used in her teaching at De Anza. This included a publication in the Journal of Free Black Thought, published February 28, 2023, in the midst of her tenure evaluation.[2]

46. Dr. Lee's teaching and scholarship expressly criticized the ideological movement of "third wave antiracism" that has captured the District and which Defendants enforce as orthodoxy on campus.

47. "Third Wave Anti-Racism" is defined in, and Dr. Lee has relied on, the scholarship of the Black Columbia linguist and public intellectual, John McWhorter. Professor McWhorter defines "Third Wave Anti-Racism" (also called "neo-racism") as follows:

> First Wave Antiracism battled slavery and legalized segregation. Second Wave Antiracism, in the 1970s and 1980s, battled racist attitudes and taught America

---

[2] https://freeblackthought.substack.com/p/race-ideology-in-practice.

SECOND AMENDED COMPLAINT AND JURY DEMAND 10 CASE NUMBER: 5:23-CV-03418-SVK

---

- **Deleted:** emailed
- **Deleted:** Obviously, De Anza would be up in arms if Dean Cortez or others promoted racist events targeted at "decentering" or "marginalizing" Black students and faculty, but somehow illegally targeting White people on the basis of race counts as "progressive" at De Anza.
- **Deleted:** Lee recognizes that even obnoxious ideas may form part of diverse discussions of ideas at any college. Thus, Dr. Lee (incorrectly) assumed that this racist message represented only one of the many diverse perspectives that could be explored at De Anza College. Dr.
- **Moved down [5]:** Dr.
- **Deleted:** Unfortunately,
- **Deleted:** Lee soon learned that this event did not represent one of many perspectives at De Anza; it represented
- **Deleted:** In addition to Defendant Alicia Cortez (as Dean)
- **Deleted:** (as Director),
- **Deleted:** other staff involved
- **Moved (insertion) [5]**
- **Deleted:** De Anza's Office of Equity, Social Justice, and Multicultural Education are Adriana Garcia and Tony Santa Ana.
- **Deleted:** 10
- **Formatted:** Centered

that being racist was a flaw. Third Wave Antiracism, becoming mainstream in the 2010s, taught that because racism is baked into the structure of society, whites' "complicity" in living within it constitutes racism itself, while for black people, grappling with the racism surrounding them is the totality of experience and must condition exquisite sensitivity towards them, including a suspension of standards of achievement and conduct.

Under this paradigm, all deemed insufficiently aware of this sense of Existing While White as eternal culpability require bitter condemnation and ostracization, to an obsessive, abstract degree that leaves most observers working to make real sense of it. . .[3]

48. Even lower-level staff members enforced De Anza's inflexible and illiberal approach to ideologically driven, race-based teaching, with the full knowledge, praise, and approval of Defendants Cortez, Holmes, Ray, Hearn, and Espinosa-Pieb.

49. For example, De Anza employee Tony Santa Ana served as program coordinator of the Office of Equity, Social Justice, and Multicultural Education before resigning from his role in August 2022. Since January 2023, he has been listed as an adjunct instructor in the Ethnic Studies Department at De Anza College. Mr. Santa Ana is a self-proclaimed "community organizer" and "artivist [sic.]."

50. Mr. Santa Ana's "artivism" is generally directed toward De Anza faculty and staff, whose viewpoints conflict with what he considers to be correct viewpoints. He holds himself out as an "educator and globe trotter that seeks to contribute to humanity and also an instructor in Intercultural Studies."

51. At all times relevant to this Complaint, Adriana Garcia was an administrative assistant in the Office of Equity, Social Justice, and Multicultural Education and an avid member of De Anza's segregated Latinx [sic] Association. To Ms. Garcia, this was an overtly ideological job. She held herself out as not just keeping the administrative affairs of the office in good order but

---

[3] See https://johnmcwhorter.substack.com/p/the-elect-neoracists-posing-as-antiracists

advocating for "immigrant rights campaigns and womyn [sic] wellness through a human rights and social justice lens" (whatever that means) and "international solidarity with local people's movements such as police brutality, gender equity, racial justice and environmental justice, especially when it involves art for the people."

52. The same day Dean Cortez suggested Dr. Lee attend the "Decentering Whiteness" webinar, Mr. Santa Ana emailed Dr. Lee to inform her and others in the campus community that the Office of Equity, Social Justice, and Multicultural Education would provide free copies of a book by Black Lives Matter founder Alicia Garza, *The Purpose of Power: How We Come Together When We Fall Apart*.

53. On October 8, 2021, Dr. Lee was assigned to moderate an event with students and the author, Ms. Garza, about *The Purpose of Power* and the Black Lives Matter movement.

54. Dr. Lee's moderation of this event was one of her teaching and pedagogical activities, for which she was evaluated as part of her tenure and promotion process.

55. In preparation for the teaching event, Dr. Lee compiled, with students, a list of questions that the De Anza students wished to ask Ms. Garza about her book as part of their learning experience.

56. Ms. Garza's book agent, however, insisted that Dr. Lee restrict questions to Ms. Garza from a list of scripted questions they had prepared. Dr. Lee expressed that the students' questions reflected "a deeper reading and understanding of the issues presented by the author" than the "sanitized" questions prepared by Ms. Garza's agents. Dr. Lee believed the students' learning experience would be enhanced by the use of the students' questions.

57. To allow the students to gain maximal pedagogical benefit from the event, Dr. Lee encouraged the students to put forward their questions to Ms. Garza as "follow-up questions."

SECOND AMENDED COMPLAINT AND JURY DEMAND 12 | CASE NUMBER: 5:23-CV-03418-SVK

---

Deleted: .]

Commented [SH1]: This is totally out of place here since she is not mentioned in the coming paragraphs… need to move somewhere else.

Moved down [8]: <#>Dr.

Deleted: <#>Again, Dr. Lee did not object to the clearly ideological content of Garza's book because

Deleted: <#>Lee (again, incorrectly) assumed that this was only one of many different perspectives on the topic or race that could be discussed critically at De Anza.¶

Deleted: <#>further surprised to be

Deleted: <#>serve as moderator of

Commented [SH2]: I'm just trying to be consistent about whether or not we use things like "Dr." or "Ms." – we do for other people so we should do for everyone – or not do for anyone.

Moved down [9]: <#>Dr.

Deleted: <#> Because Dr. Lee is Black, it did not occur to any of Dr. Lee's colleagues or to any of Defendants

Deleted: <#>Lee was capable of forming her own personal opinion or any criticism of Garza. At De Anza, Black women are expected to think the same (or to shut up).

Moved (insertion) [8]

Deleted: As moderator

Moved down [10]: Dr.

Deleted: Lee committed an ideological indiscretion. Dean Cortez informed Dr. Lee that Garza could not be asked unscripted questions. Students wished to pose

Moved (insertion) [9]

Deleted: Garza, their hero as a prominent Black Lives Matter movement organizer. Instead of suppressing

Moved (insertion) [10]

Deleted: free speech and free inquiry, Dr.

Deleted: 12

Formatted: Centered

58. This prompted Ms. Garza to turn off her video conference camera. Later, De Anza employee and one of Dr. Lee's evaluators at tenure time, Cynthia Kaufman claimed that Dr. Lee undermined Black Lives Matter by criticizing Ms. Garza.

59. In fact, what Dr. Lee was doing was trying to optimize the educational value for California students participating in the workshop — a workshop that was observed as part of Dr. Lee's tenure review process, in particular by Defendant Cortez.

60. De Anza's intolerance was demonstrated again about a month later, on or around November 1, 2021. Bizarrely, in the "social justice" ideology the District has imposed, the efficient organization of meetings, punctuality, objectivity, and the like are condemned as "white supremacy." Thus, when Dr. Lee chaired a team meeting which included Mr. Santa Ana and attempted to set a meeting agenda and identify ways to collaborate, Mr. Santa Ana objected.

61. Mr. Santa Ana accused Dr. Lee of "White speak," being "transactional," and "Whitesplaining." Apparently, to Mr. Santa Ana and De Anza College, simply articulating a different perspective was enough to revoke Dr. Lee's "Black card" and somehow transform the words of an educated Black woman into "White speak."

62. Whereas real White supremacists of the 19th century condemned people of color for being supposedly genetically incapable of punctuality, efficient work, facility with the written word, and "perfectionism," the District and at De Anza have turned these racist stereotypes upside down. De Anza now celebrates these racist stereotypes as somehow indicating the *superiority* of people of color. The consequence is that any Black person, such as Dr. Lee, who believes in hard work, individualism, efficiency, doing well at mathematics, writing well, and many other attributes, is treated as some sort of race traitor. This is what Mr. Santa Ana conveyed to Dr. Lee in the November meeting.

SECOND AMENDED COMPLAINT AND JURY DEMAND 13| CASE NUMBER: 5:23-CV-03418-SVK

---

**Deleted:** , although the questions were positive soft-ball questions,

**Deleted:** this was an example in which Dr. Lee did nothing more than put student questions to Garza, of Dr. Lee "

**Deleted:** "

**Deleted:** and undermining Black Lives Matter.

**Deleted:** <#>Posing questions to a Black woman in an open forum is not allowed at De Anza—at least if a Black woman openly espouses the Black Lives Matter movement. However, it became clear that it is permissible and encouraged to criticize a Black woman, such as Dr. Lee, for any inkling, however hallucinatory, that the authority of the Black Lives Matter leadership could be questioned by De Anza students. ¶
Dean Cortez and others criticized Dr. Lee for her lamentable failure to discourage free and open discussion with Alicia Garza.¶

**Deleted:** (

**Deleted:** ).

**Deleted:** on the grounds of hostile race-based stereotypes

**Deleted:** "; in

**Deleted:** ,

**Deleted:** have now been turned

**Deleted:** considered

**Deleted:** 13

**Formatted:** Centered

63. This racial stereotyping was further exemplified by indoctrination sponsored by De Anza on June 7, 2022, which Defendants Dean Cortez, Espinosa-Pieb, Ray, Hearn, and Holmes promoted and actively participated in.

64. De Anza sponsored a presentation by University of California Davis administrator Laura Bohorquez Garcia, a mid-level staff member at UC Davis with no more than a BA in "American Cultural Studies." Bohorquez Garcia's presentation was titled "White Supremacy Culture, Professionalism and the 'Good' Immigrant Narrative."

65. This was again part of the drumbeat of in hostile racial stereotypes promoted by the District and Defendants Cortez, Espinosa-Pieb, Hearn, Ray, and Holmes.

66. Over 50 members of the campus learning community attended, including administrators, faculty, classified professionals, and students.

67. Bohorquez Garcia circulated the following slide identifying so-called "CHARACTERISTICS OF WHITE SUPREMACY CULTURE" (all caps in original), in which values such as "worship

**Deleted:** promoted by

**Deleted:** by Dean Cortez and administrative assistant Adriana Garcia. …

**Deleted:** Davis'

**Deleted:** " and again promoted by Dean Cortez.

**Deleted:** 14

**Formatted:** Centered

of the written word," "objectivity," "individualism," "perfectionism," and "progress" are vilified



as vials of poison.

Deleted: 15

Formatted: Centered



68. The District also promoted the ideology that "WHITE SUPREMACY IS A PROJECT OF COLONIZATION" (emphasis in original), in which Whiteness supposedly "colonizes our minds, our bodies, our psyches, our spirits, or emotions … as well as the land and the water in the sky and air we breathe."

69. This document is just as demeaning to Black Americans and other minorities as it is to white people. Just as real white supremacists of a bygone era identified immigrants (of whatever sort) as inarticulate, lazy, incapable of progress, trapped by tribal, communal values, and objectively incompetent, so too, Defendants peddle the same stereotypes. Defendants simply substitute

SECOND AMENDED COMPLAINT AND JURY DEMAND 16 CASE NUMBER: 5:23-CV-03418-SVK

Deleted: 16

Formatted: Centered

praise of all these demeaning, racist stereotypes for the condemnation expressed by the racists of

yesteryear. Defendants bizarrely condemn all the stereotypical "White" qualities that racists once

praised as evidence of "White" genetic superiority.

**D. Tabia Lee Expresses Viewpoints that the District Finds Intolerable**

70. As early as October 2021, Dr. Lee began to encounter difficulty expressing even mainstream

viewpoints in her teaching and advocacy of pedagogical change at De Anza because of

Defendants' retaliation.

71. Dr. Lee discovered that De Anza purposefully maintains campus facilities to exclude students,

faculty, and staff on the basis of race, which created a hostile environment for Dr. Lee.

72. On October 4, 2021, Dr. Lee chaired a team meeting with Ms. Garcia, Mr. Santa Ana, and

Instructor of English Francesca Caparas. Leading these team meetings was one of Dr. Lee's

responsibilities as Faculty Director for the Office of Equity, Social Justice, and Multicultural

Education and Chairperson of the Department of Equity, Social Justice, and Multicultural

Education. These team meetings convened to address substantial changes to pedagogy at De

Anza.

73. At the time, Ms. Caparas served as Faculty Coordinator for the "Women, Gender, and Sexuality

Center, also known as the Jean Miller Resource Room" ("WGSC" / "JMRC"). While Ms.

Caparas was not on the staff of the Office of Equity, Social Justice, and Multicultural Education,

the WGSC/JMRC's physical space on campus is in that office. Therefore, she often attended

these team meetings in the Fall 2021 quarter.

74. Ms. Caparas explained that "more than one administrator has told me that White people, faculty

members, are not feeling welcome at the Center . . . so where is this complaint coming from?"

SECOND AMENDED COMPLAINT AND JURY DEMAND 17 | CASE NUMBER: 5:23-CV-
03418-SVK

75. On information and belief, Ms. Caparas was referring, without limitation, to Defendants Cortez, Espinosa-Pieb, and Holmes, who endorsed the exclusion of "white" people from the Center.

76. Ms. Caparas added, "I am not trying to make this a space for White gays and lesbians. They have the whole campus already."

77. Mr. Santa Ana, the Program Coordinator who had accused Dr. Lee of "Whitesplaining," readily agreed, chiming in, "Our whole center is for people of color. That is our safe space we have made."

78. In the meeting, Dr. Lee expressed the view, to which De Anza and the District were openly hostile, that resources of a state community college should be available to all students, regardless of race, and to all students seeking a non-threatening and welcoming environment to discuss their sexuality—of whatever persuasion. Dr. Lee directly addressed the issue of what pedagogical resources should be made available at De Anza.

79. Dr. Lee emphasized that the Office should be a space for all members of the learning community who seek refuge or solace, regardless of race.

80. Ms. Caparas, Mr. Santa Ana, and Ms. Garcia then informed Dr. Lee that the physical Office of Equity, Social Justice, and Multicultural Education is for students, faculty and staff of color only, and that White people or others who do not fit that definition are not welcome in the Office of Equity or in the Jean Miller Resource Room (i.e., the Women, Gender, and Sexuality center).

81. Ms. Caparas stated that "we," meaning the whole De Anza administration including Defendants Cortez, Espinosa-Pieb, Hearn, and Holmes, "are intentionally decentering Whiteness here." Defendants Cortez, Espinosa-Pieb, Hearn, Ray, and Holmes knew of and endorsed Ms. Caparas' creation of a center that excluded people on the basis of race and gender orientation.

82. Once again, race-based hostility was polluting Dr. Lee's workplace.

83. Ms. Garcia announced that "We built this space for our voices and our stories, not for White people's voices, and that "they," apparently meaning anyone who is White, "have the whole campus already. They are trying to Whitewash our space."

84. This conversation revealed how, despite the disgraceful tradition of segregation in America, De Anza and the District still promote illegal segregation, which is suddenly in vogue among so-called "anti-racists."

85. Dr. Lee directly complained to both Dean Cortez and Associate Vice President Ray about the race and gender-based discrimination that pervaded the meeting. They did nothing.

86. Defendants' new-found celebration of segregation is similar to Defendants' endorsement of other 19th-century racist stereotypes and practices, such as stereotyping non-Whites as somehow incapable of objectivity, individualism, etc. They must now be segregated as well in the name of "safe spaces."

87. In mid-November 2021, Dr. Lee spoke out on a matter of public concern and pedagogy at De Anza. She began to express concerns about De Anza's use of recently invented labels such as "Latinx" and "Filipinx" in student-facing communications. Dr. Lee expressed her viewpoint that placing these terms in De Anza's Educational Master Plan — a Plan that set the practice, patterns of behavior, and process that would impact both curriculum and classroom pedagogy — would impose a toxic ideology that everyone at the college would have to work under and follow.

88. Dr. Lee outlined her objections to including these terms in the Educational Master Plan in an email to De Anza's Office of Research, writing "Some folks have shared with me that literally, one day they were directed, 'We will now refer to Latino or Latina as Latinx' without explanation or rationale . . . As for me, I do not use those newly invented terms out of respect for

SECOND AMENDED COMPLAINT AND JURY DEMAND 19| CASE NUMBER: 5:23-CV-03418-SVK

the cultures and languages of the working-class communities where I have worked for decades and also because a reasonable rationale and origin has not been provided to justify their use."

89. As Dr. Lee explained, these terms are, for all intents and purposes, unrecognized by actual Latin Americans or Filipinos, and imposing such terms on large swaths of historically underprivileged populations, in opposition to their own preferences, may be "cultural imperialism." Dr. Lee also encouraged the Office of Research to consider using the racial and ethnic category names provided by California agencies, which do not include the alien misspellings "Latinx" and "Filipinx."

90. De Anza imposes this and other arcane vocabulary, utterly incomprehensible to the vast majority of Californians. To most people, the substitution of "y" for "e" in the common spelling of "women" or forcing Spanish speakers to cancel the gender declination of Spanish nouns is simply misspelling. But at De Anza, Defendants have developed practices, policies, and processes for enforcing the intentional misspelling of foreign languages.  At De Anza and in the District, this counts as "social justice."  Defendants have embedded this in De Anza's Educational Master Plan.

91. This constant drumbeat and enforcement of racial stereotypes not only created a hostile environment, but in addition, Dr. Lee's dissent from this kind of magical thinking quickly made her a target for retaliation that included public shaming and, eventually, her termination.

92. Another example of Dr. Lee's ideological indiscretion was her asking questions about the performative nature and accuracy of De Anza's "land acknowledgement," another sacred cow in the District, whose veneration is required by the practices, policies, and processes of the District and in De Anza.

SECOND AMENDED COMPLAINT AND JURY DEMAND 20| CASE NUMBER: 5:23-CV-03418-SVK

| Deleted: Yet |
| Deleted: invest |
| Deleted: with world-historical importance |
| Deleted: cause of |
| Deleted: Dr. |
| Deleted: De Anza's suppression of |
| Deleted: protected speech |
| Deleted: a |
| Deleted: 20 |
| Formatted: Centered |

93.    De Anza maintains the following "land acknowledgment," which all state employees of its

Office of Equity are forced to adopt, and which students are encouraged to perform at the

beginning of school-wide events and proceedings like some sort of substitute Pledge of

Allegiance or morning prayer.

> Office of Equity staff members humbly work in unceded Ohlone territory, here
> in De Anza College also known as the South Bay and or Silicon Valley.  We live
> among the original caretakers and stewards, The Muwekma Ohlone Tribe of the
> San Francisco Bay Area.  We recognize De Anza College sits on the crux of
> Raymatush and Tamien tribal lands,. For more information about the Muwekma,
> please visit their website.
>
> Our vision is to continue a beautiful legacy of ancestral wisdom and cultural
> keeping in relationship to the land with much love and respect.  We understand
> we do this work with the contradiction that we are in occupied territory after the
> massacre and genocide of Ohlone peoples, with western definitions of political
> borders.  Thus with more conviction, we are determined to educate ourselves, as
> staff, faculty, students and as community members to decolonize and
> deconstruct, to make room for ongoing unschooling, to learn cultural humility,
> giving life to social justice inside and outside the classroom centering first nation
> peoples and through relationship building.  In this way, we stay true to an
> indigenous way of life, to the core value that involves "To All My Relations."

See https://www.De Anza.edu/equityoffice/land.html.[5] Defendants instructed the faculty and

students that they must treat De Anza's "land acknowledgment" like the National Anthem.

94.    Dr. Lee objected, among other things, that De Anza's "land acknowledgment" is not even

accurate; it gets the names of indigenous tribal nations wrong and does not do anything to

incorporate practices recommended by the Tribal Nations Resource Center. Like fetishizing "x"

in misspelling foreign words, it demonstrates contempt for the actual minority populations it

claims to recognize.

---

[5] According to Cal State East Bay's, C.E. Smith Museum of Anthropology, Virtual Museum, De
Anza's "land acknowledgement" does not even appear to be historically/anthropologically
accurate.  See https://www.csueastbay.edu/museum/virtual-museum/native-california/5-
gen/tribal.html.

95. Dr. Lee objected a faculty member addressing issues of public concern that directly had an impact on pedagogy at the community college.

96. She also did so in order to highlight the hostile environment created by such racist mischaracterizations, which Defendants made part of the practices, policies, and procedures of the community college.

97. The "land acknowledgment" is yet another empty "anti-racism" gesture, and another indulgence of 19th-century race-based stereotypes, so beloved by Defendants, in this case the stereotype of the "noble savage."

98. On information and belief, no one in the District, certainly no Defendant, has ever "decolonized" the Bay Area by sacrificing their personal property or time to do actual work for Native Americans. On information and belief, neither the District nor De Anza has ever returned any property to supposed tribes who were "original caretakers and stewards" of the land which De Anza claims to have appropriated.

99. The only significant action taken by Defendants has been to discriminate against and retaliate against Dr. Lee for her failure to conform to the constant drumbeat of race-based stereotypes, for her insistence on speaking her mind on matters of public concern as a faculty member, for her opposition to unlawful and immoral discrimination, and, to paraphrase the 19th-century racist tropes which Defendants repeatedly resurrect, for her persistence in being an "uppity" Black woman.

### E.  Dr. Tabia Lee Addresses De Anza's Discriminatory "Anti-Racism" before the Academic Senate.

100.     As part of Dr. Lee's job responsibilities, she provided regular "report outs" to the De Anza Academic Senate, before whom she was required to address issues that substantially affect pedagogy at the community college and throughout the District.

101.    The Academic Senate holds meetings that are open to the public.  It is not strictly an internal administrative body.  The Academic Senate is an organization whose primary function is to make recommendations on academic pedagogy and professional matters in the District, and its operations substantially affect pedagogy that has an impact on the California taxpayers and students that De Anza purports to serve.

102.    As part of their role in judging Dr. Lee's promotion and tenure process, Defendants Cortez, Holmes, and Ray evaluated her performance based on her reports to the Academic Senate.

103.    The Academic Senate includes all faculty members.

104.    On November 29, 2021, Dr. Lee presented in front of the Academic Senate.

105.    Dr. Lee included the full the newsletter text of her presentation in her quarterly newsletter circulated by email on December 1, 2021 to all faculty and members of the De Anza community. The newsletters that Dr. Lee circulated addressed serious suggestions about the future course of important issues of teaching and pedagogy at the community college.  She did not address personal complaints or the minutiae of particular individuals' roles amongst the faculty.

106.    Dr. Lee's message directly addressed pedagogy at De Anza, stating that "my approach is one of unity and inclusion of diverse faculty ideological perspectives and learning together that intentionally centers respect for academic freedom and diversity of thought."  Dr. Lee's message addressed broad proposals to change the direction and focus of De Anza, in particular due to its hostility to academic freedom in proportion to its fascination with race-based dogma.

107.    Without identifying a colleague by name, Dr. Lee related the following:

> Recently, one of my colleagues that I highly respect met with me. They explained that they work from an anti-racist perspective and that because I have recently been advocating for our state and local senates to remain ideologically neutral and/or at least more ideologically inclusive in their resolutions and

SECOND AMENDED COMPLAINT AND JURY DEMAND 23| CASE NUMBER: 5:23-CV-03418-SVK

actions, they felt that they could no longer advance the anti-racist work that they had worked hard to advance over many years. I was floored to hear this. I explained to my colleague that I was baffled by how they somehow connected two completely unrelated items to a reflection on their personal pedagogical practice and I also shared with them that this extrapolation concerns me deeply. How could my personal advocacy for faculty academic freedom lead them to such a conclusion? Thankfully, we worked together to unpacked it.

108.    Dr. Lee also expressed to the Academic Senate:

> **We have to all work together in this world and in our learning community for greater equity. In the scope of this Academic Senate body, for me working together means protecting Academic Freedom for all even those we may be in disagreement with.** When we inevitably disagree with one another, please understand for real that I am not the great Black hope for Equity, so please don't try to cast me as such. **I am just a person, a colleague, a human being. If you have not yet had a conversation with me, have a conversation with me. If you have not yet come to my workshops, come to them. At my workshops by design you may hear or be exposed to diverse ideas, controversies, different thoughts, and utterances. It's fun!**

(Emphasis in original.)

109.    Dr. Lee's plea for academic freedom and diversity of opinion in the classroom and beyond quickly caused an uproar, especially among faculty and administrators, including Defendants Cortez, Espinosa-Pieb, and Holmes, who consider themselves "social justice" activists.

110.    Defendant Lydia Hearn, from August 2021 the Interim Associate Vice President of Instruction at De Anza, is a teacher of English who has taught at De Anza for over 20 years. She is an active member of De Anza's segregated Asian Pacific American Staff Association "affinity group."

111.    Defendant Hearn confronted Dr. Lee and informed her that by opposing the prevailing campus ideology on things like land acknowledgements, misspelling Spanish words, questioning the actions of any Black Lives Matter leader, and failing to kowtow to District orthodoxy, Dr. Lee was "burning bridges" and did not have "allies" on campus.

112.     Defendant Hearn also took umbrage at Dr. Lee's statements referencing the "seemingly difficult conversation between her and a colleague, who was mentioned anonymously, regarding the varying approaches to their work," suggesting that doing so without that person's permission was disrespectful or unprofessional.

113.     It is important to note that, as even Defendant Hearn acknowledged, Dr. Lee kept this person's identity anonymous. Dr. Lee even referred to this person as "one of my colleagues that I highly respect…" However, Dr. Lee had dared to question her colleague's "anti-racist" views, which in Defendant Hearn's view was highly inflammatory and "disrespectful."

114.     Defendant Hearn expressed this criticism of Dr. Lee, indicating a clear hostility to her protected speech and dissent from the orthodox ideology of the District. Dr. Lee's advocacy for academic freedom and viewpoint diversity in De Anza's pedagogy was a substantial factor motivating Defendant Hearn's and all defendants' hostile treatment of Dr. Lee.

115.     The clear message was that Dr. Lee should shut up or be fired. Dr. Lee did not and would not shut up, and she was fired.

**F.     De Anza Continues to Ignore Dr. Lee's Complaints of a Hostile Environment**

116.     Because of Dr. Lee's expression of unpopular views concerning De Anza's race-based pedagogy, Defendants actively retaliated against Dr. Lee.

117.     Because of Dr. Lee's opposition to De Anza's race-based discrimination, Dr. Lee was singled out and targeted by the De Anza community, with full knowledge and approval of all Defendants.

118.     For example, Political Science Instructor Nicky Yuen accused Dr. Lee of "getting in the way of anti-racist progress." Black women who think freely are not acceptable at De Anza, and

Yuen told Dr. Lee point blank that he would not allow anyone to get "in the way" of "the progress we have made in anti-racism" at De Anza.

119.     By contrast, accusing a Black woman of "White speak" and "Whitesplaining," as Mr. Santa Ana did, has no consequences and does not "get in the way" of "anti-racist progress" at De Anza.

120.     Dr. Lee repeatedly complained to Dean Cortez of this hostile environment, but Dean Cortez did nothing, with the full knowledge and approval of Defendants Hearn, Ray, Holmes, and Espinosa-Pieb.

121.     Dr. Lee repeatedly notified De Anza officials of the hostile Environment to which she was being subjected.  Upon information and belief, Defendants Espinosa-Pieb and Holmes knew of these complaints, were responsible for supervising Dean Cortez, and fully approved of the hostile environment and Dean Cortez's complete lack of any initiative to do anything about it.

122.     Dr. Lee complained to Defendant Cortez about the racialized insults hurled at her by Tony Santa Ana in November 2021, but neither Defendant Cortez nor anyone else ever took any action in response to her complaint.

123.     On March 31, 2022, Lee submitted a formal grievance complaint detailing allegations of discrimination and harassment in violation of the District's policies.  She expressly complained about the October 4, 2021 meeting with Garcia, Caparas, and Santa Ana in which they openly expressed their intent to discriminate against California citizens on the basis of race and sexual orientation.

124.     The March 31, 2022 grievance complaint also complained of Santa Ana's accusations that, when Dr. Lee refused to conform to racist stereotypes, she was engaging in "White speak" and "White-splaining."

125.    Dr. Lee also complained that she had met personally with Defendant Cortez to discuss concerns about anti-Semitism on campus and hostility towards Jewish students. As part of her efforts to address pedagogy on campus, starting in spring of 2021 and continuing over the course of the next year, Dr. Lee had advocated for Jewish-American Heritage Month and International Holocaust Remembrance Day.

126.    However, in the spring of 2021, Jewish students presenting a resolution to De Anza's so-called "Equity Action Council" promoting these ideas were shouted down with chants of "from the river to the sea, Palestine will be free." Although purportedly championing "diversity, equity, and inclusion," Jewish students who wish to promote their own heritage are not part of the "diversity" and "inclusion" that Defendants wish to support. Dean Cortez, with the knowledge and approval of Defendants Holmes and Espinosa-Pieb, once again did nothing when Dr. Lee brought this to her attention.

| Moved (insertion) [14] |
|---|

127.    In 2022, Dr. Lee learned that professor of philosophy and Director of the Vasconcellos Institute for Democracy in Action, Cynthia Kaufman (former mentor to "artivist" Tony Santa Ana and a member of Dr. Lee's Phase I Tenure Review Committee), participated in and organized the suppression of Jewish events on campus. Dr. Lee again reported this racist discrimination and intolerance to Dean Cortez.

| Moved (insertion) [15] |
|---|

| Moved (insertion) [16] |
|---|

128.    No action was taken. Nothing was done and neither Dean Cortez nor De Anza investigated these issues.

129.    Defendants openly opposed the celebration of Jewish culture, remembrance, or heritage on campus. Defendants encouraged the shouting down and cancelation of Jewish culture, remembrance, and heritage on campus.

| Deleted: 27 |
|---|
| Formatted: Centered |

130.     Dr. Lee's teaching on campus included a Jewish Inclusion Summit, held on February 24, 2022, which addressed "Defining Anti-Semitism" with Alyza D. Lewin of the Lewis D. Brandeis Center for Human Rights under Law and Rabbi Dr. Mark gold Felder, Esquire from the National Jewish Advocacy Center.

131.     Upon the announcement of this initiative, Cynthia Kaufman, who sat in judgment on Dr. Lee's promotion and tenure committee, responded with a single word: "barf."

132.     Antiracism at De Anza that dares to address racism against the Jews makes Defendants "barf."

133.     Dean Cortez, Ms. Garcia, and Mr. Santa Ana obstructed Dr. Lee from presenting workshops on the topic of Jewish culture, remembrance, and heritage. Dean Cortez refused to promote or list events Dr. Lee organized on Jewish Inclusion and Anti-Semitism Community Education on the De Anza college calendar.

134.     Ms. Garcia attended a workshop where Dr. Lee urged students to report instances of anti-Semitism on campus to the Office of Equity and Engagement, whereupon Ms. Garcia demanded, with Dean Cortez's support, that Dr. Lee remove Ms. Garcia's name, picture, title, and any reference from all slides at all workshops Dr. Lee facilitated going forward.

135.     Dr. Lee also raised with Dean Cortez her concern that De Anza should recognize International Holocaust Remembrance Day and Jewish-American Heritage Month in the same way that it recognized heritage months or similar celebrations for other historically oppressed ethnic communities. Dean Cortez advised her that this was not a priority or important.

136.     On January 26, 2022, Hillel of Silicon Valley and the National Jewish Advocacy Center reported concerns to the De Anza's Equity Action Council "for the Jewish student community at

SECOND AMENDED COMPLAINT AND JURY DEMAND 28| CASE NUMBER: 5:23-CV-03418-SVK

De Anza College."  They suggested that the De Anza take action to address longstanding concerns of anti-Semitism.

137.      In response during the meeting, in the chat, Ms. Garcia posted resources about anti-Zionist and anti-Israel organizations to antagonize the representatives of Hillel and the National Jewish Advocacy Center.

138.      Dr. Lee objected later that this was disrespectful. Dean Cortez, Ms. Garcia, and Mr. Santa Ana then ganged up on Dr. Lee. Ms. Garcia told Dr. Lee, in Dean Cortez's presence, that there was no reason to lift up "White oppressors" when De Anza's focus was on "decentering Whiteness" (whatever that means).

139.      This too was included in the March 31, 2022 grievance, expressly complaining of the hostile environment of race-based stereotypes at De Anza.

140.      On November 7, 2022, Dr. Lee filed an additional grievance complaint again alleging a hostile environment.

141.      Dr. Lee complained that she was retaliated against for filing her previous grievance and was being prevented from performing the job she was hired to do as punishment because she did not align with the "political perspectives" by Defendants Ray, Cortez, and Salamander Breiter (who attacked Dr. Lee in vulgar screeds for her viewpoints in her Phase II tenure review).

142.      Dr. Lee specifically complained about the hostile environment created in her office by Adriana Garcia, among others.  Dr. Lee also specifically complained about De Anza's retaliation against her for speaking out against land acknowledgments.  And Dr. Lee complained about the censorship of her teaching and workshops which were rooted in her expressed criticism of Defendants' "third wave antiracism."

SECOND AMENDED COMPLAINT AND JURY DEMAND 29| CASE NUMBER: 5:23-CV-03418-SVK

143.     One of these publications and teaching materials was a module titled "The Race and Racial Equity," that Dr. Lee eventually published in the Journal of Free Black Thought on January 17, 2023, but which she circulated to the faculty and administration at De Anza as early as October 2022.

144.     On November 16, 2022, Dr. Lee complained that race-based stereotypes were polluting her workplace.  She said, in an email to Defendant Espinosa-Pieb and copied to Defendants Cortez and Ray, "I hope to receive the supports that I need to conduct my job duties in an environment that is free from the terrible and exhausting constraints of hostility, harassment, bullying, and discrimination."

145.     Dr. Lee told Defendant Espinosa-Pieb that "an ongoing pattern of harassment and bullying from my Dean and her aligned colleagues based on perceptions about my race, ideological perspective, political orientation, and medical condition," and expressed that "these behaviors have been relentless since my hire date."

146.     Dr. Lee's complaints detailed how doing her job was becoming impossible because of the hostile environment promoted and supported at all levels of leadership, including by all Defendants, at De Anza.

147.     Despite repeated notification of this racially discriminatory behavior, Defendants Cortez, Holmes, Ray, Hearn, and Espinosa-Pieb refused to take any action.

148.     On information and belief, De Anza took no action on any of Dr. Lee's complaints.

149.     For example, when Defendant Cortez received Dr. Lee's complaints about racist comments made toward her, Defendant Cortez agreed to Dr. Lee's request that she would attend team meetings in the future to ensure that a tone of civility was maintained and have Tony Santa Ana apologize for these racist comments. This never happened.

SECOND AMENDED COMPLAINT AND JURY DEMAND 30| CASE NUMBER: 5:23-CV-03418-SVK

| Deleted: historically |
| Deleted: used to discredit free-thinking Black intellectuals who express the "wrong" opinions. |
| Deleted: <#>Dean Cortez, at all relevant times, by this notification others, had direct knowledge that Dr. Lee was discriminated against on the basis of race, in particular for not being the proper kind of Black person, and not expressing proper "Black" thoughts.¶ |
| Deleted: Dean Cortez |
| Deleted: <#>Dean Cortez refused to protect Dr. Lee from attacks on her academic freedom.¶ Worse |
| Deleted: complaint |
| Deleted: Santa Ana's |
| Deleted: This never happened. Dr. Lee also requested that team communication and team building training support be provided to herself and the office staff. |
| Formatted: Font: Times New Roman |
| Deleted: 30 |
| Formatted: Centered |

150.     Dean Cortez instead took over Dr. Lee's meetings herself, in which she added to the

cacophony of criticism of Dr. Lee when Dr. Lee expressed unorthodox ideas.  This was another

manifestation of Defendants' institutional practices, policies, and processes for enforcing its

race-based dogma, which Dr. Lee continued to publicly criticize as "third wave antiracism" and

"woke ideological perspectives."

   **G.  De Anza's Retaliation Against Dr. Lee**

151.     Dean Cortez and others engaged in an active campaign to retaliate against Dr. Lee and

prevent her from doing the job she was hired to do. Dr. Lee was targeted because she expressed

the wrong opinions for a Black woman in the eyes of the Defendants.

152.     On information and belief, Vice President of Instruction, Defendant Christina Espinosa-

Pieb, and Dean Cortez ordered the removal of Dr. Lee's events from De Anza's College Events

Calendar.

153.     In October 2022, De Anza suddenly imposed on Dr. Lee the requirement that her

presentations and pedagogical materials were not "official activities of the Office of Equity and

Engagement" and "will not be promoted through official college channels."  This severely

compromised Dr. Lee's ability to perform her job as Faculty Director for the Office of Equity,

Social Justice, and Multicultural Education Director and Department Chair of the Office of

Equity, Social Justice, and Multicultural Education Director.

154.     In November 2022, Defendant Thomas Ray, then Interim Associate Vice President of

Instruction, directed the De Anza communications team to remove all promotion of Dr. Lee's fall

workshops from the College Events Calendar.

155.     Defendants Cortez, Ray, and Espinosa-Pieb delisted Dr. Lee's workshops and events as

available for professional growth activity hours ("PGA" hours), which are continuing

SECOND AMENDED COMPLAINT AND JURY DEMAND 31 CASE NUMBER: 5:23-CV-
03418-SVK

professional education credits for faculty. Prior to Dean Cortez's recommendation of termination

to Dr. Lee's Phase I Tenure Review Committee, Dr. Lee's presentations were listed as approved

for PGA hours.

156.    Although De Anza continued to hold out Dr. Lee as the Department Chair of the Office

of Equity, Social Justice, and Multicultural Education,[6] Dean Cortez instructed Dr. Lee that she

was not, in fact, department chair in an email dated February 9, 2023. Dean Cortez thus

prevented Dr. Lee from holding meetings with faculty "on Academic Senate topics related to

curriculum updates and revisions, new curriculum, student learning outcomes assessments,

instructional program review and other instructional and/or faculty matters."

157.    While Dr. Lee was held out as Faculty Director for the Office of Equity, Social Justice,

and Multicultural Education, Dean Cortez and Thomas Ray reprimanded Dr. Lee for calling

team meetings for Dr. Lee's office, effectively silencing her. Defendants Cortez and Ray

directed Administrative Assistant and acting Program Coordinator Garcia not to attend meetings

or work with Dr. Lee on office matters and to ignore Dr. Lee's email communications.

158.    Dean Cortez instituted never-before-heard-of procedures for approving Dr. Lee's

workshops. On information and belief, the procedures imposed on Dr. Lee were not applied to

other faculty or program directors at De Anza.

159.    Before Dean Cortez began to advocate for Dr. Lee's termination, Dr. Lee was not

required to gain such "approval" and her events were held on campus without this obstruction.

160.    Administrative assistant and self-proclaimed "social justice" advocate Adriana Garcia

repeatedly locked the Office of Equity, Social Justice, and Multicultural Education webpage to

prevent Dr. Lee from publishing content on topics of public concern, especially messages openly

---

[6] See https://www.De Anza.edu/gov/academicsenate/department-chairs.html.

dissenting from campus orthodoxy. Nominally, Ms. Garcia worked under and for Dr. Lee, but

Defendants permitted and approved Ms. Garcia's censorship of Dr. Lee in Dr. Lee's own office.

161.     These measures were not merely administrative reshuffling.  They were the equivalent of

placing Dr. Lee in a virtual rubber room or lightless basement office, where performing her job

was now intentionally impossible.

162.     In the spring of 2022, De Anza proposed and eventually implemented a policy of giving

some minority faculty, whom De Anza segregated into "affinity groups," special voting rights in

the Academic Senate.

163.     But Dr. Lee had the habit, tragically misguided in the eyes of her state employer, of

taking her job description literally. Her faculty position called for her to "facilitate inclusive

processes that empower **all constituent groups** to be part of institutional transformation" and to

work with shared governance groups, including the Academic Senate, to perform these duties.

164.     Whenever Dr. Lee attempted to perform these duties in a non-discriminatory manner,

however, Dean Cortez attacked her and attacked any who refused to abandon Dr. Lee and her

principles of universal civil and human rights.

165.     Dr. Lee spoke out on this issue to the Academic Senate.  Dr. Lee suggested to the

Academic Senate that if the District, as an arm of the state, was going to sponsor segregated

organizations by race and was going to incorporate members of segregated groups into

privileged governance structures, then it should offer such "resources" to white faculty, staff, and

students as well as numerous other racial and ethnic groups that are not presently reflected in the

segregated "affinity groups" of De Anza.

166.     De Anza rejected the suggestion that members of different racial groups be treated

equally. De Anza and the District prefer to grant privileges, including privileged voting rights, to

SECOND AMENDED COMPLAINT AND JURY DEMAND 33 CASE NUMBER: 5:23-CV-
03418-SVK

faculty members and students on the basis of race and national origin and deny voting rights to others based on skin color.

167.    This once again institutionalized De Anza's mania for race-based and gender-based dogma in its policies, practices and processes throughout the community college system, further polluting Dr. Lee's workplace with race-based stereotypes.

168.    De Anza rejected all recommendations from the Jewish advocacy groups. Dean Cortez also informed Dr. Lee that the Office of Equity and Engagement would not update the District's webpages to condemn anti-Semitism because it was not important.

169.    Ms. Garcia, who edits the office's website, opined that statements on the website condemning anti-Asian hate and supporting Black Lives Matter were good enough.

170.    Dean Cortez, Ms. Garcia, and others excluded Dr. Lee from the Equity Action Council going forward, even as her job description stated that she was to serve as "Faculty Lead" for the Equity Action Council.

171.    At around this time (December 6, 2022), the Chancellor of the District Judy Miner welcomed the incoming President of Foothill, Dr. Christina Whalen, with a letter. Chancellor Miner announced that Dr. Whalen "provided oversight to redesign the curriculum development process to . . . work toward decentering whiteness as the standard guiding policy and practice." This announced the District's official policy to target one group, in this case White people, on the basis of race.

**H.  The Retaliation Escalates: Dr. Lee Faces a June 13, 2022 "Struggle Session" before the Board Defendants**

172.    On June 13, 2022, the District dedicated a Board of Trustees meeting to condemning Dr. Lee by name because she voiced what De Anza and the Defendants considered the wrong kinds of opinions and thoughts.

173.     De Anza College Academic Senate President Cheryl Balm led the condemnation of Dr. Lee.

174.     Faculty members Erick Aragon, Maristella Tapia, Jorge Morales, Noemi Teppang, Andrea Santa Cruz, and Linda Conroy claimed to speak on behalf of the following race-based (that is, segregated) "affinity groups": De Anza Latinx [sic.] Association ("DALA") and De Anza Asian Pacific American Staff Association ("APASA").  They submitted written statements and came forward to speak about their "harm," "harassment," or other subjective feelings that they claimed had been hurt because they disagreed with Dr. Lee's protected speech.

175.     In particular, they condemned Dr. Lee for criticizing De Anza policies that she found racist; they condemned Dr. Lee for advocating the removal of "third wave anti-racism" signifiers from De Anza's official statements; they condemned Dr. Lee for criticizing De Anza's race-based, segregated "affinity groups"; they condemned Dr. Lee for criticizing the Black Lives Matter organization, they condemned Dr. Lee for not using what they characterized as "gender neutral" foreign language words like "Latinx" and "Filipinx"; and they condemned Dr. Lee for hosting an event on March 2, 2022, titled "Protecting Freedom of Expression on Campus."  They condemned Dr. Lee for supporting Jewish heritage events and recognizing the prevalence of anti-Semitism.

176.     On information and belief, none of the faculty members who expressly condemned Dr. Lee by name wherever worn or evaluated negatively for using Dr. Lee's name in their vicious diatribes before the Board.

177.     The speakers repeatedly call for Dr. Lee to be fired because of her protected speech.

178.     The Board and these official organizations of De Anza created and condoned a hostile environment for Dr. Lee based on their perceptions about her race and the opinions she

---

**Deleted:** <#>As Dean Cortez and Hearn made clear in November 2022, it is somehow a fireable offense for Dr. Lee to refer, even anonymously, to a "respected colleague" for their intolerance of free expression. Yet at the Foothill-De Anza Board of Trustees Board meeting of June 13, 2022, it was permissible to hold a struggle session to attack Dr. Lee, *expressly by name*. ¶

**Deleted:** ,

**Deleted:** ,

**Deleted:** ,"

**Deleted:** (but actually misspelled)

**Deleted:** ,"

**Deleted:** attacking Dr. Lee's free expression of ideas. Yet these

**Deleted:** 35

**Formatted:** Centered

expressed. These would-be "social justice" activists condemned Dr. Lee because, they claimed, she supposedly created a "hostile environment" *for them* by encouraging critical thinking and expression of improper opinions.

179.     Many of these criticisms found their way into Dr. Lee's promotion and tenure review evaluations, which were eventually endorsed by all Defendants.

180.     In sum, before De Anza and the District decided to recommend her termination, Dr. Lee had publicly expressed the following dissenting viewpoints addressing substantive pedagogical changes at the community college but which are not permitted at De Anza:

- Support for Israel and Jewish Heritage Month and opposition to anti-Semitism.
- Opposition to the public shout-down (the "heckler's veto") of Jewish events.
- Opposition to stripping the gender declension from Spanish words like "Latino."
- Promotion of free speech on campus.
- Promotion of academic freedom on campus.
- Questioning granting voting rights based on racial preference to some students and student groups while suppressing the vote of other racial groups.
- Objection to De Anza's purely performative and historically dubious "land acknowledgment."
- Permitting students to question a leader from the Black Lives Matter organization.
- Criticizing racial segregation, euphemistically called "affinity groups" and "safe spaces."
- Criticizing racial stereotypes of Black Americans and others as somehow incapable of objectivity, mastery of the written word, individualism, progress, and other attributes De Anza disparages as "white supremacy" and "colonialization."

SECOND AMENDED COMPLAINT AND JURY DEMAND 36 CASE NUMBER: 5:23-CV-03418-SVK

- Criticizing De Anza's orthodoxy of "anti-racism" as the only way to approach diversity, equity, and inclusion.

**I.   De Anza Terminates Dr. Lee In Retaliation for Her Protected Speech and Activity And in Retaliation for Her Complaints about De Anza's Race-Based Hostile Environment**

181.    The District's employment probation, tenure review, and promotion policy is set forth in the District Tenure Review Handbook 2019-2022: A Guide for Faculty and Administrators ("Handbook").

182.    Under Article 6A, the District sets forth its process for evaluating faculty who are hired to a probationary period pending promotion to tenured faculty. This policy applied to Dr. Lee.

183.    During the probationary period, there is a "rigorous process of evaluation during which a review of the candidate's performance is conducted and a recommendation is made to the Board of Trustees, which makes the final decision on whether to grant tenure to the candidate."

184.    Tenure review, in its entirety, is a four-year process divided into three phases.

185.    Phase I takes place in the fall and winter quarter of the first year of employment.

186.    Phase II follows in the spring quarter of the first year. It then continues in the fall and winter quarters of the second year of employment.

187.    Phase III begins in the spring quarter of the second year and ends in the winter quarter of the fourth year.

188.    Each of these years from Phase I through Phase III is considered a "Probationary Year."

189.    The President of De Anza appoints a Tenure Review Coordinator, with concurrence of the Faculty Association (union) and the De Anza Academic Senate. The Chair coordinates all tenure review activities.

190.    De Anza convenes a "Core Committee" to evaluate the probationary faculty member. The Core Committee is composed of the Division Dean (in this case Defendant Dean Cortez)

and to tenured faculty member from within the division, at least one of whom, if possible, "shall be from the same department as the probationary faculty employee."

191.    In Phases I and II, the appropriate Vice President or his or her delegate and a third tenured faculty member from the at-large faculty outside the division join the Core Committee. These five members comprise the Tenure Review Committee.

192.    The two tenured faculty members in the Core Committee must be nominated by the appropriate division faculty and confirmed by the De Anza Academic Senate.

193.    The at-large faculty member who joins the Tenure Review Committee in Phase I and II is appointed by the Academic Senate.

194.    The Chair of the tenure review committee is elected by the Core Committee.

1) *Phase I of Dr. Lee's Tenure Review*

195.    Dr. Lee's Phase I Tenure Review Committee was composed of the following De Anza employees:

Julie Wilson served as Chairperson and Core Committee member. Wilson teaches English and Language Arts at De Anza and, ironically, holds herself out as addressing "anti-Blackness embedded in our society." She received tenure at De Anza in 2020 but has never earned a Ph.D.

Cynthia Kaufman served as part of the Core Committee. Kaufman was also the former mentor and teacher of "artivist" Tony Santa Ana and had responded with the single word, "barf," to Dr. Lee's teaching initiatives on anti-Semitism. Kaufman holds herself out as a "lifelong social change activist" (whatever that means) and serves as Director of the De Anza Vasconcellos Institute for Democracy in Action—where she projects messages vilifying people on the basis of race, namely that "White supremacy remains a core part of every aspect of our society."

Doli Bambhania served as at-large member of the Tenure Review Committee in at-large capacity. Bambhania is a mathematics instructor and member of the segregated APASA "affinity group."

Dean Alicia Cortez served as Division Dean and Dean of Equity and Engagement, and she is also member of the segregated "affinity group" DALA.

SECOND AMENDED COMPLAINT AND JURY DEMAND 38| CASE NUMBER: 5:23-CV-03418-SVK

Lydia Hearn is a member of the segregated "affinity group" APASA, served as Interim Associate Vice President of Instruction, and she returned to the faculty after predicting that Dr. Lee would be unanimously recommended for termination in Phase I. Lydia Hearn has been referenced above and proved especially hostile to Dr. Lee's ideas and public expression.

Thomas Ray followed Hearn as Interim Associate Vice President of Instruction and Dean of Language Arts, and he took over when Lydia Hearn stepped down on or around January 31, 2022 – just days after the Phase I delivered (as predetermined) a unanimous vote against Dr. Lee.

> **Deleted:** predicted

Veronica Acevedo Avila served briefly as a member of the Tenure Review Committee at the end of Phase I, replacing at-large member Doli Bambhania. She is Instructor of English and reading and member of the DALA "affinity group."

196.    Student and faculty evaluations of Dr. Lee's workshops and classes were positive and were submitted to the Tenure Review Committee. But these were not considered.

197.    During Phase I, *at least three* probationary evaluations must be performed, one by each of the Core Committee members. Additional probationary evaluations may be called for by the Tenure Review Committee, at the discretion of the committee.

198.    Dr. Lee received three positive evaluations and two negative evaluations.

199.    The Chair of the Tenure Review Committee, Wilson, informed Dr. Lee on October 24, 2021 and on other occasions, that Dean Cortez acted as de facto Chair of the committee and that Wilson, as a professor only recently granted tenure, had little authority. She told Dr. Lee that she acted more like Dean Cortez's secretary, and had to make sure paperwork was filed on time.

200.    Thus, Defendant Cortez directly intervened to get Dr. Lee fired.

201.    Each of the two negative evaluations in Phase I criticized Dr. Lee's protected academic speech, in direct violation of the First Amendment, De Anza's academic freedom policy, and its rules of faculty ethics.

> **Deleted:** impermissible viewpoints

> **Deleted:** 39
>
> **Formatted:** Centered

202.     The Handbook provides that academic freedom and free speech are protected at De Anza

by policy and not just by the inherent protections granted by the United States and California

Constitution:

### ACADEMIC FREEDOM

Academic freedom encompasses the freedom to study, teach and express ideas and viewpoints, including unpopular and controversial ones, without censorship, political restraint or retribution. Academic freedom allows for the free exchange of ideas in the conscientious pursuit of truth. This freedom exists in all service areas, including but not limited to teaching, librarianship, counseling, coordinating and all faculty-student interactions. Academic Freedom is the bedrock principle of all institutions of learning and must be extended to all faculty regardless of their status as full-time, part-time, or probationary.

Faculty members have the principal right and responsibility to determine the content, pedagogy, methods of instruction, the selection, planning and presentation of course materials, and the fair and equitable methods of assessment in their assignment in accordance with the approved curriculum and course outline and the educational mission of the District, and in accordance with state laws and regulations. These rights and responsibilities include, but are not limited to, the faculty member's choice of textbooks and other course materials, assignments and assessment methods, teaching practices, grading and evaluation of student work, and teaching methods and practices.

Special vigilance must be paid to the protection of the Academic Freedom Rights of probationary faculty undergoing the tenure process. While the tenure process is, at its core, an evaluative process, the evaluation of probationary faculty must never be used as a pretense for abridging or restricting the Academic Freedom rights of a tenure candidate. All members of a probationary faculty member's tenure review committee should bear in mind that differences between their own teaching methods and practices and beliefs and those of the tenure candidate should never be the basis for their evaluation of a probationary faculty member. These differences are protected by the tenure candidate's Academic Freedom. The evaluation of a probationary faculty member should be based solely on those criteria described in the negotiated faculty evaluation instruments and those listed in the advertised job description under which the tenure candidate was hired.

203.     The Handbook also sets forth standards for faculty ethics, including, Section 3, which

imposes the obligation on De Anza and District personnel, including all Defendants, to respect

the freedom of inquiry and to refrain from harassing their colleagues:

SECOND AMENDED COMPLAINT AND JURY DEMAND 40 CASE NUMBER: 5:23-CV-03418-SVK

**Deleted:** 40

**Formatted:** Centered

As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debt and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution.

204.    Ms. Kaufman submitted the first negative evaluation of Phase I on November 4, 2021.

205.    Ms. Kaufman's criticism turned on Dr. Lee's insistence on expressing dissenting thoughts and ideas. Ms. Kaufman criticized Dr. Lee for "criticiz[ing] [Black Lives Matter founder Alicia] Garza publicly," — by criticizing Ms. Garza's willingness to engage openly with students who had prepared questions about her book.

206.    Ms. Kaufman also criticized Dr. Lee for having "too many concepts and ideas," two of which were "quite controversial," because it is apparently impermissible for an educated Black woman to have so many impermissible thoughts at De Anza.

207.    In particular, Ms. Kaufman expressed that Dr. Lee, in her teaching and scholarship, had impermissibly criticized the prevailing orthodoxy of De Anza as a "third wave anti-racist lens." To Ms. Kaufman, this "raised some concerns" that "anyone who considered themselves anti-racist would have felt unfairly criticized by this analysis." Dr. Lee's mandate to "facilitat[e] an institution-wide transformation that realizes and promotes our commitment to equity, social justice, and multicultural education for students, classified professionals, faculty and administrators" did not include the right to criticize so-called "anti-racism."

208.    Ms. Kaufman's criticism expressly targeted Dr. Lee's viewpoints, expressed over the course of her employment with Defendants, concerning land acknowledgments, Black Lives Matter, race-based segregation and safe spaces, anti-Semitism, opposition to "Latinx" and other

SECOND AMENDED COMPLAINT AND JURY DEMAND 41 | CASE NUMBER: 5:23-CV-03418-SVK

---

**Deleted:** <#>There were only two areas for evaluation that Kaufman did not give Dr. Lee top marks: "Communicates information clearly, concisely, and effectively" and "Accepts criticism."¶

**Deleted:** <#>." She

**Deleted:** ."

**Deleted:** she felt that

**Deleted:** and the District

**Deleted:** ," borrowing from the Columbia linguist Professor John McWhorter, which

**Deleted:** for" Kaufman. Kaufman worried

**Deleted:** <#>In the virtual workshop that Kaufman evaluated, Dr. Lee had also proposed to take a poll to see how much of De Anza's "equity" work fell into each of three "anti-racist" categories that Dr. Lee analyzed in the presentation. Kaufman found this effort to collect even a modicum of objective data especially troubling. "That poll was hard for me to take when I felt that my position had been mischaracterized." Kaufman imagined that being surveyed about controversial views at De Anza was "uncomfortable to many in ways that were not conducive to intellectual growth and dialogue."¶ Kaufman was also quite upset that Dr. Lee disagreed with the intentional misspelling of foreign words such as "Latinx" and "Filipinx," as well as Dr. Lee's characterization of these misspellings as "linguistic imperialism." At De Anza, it is laudable to force faculty and students to take seminars on "White supremacy" as "colonialization." Yet it is forbidden to criticize the bastardization of foreign languages spoken by historically marginalized groups as "linguistic imperialism."

**Deleted:** 41

**Formatted:** Centered

intentional misspellings of foreign languages, and her advocacy for academic freedom and free speech.

209.    Ms. Kaufman insisted Dr. Lee's critique of De Anza's orthodoxy "seemed counterproductive" because it confronted De Anza students "with something quite challenging . . ." At De Anza, students may not be challenged, according to Ms. Kaufman.  Ms. Kaufman aimed this criticism directly at Dr. Lee's teaching and content in the classroom.

210.    Defendant Lydia Hearn submitted the second negative evaluation in the Phase I process on January 14, 2022.

211.    Ms. Hearn graded Dr. Lee down to "satisfactory but needs improvement in specific areas" in the following four categories:

- Demonstrate cooperation and sensitivity and working with colleagues and staff;
- Develops instructional and institutional resources;
- Provides leadership and coordinates programs effectively; and
- Communicate information clearly, concisely, and effectively.

212.    However, these were pretextual to criticize Dr. Lee's protected speech and attack her academic freedom because Dr. Lee had dissented from the prevailing De Anza orthodoxy.

213.    Tenure review at De Anza, by express policy of the District, may not be an ideological litmus test. Yet Ms. Hearn's review of Dr. Lee's performance explicitly criticized Dr. Lee for voicing controversial viewpoints.

214.    Ms. Hearn specifically criticized Dr. Lee for her speech on November 29, 2021 before the Academic Senate Executive Committee (quoted in part above). In that speech, Dr. Lee had defended academic freedom, promoted viewpoint diversity, and free speech. This was somehow controversial at De Anza and in the District.

SECOND AMENDED COMPLAINT AND JURY DEMAND 42 CASE NUMBER: 5:23-CV-03418-SVK

215.     Ms. Hearn went on to work tirelessly for Dr. Lee's termination, invoking ever-more

pretextual reasons for retaliating against Dr. Lee on the basis of her protected speech and also on

the basis of race—because Dr. Lee is not, as Mr. Santa Ana had indicated, the "right kind" of

Black person.

216.     The District's Handbook requires the findings and recommendations of the Phase I tenure

review process to be reviewed and committed to writing for presentation to the probationary

faculty member, in this case to Dr. Lee.

217.     That meeting took place on November 19, 2021. Yet nothing was presented to Dr. Lee in

writing. Instead, the Tenure Review Committee, led de facto by Dean Cortez, informed Dr. Lee

that they wanted to "see more of her" in the winter quarter. The Tenure Review Committee did

not specify any specific areas in which Dr. Lee needed to improve, nor did they describe specific

recommendations for improvement.

218.     To summarize – of the twenty-eight scores assigned to Dr. Lee by her evaluators, Dr. Lee

received a score of "Unsatisfactory" in only one. Furthermore, Dr. Lee received the highest

possible rating for twenty-two of the twenty-eight scores.

219.     Nevertheless, on January 18, 2022, Interim Associate Vice President of Instruction,

Defendant Lydia Hearn, one of the two "evaluators" who had criticized Dr. Lee for her protected

speech and open advocacy of academic freedom, told Dr. Lee that the Tenure Review Committee

would be unanimously recommending her for termination.

220.     And true enough, on January 25, 2022, Phase I concluded with a unanimous

recommendation that Dr. Lee should be terminated, in particular due to her dissent from De

Anza's race-based orthodoxy.

SECOND AMENDED COMPLAINT AND JURY DEMAND 43| CASE NUMBER: 5:23-CV-
03418-SVK

221.    Ordinarily, this would have led to Dr. Lee being separated from the college. However,

then-President Lloyd Holmes overrode the Tenure Review Committee's retaliation against Dr.

Lee, and she continued into Phase II. Although Defendant Holmes was supposed to notify Dr.

Lee directly, he never did so. Instead, Dr. Lee found out she would be allowed to advance to

Phase II only by consulting an on-line list of faculty candidates who were being advanced to

Phase II.

    *2) Phase II of Dr. Lee's Tenure Review Continues to Single Her Out for Protected Speech*

222.    On May 3, 2022, Dr. Lee was given her Phase II tenure review schedule. The members of

the Phase II Tenure Review Committee were:

        Richard Lopez, mathematics Instructor and Chairperson;

        Luis Limcolioc, English full-time faculty; and self-proclaimed social justice advocate;

        Salamander Breiter, the co-Chair of the Humanities at De Anza.  Breiter earned a bachelor's degree from Fairhaven College in 1995 followed by a Masters degree from Western Washington University in 2000. Like so many of the faculty called upon to pass judgment on Dr. Lee, however, he conceives of his job less as an instructor of an academic discipline, but more as a social activist. He designs his classes "to build commitment to civic and moral responsibility for diverse, equitable, healthy and sustainable communities," expecting students "to recognize themselves as members of larger social fabrics and to develop the abilities and motivation to take informed action for change."

223.    In addition, Defendant Cortez continued to exert influence over the process, as did

Defendant Ray, both of whom remained on the Tenure Review Committee for Phase II.

224.    In Phase II of the tenure and promotion process, each member of the Tenure Review

Committee must perform at least one additional probationary evaluation.

225.    Mr. Breiter submitted an evaluation of Dr. Lee on November 7, 2022, as had Ms. Hearn

and Ms. Kaufman (fellow self-proclaimed "social justice" advocates) in Phase I.  Mr. Breiter

again found fault with Dr. Lee's November 29, 2021 speech to the Academic Senate which

SECOND AMENDED COMPLAINT AND JURY DEMAND 44  CASE NUMBER: 5:23-CV-03418-SVK

defended academic freedom, viewpoint diversity, and free speech. Mr. Breiter declared Dr. Lee's mild language as "combative and edgy to me" — a pretext for his condemnation of the content of Dr. Lee's speech.

226.     This is ironic because Mr. Breiter used the most abusive profanity in a one-on-one meeting with Dr. Lee, saying things like: "I just don't understand how all this shit happened"; "I may be doing this differently than others but fuck that; I have to be myself"; and "I don't give a damn..." as he condemned Dr. Lee.

227.     He also objected in the spring of 2022 two Dr. Lee's criticism of De Anza's intentional abuse of the Spanish-language by misspelling foreign words like "Latino" or "Filipino" with an "x." Mr. Breiter found that Dr. Lee "continued to push a particular perspective and sense of 'right' action beyond comfortable discourse."

228.     Again, the criticism of Dr. Lee's protected speech and expressions of orthodox viewpoints was express: Mr. Breiter said the quiet part out loud and "sens[ed]" that Dr. Lee's "adherence to particular perspectives created some resistance and conflict during [her] first year at De Anza College."

229.     Mr. Breiter referred to Dr. Lee's dissent from De Anza's semi-religious sacralization of land acknowledgments, Black Lives Matter, its race-based segregation and safe spaces, the prevalence of anti-Semitism, her opposition to "Latinx" and other misspellings, and her advocacy of academic freedom and free speech.

230.     The Phase II Tenure Review Committee opted not to conduct any observations of Dr. Lee's teaching and faculty events in the Winter Quarter of 2023, despite Dr. Lee's best efforts to provide the committee with dates for observation of her work.

231.     On February 7, 2023 the "reconstituted" Phase II committee met with Dr. Lee. The Tenure Review Committee concluded Phase II and issued a report, once again unanimously recommending Dr. Lee for termination after expressly criticizing her outspoken views on pedagogy and teaching within the District on issues such as land acknowledgments, anti-Semitism, academic freedom, viewpoint diversity, segregate affinity groups and "safe spaces," Black Lives Matter, and bastardizations like "Latinx."

232.     But for Dr. Lee's exercise of her right to free expression in her teaching, in her opposition to "third wave antiracism" including but not limited to her publication in Free Black Thought, and in her advocacy for substantive pedagogical changes at the De Anza, Defendants would not have fired Dr. Lee.  Both her protected speech and her protected activity in grieving the hostile environment in the District and at De Anza were substantial and motivating factors in Defendants' conduct.

233.     The report issued by the committee made clear that Dr. Lee would be terminated because of her protected speech. The report condemned her, ironically, for having "one . . . particular perspective" and creating "polarizing conversations that interfere with supporting the college mission and equity goals."

234.     De Anza was, in fact, censoring Dr. Lee's speech, about which Dr. Lee complained to the Office of Communication, De Anza senior leadership, and District senior leadership. De Anza retaliated against Dr. Lee for submitting complaints about her censorship. The report referred to this as another reason to fire her.

235.     Phase II concluded with a notice of termination issued March 15, 2023.

236.   Dr. Tabia Lee's last day of work was June 30, 2023.

SECOND AMENDED COMPLAINT AND JURY DEMAND 46 CASE NUMBER: 5:23-CV-03418-SVK

**COUNT 1:**

**VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

**— RETALIATION —**

**(AGAINST THE BOARD DEFENDANTS, LAMBERT, AND ESPINOSA-PIEB IN THEIR OFFICIAL CAPACITIES AND AGAINST DEFENDANTS CORTEZ, HEARN, HOLMES, RAY, AND ESPINOSA-PIEB IN THEIR INDIVIDUAL CAPACITIES)**

237.    All the foregoing allegations are incorporated by reference into this Count as if fully restated here.

238.    Each Defendant sued in their official capacity has the authority to grant all injunctive relief requested in this civil action.

239.    Each Defendant sued in their individual capacity had clear notice that their suppression and retaliation against Dr. Lee for speaking on matters of pedagogy, scholarship, and public concern was a First Amendment violation, not least through *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).

240.    Plaintiff engaged in constitutionally protected speech, including but not limited to the following, and was subjected to severe retaliation as a result:

    a.   Reports to the public sessions of the Academic Senate.

    b.   Emails and newsletters to all De Anza faculty and administrators.

    c.   Criticism of Defendants' practice and policy of intentionally misspelling foreign words like "Latino."

    d.   Opposition to illegally segregated "affinity groups" and "safe spaces."

    e.   Criticism of Defendants' "land acknowledgment."

    f.   Criticism of Black Lives Matter and leading students in posing benign questions to its founder Ms. Garza.

---

Deleted: COUNTS¶

Deleted: THE FIRST AMENDMENT AS APPLIED TO THE STATES

Deleted: FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Deleted: USC

Deleted:
(ALL INDIVIDUAL

Deleted: AND INDIVIDUAL CAPACITIES

Deleted: TRUSTEE

Deleted: OFFICIAL

Deleted: <#>The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." ¶
The First Amendment is made affective against the states by the Fourteenth Amendment and breach of the Fourteenth Amendment is actionable under 42 USC § 1983, which states in relevant part:¶
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law suit in equity, or other proper proceeding for redress. . . .¶
All Individual Defendants and Trustee Defendants acted as state actors under color of state law. All Individual Defendants and Trustee Defendants violated Dr. Lee's rights to free expression, either directly through censorship of her viewpoints or by retaliating against Dr. Lee for the exercise of her free expression.¶

Deleted: <#>Dean Alicia Cortez violated Dr. Lee's right to free expression in her individual and

Deleted: <#>Defendant Thomas Ray violated Dr. Lee's right to free expression in his individual and official capacity.¶
Defendant Lydia Hearn violated Dr. Lee's right to free expression in his individual and official capacity.¶
Defendant President Lloyd Holmes violated Dr. Lee's right to free expression in his individual and official capacity.¶

Deleted: 47

Formatted: Centered

g.   Opposition to prevalent anti-Semitism on the District campuses and advocacy of Jewish heritage events.

h.   Criticism of "third-wave antiracism," including but not limited to her publication on this topic in the Journal of Free Black Thought.

241.      All writings and speech on these subject matters by Dr. Lee were related to pedagogy, scholarship, and/or matters of public concern.

242.      Defendant Cortez took multiple retaliatory actions against Dr. Lee for her protected academic speech. These actions gradually stripped Dr. Lee of her ability to do her job until finally, with Defendant Cortez's help, Dr. Lee was terminated.  Among other things, Defendant Cortez ordered the removal of Dr. Lee's events from the college calendar; de-listed Dr. Lee's events and workshops from eligibility for professional development credits; declared that Dr. Lee was no longer department chair when she was still listed as such on the website; directed others not to work with Dr. Lee; instituted new and onerous procedures for the approval of Dr. Lee's workshops; excluded Dr. Lee from participation in the Equity Action Council; and ultimately, participated in the decision to terminate Dr. Lee in retaliation for her protected speech.

243.      Defendant Ray took multiple retaliatory actions against Dr. Lee for her protected academic speech.

244.      Defendant Ray's actions gradually stripped Dr. Lee of her ability to do her job until finally, with Defendant Ray's direct help, Dr. Lee was terminated. Among other things, Defendant Ray: directed the De Anza communications team to remove all promotion of Dr. Lee's workshops from the College Events Calendar; de-listed Dr. Lee's events and workshops

Deleted: 48

Formatted: Centered

from eligibility for professional development credits; directed others not to work with Dr. Lee; and ultimately, participated in the decision to terminate Dr. Lee.

245.    Defendant Hearn took multiple retaliatory actions against Dr. Lee for her protected academic speech.

246.    Defendant Hearn's actions gradually stripped Dr. Lee of her ability to do her job until finally, with Defendant Hearn's help, Dr. Lee was terminated. Among other things, Defendant Hearn: submitted a retaliatory evaluation as part of Dr. Lee's tenure review process, explicitly citing Dr. Lee's expression of controversial viewpoints as the reason for the negative evaluation, and ultimately, participated in the decision to terminate Dr. Lee.

247.    Defendant Holmes retaliated against Dr. Lee for her protected academic speech by participating in her termination with full knowledge that her termination was in retaliation for her protected academic speech. Among other things, Defendant Holmes: refused to act on and even condoned the behaviors complained about in Dr. Lee's grievances submitted through the formal channels of the District, and presided over her termination through a pretextual tenure and promotion review process in which she was expressly condemned for her viewpoints.

248.    Defendant Espinosa-Pieb took multiple retaliatory actions against Dr. Lee for her protected academic speech. These actions gradually stripped Dr. Lee of her ability to do her job until Dr. Lee was terminated. Specifically, Defendant Espinosa-Pieb directed the De Anza communications team to remove all promotion of Dr. Lee's workshops from the College Events Calendar, and de-listed Dr. Lee's events and workshops from eligibility for professional development credits.

Deleted: 49

Formatted: Centered

249.     Dr. Lee has been harmed by, among other things, the termination of her faculty position,

the loss of future income, and she is entitled to recover all direct and indirect damages allowable

at law.

250.     Dr. Lee is also entitled to reinstatement to her faculty position. Upon information and

belief, the President, the Chancellor, and the Trustee Defendants have the authority to overturn

the decision to terminate Dr. Lee from De Anza College and provide the requested injunctive

relief.

**COUNT 2:**

**VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AND
FOURTEENTH AMENDMENTS (42 U.S.C. § 1983)**

**— CENSORSHIP —**

**(AGAINST THE BOARD DEFENDANTS, LAMBERT, AND ESPINOSA-PIEB IN
THEIR OFFICIAL CAPACITIES AND AGAINST DEFENDANTS CORTEZ, HEARN,
HOLMES, RAY, AND ESPINOSA-PIEB IN THEIR INDIVIDUAL CAPACITIES)**

251.     All foregoing allegations are incorporated by reference into this Count as if fully restated

here.

252.     As part of her scholarship and teaching, Dr. Lee developed and published workshop

materials titled "The Race and Racial Equity What's It to You?"  These materials were published

in the Journal of Free Black Thought.

253.     As part of her teaching duties and public speaking on issues of future pedagogical

initiatives at the District and De Anza, Dr. Lee sought to present these materials at De Anza,

including but not limited to in October 2022.

254.     To prevent these materials from being taught and heard by students, Defendants directed

the De Anza communications team to remove all promotion of Dr. Lee's workshops from the

SECOND AMENDED COMPLAINT AND JURY DEMAND 50 | CASE NUMBER: 5:23-CV-
03418-SVK

| Deleted: COUNT |
| Deleted: TITLE VI |
| Deleted: CIVIL RIGHTS ACT OF 1964, |
| Deleted: 2000D, ET SEQ.<br>(DE ANZA COLLEGE AND |
| Deleted: DISTRICT |
| Deleted: 50 |
| Formatted: Centered |

College Events Calendar, and de-listed Dr. Lee's events and workshops from eligibility for professional development credits.

255.      Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

256.      Dr. Lee is also entitled to reinstatement to her faculty position. Upon information and belief, the President, the Chancellor, and the Trustee Defendants have the authority to overturn the decision to terminate Dr. Lee from De Anza College and provide the requested injunctive relief.

257.      Dr. Lee also published in the Journal of Free Black Thought during her tenure and promotion review process the article Race Ideology in Practice (February 28, 2023).  This expressed Dr. Lee's criticism of "third-wave antiracism," among other things.

258.      Dr. Lee had taught on this issue as part of her faculty duties and her criticism of third-wave antiracism was expressed repeatedly as part of her expressions on matter of public concern at De. Anza

259.      Expressly to prevent the spread of such impermissible thoughts among the student body and faculty of De Anza, even before the publication became available, Dr. Lee was fired, her teaching canceled.

260.      These measures were not merely administrative reshuffling.  They were the equivalent of placing Dr. Lee in a virtual rubber room or lightless basement office, where performing her job was now intentionally impossible.

261.      Dr. Lee's protected speech was a substantial motivating factor in imposing adverse employment actions, including but not limited to her termination.  But for Dr. Lee's expression

> **Deleted:** 51
>
> **Formatted:** Centered

of protected speech on matters of public concern, Defendants would not have imposed adverse employment consequences on Dr. Lee.

262.    Dr. Lee has been harmed by, among other things, the termination of her faculty position, the loss of future income, and she is entitled to recover all direct and indirect damages allowable at law.

263.    Dr. Lee is also entitled to reinstatement to her faculty position and is entitled to all back pay, front pay, and interest.

264.    All Defendants named in their official capacities have the authority to grant the injunctive relief requested in this civil action.

### COUNT 3:

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §42 U.S.C. §2000-E ET SEQ. (DE ANZA COLLEGE AND THE DISTRICT)**

### -- HOSTILE ENVIRONMENT --

265.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

266.    At all relevant times the District and De Anza were Dr. Lee's employers.

267.    Throughout her employment, Dr. Lee was subjected to a workplace permeated with racial stereotypes and insults. Even when and if she was not personally the target of these racial stereotypes that demeaned Black Americans, they polluted the workplace.

268.    Defendants, acting within the scope of their employment and as employees of the District and De Anza, repeatedly informed Dr. Lee that she was not the "right kind of Black person."

269.    This conduct would be severe and pervasive racial harassment in any context because Defendants continually peddled — and tried to force Dr. Lee to peddle — racial

SECOND AMENDED COMPLAINT AND JURY DEMAND 52 | CASE NUMBER: 5:23-CV-03418-SVK

stereotypes depicting Black Americans as incapable of objectivity, efficiency, individualism, progress, and other traits and stereotypes adopted wholesale from 19th-century ideologues of racial supremacy.  Such stereotypes are and should be abhorrent to all Americans committed to civil rights and equality.

270.    While purporting to praise Black Americans for these stereotypes, these stereotypes are demeaning and degrading to the true capabilities and true aspirations of Black Americans.

271.    Defendants established so-called "affinity groups," a euphemism for segregated institutions bestowed with special voting rights and privileges, as well as so-called "safe spaces" which were segregated by race.

272.    Segregation is and should be abhorrent to all Americans committed to the proud tradition of civil rights, and in any context, not least in an academic context supposedly dedicated to free thought, teaching, and learning, institutionalized segregation as practiced by Defendants was severe and pervasive and offensive enough to create a hostile environment.

273.    When Dr. Lee proposed additional "affinity groups" for other racial groups such as Jews, white people, etc., she was treated with utmost hostility.  In one instance, her proposal to celebrate Jewish heritage and teach about the dangers of anti-Semitism on campus were greeted by a member of her tenure and review committee with the single word: "barf."

274.    Through De Anza's Educational Master Plan and other institutional documents, as well as through established practices and patterns of workplace management, Defendants maintained a practice, policy, and process of systemic discrimination based on race.

275.    Yet when Dr. Lee criticized the race-based pieties promoted by De Anza and the District in the name of "social justice," she was told she was "Whitesplaining"; and Dr. Lee was

directed to "decenter" "Whiteness." Attacking a Black American for "acting white" is no less a racial epithet then labeling a Black American by other racial slurs. A workplace, especially in academic workplace supposedly committed to free thought, teaching, and learning, would never tolerate racial stereotypes in which white people were criticized for "acting black," speaking like a Black person, and rightly so. Special vitriol was reserved for Dr. Lee precisely because she is Black but dissented from De Anza's "antiracist" orthodoxy.

276. The Chancellor of the District has expressly made "decentering Whiteness" the official policy of the District on the basis of race. When Dr. Lee submitted grievances complaining about the hostile environment in her workplace, these were brushed aside and ignored. She had no recourse.

277. Dr. Lee submitted grievances and complained about the District's and De Anza's race-based policies and the hostile environment created by the District and De Anza, including but not limited to Defendants Cortez, Ray, Hearn, Espinosa-Pieb, and Holmes.

278. Not only did Respondents do nothing to remedy racial discrimination, they censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection to the District's and De Anza's race-based discrimination.

279. Plaintiff has exhausted her administrative remedies and submits her right to sue letter from the California Civil Rights Department.

280. Respondents' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

281. Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.

Deleted: (whatever that means)

Deleted: <#>This created a hostile environment which was severe, pervasive, and objectively offensive. The District and De Anza's acts and omissions directly interfered with Dr. Lee's inability to do her job.¶
The District and De Anza have sponsored, organized, and established segregated organs of the state on the basis of race, euphemistically called "affinity groups," and vested them with rights on the basis of race which are denied other groups of students, faculty, and staff on the basis of race, for example, and without limitation, voting rights. ¶
Dr. Lee objected to these segregated organizations created by the District and by De Anza on the basis of race and was likewise criticized and retaliated against for opposing the race-based policies promoted by these recipients of federal funding.¶

Moved down [30]: <#>Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.¶
COUNT

Moved down [31]: <#>All foregoing allegations are incorporated by reference into this Count as if fully restated here.¶

Moved up [29]: <#>All foregoing allegations are incorporated by reference into this Count as if fully restated here.

Deleted: <#>Dean

Deleted: <#>Vice President of Instruction

Deleted: <#>Vice President of Instruction

Deleted: <#>and Vice President of Instruction

Deleted: <#>President Holmes. ¶
Not only did Defendants do nothing to remedy racial discrimination, they censored Dr. Lee, prevented her from doing her job, and terminated Dr. Lee in retaliation for her objection to the District's and De Anza's race-based discrimination.¶
Defendants' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.¶

Deleted: <#>3¶
VIOLATION OF THE CALIFORNIA STATE CONSTITUTION, ART. 1, § 2(A)
(ALL DEFENDANTS)

Deleted: <#>Section 2(a) of the California State Constitution, Declaration of Rights provides that "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."¶
The California Constitution gives every person an affirmative right to free speech. Cal. Const., art. I, § 2(a). And the California Supreme Court has held that the California free speech clause is more definitive and inclusive than the First Amendment to the United States Constitution.¶
For all the reasons set forth in Count 1, which is incorporated here by reference, Defendants acted under color of state law in suppressing, censoring, and retaliating against Dr. Lee for the exercise of her right to free expression. ... [9]

Deleted: <#>¶
At all relevant times, the fundamental, formally established public policy of the State of California as expressed, without limitation, in Government Code section 12940 et seq. was and is that emp ... [10]

Deleted: 54

Formatted: Centered

COUNT 4:

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §42 U.S.C. §2000-E ET SEQ. (DE ANZA COLLEGE AND THE DISTRICT)**

**-- RETALIATION --**

282.     All foregoing allegations are incorporated by reference into this Count as if fully restated here.

283.     At all relevant times the District and De Anza were Dr. Lee's employers.

284.     Dr. Lee submitted multiple grievances objecting to the hostile environment created as part of the policies, practices, and processes of Defendants.

285.     Dr. Lee's grievances went nowhere and were effectively ignored.

286.     Dr. Lee also complained to her supervisors about the racial epithets and racial stereotypes peddled by the Anza and the name of "antiracism" and "social justice."

287.     Dr. Lee also spoke out publicly and criticized "third wave antiracism" for peddling racist stereotypes, not least racial stereotypes of Black Americans as incapable and ineffective citizens fit, it would seem in De Anza's rhetoric, for nothing more than looking picturesque while sitting around in drum circles as some sort of "artivism."

288.     Submitting grievances, complaining to her supervisors, and publicly speaking out against Defendants' racist policies are protected activities.

289.     In retaliation, Defendants imposed measures were not merely administrative reshuffling.  They conditions of work that placed Dr. Lee in a virtual rubber room or lightless basement office, where performing her job was intentionally impossible.

290.     Defendants subjected Dr. Lee to a struggle sessions before the Board in retaliation, among other things, for her opposition to state-sponsored segregation in the District.

SECOND AMENDED COMPLAINT AND JURY DEMAND 55| CASE NUMBER: 5:23-CV-03418-SVK

291.    Eventually, Defendants fired Dr. Lee.

292.    Defendants therefore retaliated against Dr. Lee because of her protected activities under Title VII.

293.    Plaintiff has exhausted her administrative remedies and submits her right to sue letter from the California Civil Rights Department.

294.    Respondents' actions were malicious, wanton, or oppressive acts and demonstrated reckless or callous indifference to the federally protected rights of Dr. Lee.

295.    Dr. Lee has suffered direct and indirect damages in an amount to be determined at trial, including but not limited to lost income.

### COUNT 5:

**WILL CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, CAL. GOV. CODE § 12900 ET SEQ., ("FEHA")
(DISTRICT, DE ANZA, AND DEFENDANTS HOLMES, CORTEZ, ESPINOSA-PIEB, RAY, AND HEARN)**

296.    All foregoing allegations are incorporated by reference into this Count as if fully restated here.

297.    California's Fair Employment and Housing Act (FEHA), California Government Code, § 12900 et seq., prohibits discrimination, harassment, and retaliation on the basis of race by an employer.

298.    California Government Code, § 12965 creates a private right of action to enforce the FEHA.

299.    At all relevant times the District and De Anza were Dr. Lee's employers.

300.    For all the reasons pleaded in Count 3 and 4, which are incorporated here by reference, the Respondent District and De Anza discriminated against and terminated Dr. Lee on the basis of race.

301.    The District and De Anza have acted in a clearly oppressive and malicious

manner in discriminating against Dr. Lee.

302.    Under Cal. Civ. Code § 3294(a), Dr. Lee may recover punitive damages against

her employer for the District" and De Anza's unlawful discrimination.

303.    Plaintiff has exhausted administrative remedies and attaches her right to sue letter

from the California Civil Rights Department.

304.    Therefore, the District and De Anza are liable for violation of FEHA and Dr. Lee

is entitled to direct, indirect, and punitive damages in an amount to be recovered at trial.

### PRAYER FOR RELIEF

Plaintiff prays that this Honorable Court grant the following relief:

i.     Declare Defendants liable for the violation of Dr. Tabia Lee's right to free speech
       under the First Amendment to the United States Constitution as applied to the
       State of California under the Fourteenth Amendment and 42 USC § 1983 and
       under the Constitution of the State of California, Art. 1, § 2(a) ;

ii.    Declare Defendants the District and De Anza in violation of Title VII of the Civil
       Rights Act of 1964, 42 USC 2000d, et seq. and in violation of the California Fair
       Employment and Housing Act (FEHA), Cal. Gov. Code, § 12900 et seq.;

iii.   Order Defendants to reinstate Dr. Lee to her rightful employment;

iv.    Order Defendants to pay Dr. Lee all front and back pay and lost income, including
       pre- and post-judgment interest;

v.     Order Defendants to pay punitive damages under, without limitation, Cal. Civ.
       Code § 3294(a);

| Deleted: VI |
| --- |

| Deleted: <#>Declare Defendants to have wrongfully terminated Dr. Tabia Lee under the California Common Law;¶ |
| --- |

| Deleted: 57 |
| --- |
| Formatted: Centered |

vi. Order Defendants to pay Dr. Lee's reasonable attorneys fees and costs under, without limitation, 42 USC § 1988(b) and California Government Code section 12965(b);

vii. Order such other legal or equitable relief as the Court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Date: May 31, 2024                    Respectfully submitted,

Deleted: September 18, 2023

Michael Thad Allen
*pro hac vice* admission pending
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06357
Tel: (860) 772-4738
mallen@allenharrislaw.com

Neal S. Zaslavsky
CA Bar No. 277543
LAW OFFICE OF NEAL S. ZASLAVSKY, A
PROFESSIONAL CORPORATION
8335 Sunset Boulevard, Suite 101
West Hollywood, CA, 90069
Tel: (323) 389-1881
neal@nszlegal.com

*for Plaintiff*

Deleted: Abby Jane Moscatel¶
Deleted: 276207
Deleted: ABBY MOSCATEL
Deleted: 99 S Almaden Blvd¶
Deleted: 600
Deleted: San Jose
Deleted: 95113
Deleted: 406) 318.7223
Deleted: amoscatel@blacktaillaw.com¶

SECOND AMENDED COMPLAINT AND JURY DEMAND 58| CASE NUMBER: 5:23-CV-03418-SVK

Deleted: 58
Formatted: Centered

| Page 34: [1] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

A.

| Page 34: [2] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

B.

| Page 34: [3] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

C.

| Page 34: [4] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

| Page 34: [5] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

D.

| Page 34: [6] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

| Page 34: [7] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

E.

| Page 34: [8] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

F.

| Page 54: [9] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

| Page 54: [10] Deleted | Michael Allen | 5/31/2024 2:26:00 PM |
|---|---|---|

1.